# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| UNITED STATES OF AMERICA, STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF DELAWARE, DISTRICT OF COLUMBIA, STATE OF FLORIDA, STATE OF GEORGIA, STATE OF HAWAII, STATE OF ILLINOIS, STATE OF INDIANA, STATE OF IOWA, STATE OF LOUISIANA, COMMONWEALTH OF MASSACHUSETTS, STATE OF MICHIGAN, STATE OF MINNESOTA, STATE OF MONTANA, STATE OF NEVADA, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF NORTH CAROLINA, STATE OF OKLAHOMA, STATE OF RHODE ISLAND, STATE OF TENNESSEE, STATE OF TEXAS, STATE OF VERMONT, COMMONWEALTH OF VIRGINIA, STATE OF WASHINGTON, and the policyholders of XYZ Nos. 1-10 Insurance Companies, *ex rel.*, MARK SCHIEBER, <br><br> Plaintiff-Relator, <br><br> v. <br><br> HOLY REDEEMER HEALTHCARE SYSTEM, INC., HOLY REDEEMER HOME CARE INC., HOLY REDEEMER HOSPICE, HEARST CORPORATION, and HOMECARE HOMEBASE, INC., <br><br> Defendants. | Hon. Claire C. Cecchi <br><br> Civil Action No. 19-12675 <br><br><br> **FIRST AMENDED COMPLAINT** <br><br><br> DEMAND FOR JURY TRIAL |

Relator Mark Schieber brings this *qui tam* action in the name of the United States of America (the "United States") and the States of California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Michigan, Minnesota, Montana,

Nevada, New Jersey, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Vermont, Washington, the Commonwealths of Massachusetts and Virginia, and the District of Columbia, (the "States"), and the policyholders of certain presently unknown private insurance companies (captioned as XYZ Nos. 1-10 Insurance Companies), by and through his undersigned attorneys and alleges as follows.

## INTRODUCTION

1.      This is a civil fraud action by *qui tam* Relator Mark Schieber ("Plaintiff-Relator" or "Relator") on behalf of the United States and the States against Defendants Holy Redeemer Healthcare System, Inc.; Holy Redeemer Home Care, Inc.; Homecare Homebase, Inc.; and Hearst Corporation (commonly "Defendants"), for violations of the Federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729, *et seq*., state false claims acts ("State FCAs"), and California and Illinois insurance fraud statutes, as a result of their knowing presentation, or causing presentation, of false claims for payment, and retention of overpayments under the Medicare and Medicaid programs and private insurance in the States of California and Illinois.

2.      The home healthcare industry services over 12 million Americans, with annual revenue of $66 billion across 29,000 home healthcare agencies. The need for home health and hospice care for those aged 85 and older is expected to triple during the next forty years.

3.      Defendants knowingly made and/or caused to be presented false and/or fraudulent claims, records, and/or statements to the United States and the States in connection with the receipt of reimbursements from the Centers for Medicare and Medicaid Services ("CMS"). The claims, records and/or statements were false and/or fraudulent because they contained unnecessary medical services that falsely represented the medical conditions of the Medicare and Medicaid

beneficiaries in Defendants' care. Defendants' false claims, records, and/or statements caused CMS to make millions of dollars of overpayments to Defendants under Medicare Parts A & B.

4.      Defendants carried out their scheme to defraud the United States, and the States, through a system, pattern, and practice of (1) inflating the number of therapy visits; (2) inflating the severity of the patient's condition; and (3) inflating the duration of the therapy visits. By falsely representing the severity of patients' conditions and enhancing the number of medically-necessary visits and the length thereof for home care visits by therapists, Defendants have defrauded the United States and the various States. Therapists conducting home care visits were encouraged to increase the number of home care visits in two ways. First, managers that oversee the therapists instruct therapists that increases in the number of visits increase reimbursement rates. If a therapist did not select increased numbers of visits--even though the patient's medical condition did not warrant it--Holy Redeemer Home Care, Inc. ("Holy Redeemer Home Care") reviewers would increase the number of visits anyway. Second, Homecare Homebase, Inc. ("Homecare Homebase") has developed software used by Holy Redeemer and other home health agencies around the country to document and track home care visits. Hearst is the parent company of Homecare Homebase. The software used in the field by therapists and nurses doing home care visits automatically and repeatedly prompts the therapist to increase visits to the next reimbursement level.

5.      Additionally, with knowledge that the claims were false when submitted, Defendants failed to notify Medicare and the States of the false claims and resulting overpayments, or to return such overpayments. *See* 42 C.F.R. § 422.326.

6.      Plaintiff-Relator's supervisors strongly encouraged and instructed him to inflate the number of medically unnecessary homecare visits required by Patients in furtherance of their

scheme. Concurrent with such practices, Plaintiff-Relator complained to his supervisors, and human resources questioning the legitimacy of their instructions. Defendants ignored Plaintiff-Relator's complaints.

## JURISDICTION AND VENUE

7.      This action arises under the False Claims Act, 31 U.S.C. §§ 3729-3733. The United States District Courts have exclusive jurisdiction over actions brought under the FCA pursuant to 31 U.S.C. § 3732, and otherwise have jurisdiction over federal statutory causes of action under 28 U.S.C. §§ 1331 and 1345. This court also has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

8.      At all times relevant, Defendants conducted regular, substantial business in the United States, including the State of New Jersey. Accordingly, Defendants are properly subject to personal jurisdiction in the State of New Jersey generally, and this court specifically.

9.      Venue is proper in this District under 28 U.S.C. § 1391(b) & (c), and 31 U.S.C. § 3732(a) because Defendants transact business and have committed acts in violation of 31 U.S.C. § 3729 in this District.

## THE PARTIES

### Plaintiff-Relator

10.      Plaintiff-Relator Mark Schieber is a resident of the State of New Jersey. Plaintiff-Relator has been a Licensed Physical Therapist for 32 years. He obtained a Bachelor's Degree in Physical Therapy from the University of Central Arkansas Conway in 1987, and a Master of Business Administration from Fontbonne University in 1996. He was employed on a part-time basis in the Mercer County, NJ office of Holy Redeemer for over 17 years through September 2019.

11.     Relator has direct and independent knowledge of, and is the original source of, the allegations contained in this Complaint. Before filing this Complaint, Relator served the Attorney General of the United States, United States Attorney for the District of New Jersey, and the Attorney General of the State of New Jersey with a disclosure of all material evidence and information in his possession as required by 31 U.S.C. § 3730(b)(2) and N.J.S.A. § 2A:32C-5(d). To the extent any of his allegations have been publicly disclosed as contemplated by 31 U.S.C. 3730 (e)(4)(a), Relator's knowledge is independent of and materially adds to those allegations as pursuant to 31 U.S.C. § 3730 (e)(4)(b)(ii). Relator seeks to recovery for the United States and the States all appropriate damages, civil penalties, interests, costs, and fees arising from Defendants' violations of the FCA, the State FCAs, and the state insurance fraud statutes.

### Holy Redeemer Defendants

12.     Defendant Holy Redeemer Health System, Inc. ("HRHS") is a Pennsylvania corporation. HRHS operates as a community-based integrated health and social service delivery and financing system. Its health care services include maternity care, cardiovascular care, cancer care, lung cancer screening, emergency services, breast care, ambulatory surgery, counseling center, diabetes management, diagnostic scheduling, fitness center, holistic care, nutritional counseling, joint replacement and spine care, pediatric care, rehabilitation, senior behavior, sleep disorders, sports medicine, weight control, and wound care, as well as ear, nose, and throat care services. The company also provides homecare, hospice, support at home, and palliative care services; and also offer personal care, independent living, a short-stay program, and long-term care services.

13.     HRHS was founded in 1924 and is based in Abington, Pennsylvania. It uses the following NPI codes in New Jersey and Pennsylvania: 1851755706, 1376533109, 1487644225,

1750371522, 1255321436, 1033100052, 1447224597, 1972577617, 1700987898, 1841380383, 1174600233, 1750416715, 1619182003, 1700146123, and 1699282772.

14.     HRHS and its affiliates together form an integrated health and social service delivery system (the "System"). The System serves over 5 million people in southeastern Pennsylvania and serves eleven New Jersey counties from Union County south to Cape May County. The System includes a 229 licensed bed medical/surgical community hospital with a 21-bed licensed skilled nursing unit, a physician services company, five home health agencies and four hospice providers, a transitional housing program for women and children, and a real estate holding company. In addition, the System includes a skilled nursing facility with personal care, a retirement community with independent, personal and skilled nursing care, low income rental housing facilities for the elderly, and an active living residential community with an aggregate of approximately 1,100 beds or residential units. HRHS has offices in Burlington, Camden, Cumberland, Gloucester, Mercer, Middlesex, Salem, Somerset, Union, Atlantic, Cape May, and Ocean Counties in New Jersey; and Bucks, Montgomery, and Philadelphia Counties in Pennsylvania. It has locations in Meadowbrook, Huntingdon Valley, Yardley, Bensalem, Philadelphia, Hatboro, and Southampton, Pennsylvania.

15.     Defendant Holy Redeemer Home Care, Inc., is a New Jersey nonprofit corporation. It uses the following NPI code: 1730153479.    In 2017, Holy Redeemer Home Care reported a decrease in Medicare revenue of approximately 7%, compared to the prior year. This was due to a 6% decrease in the Medicare billing volume and a slight decrease in average revenue per episode.

16.     Defendants Holy Redeemer Home Care operates the following providers: Holy Redeemer Home Health and Hospice Services; Holy Redeemer Visiting Nurse Agency, Inc.; Visiting Nurse and Health Services, Inc.; Holy Redeemer Home Care, Inc.; Holy Redeemer

Hospice, Inc.; VNA Home Care of Mercer County, Inc. and Holy Redeemer Support at Home (collectively, "Holy Redeemer"). Holy Redeemer is the largest provider of home health and hospice services in New Jersey, and also provides care in Philadelphia, Bucks, and Montgomery Counties in Pennsylvania.

### *Hearst Defendants*

17.    Defendant Hearst Corporation ("Hearst") is a publicly traded Delaware corporation registered to do business in New Jersey. Hearst, as used herein, includes all subsidiaries and affiliates that do business with the United States. Hearst, itself and through its affiliates and subsidiaries, has offices in various locations throughout the United States and New Jersey.

18.    Healthcare information has become a chief revenue source for Hearst through its leading companies: FDB (First Databank), Zynx Health, MCG (formerly Milliman Care Guidelines), Homecare Homebase (in which Hearst owns an 85 percent stake) and Map of Medicine (internationally). Each year in the United States, care guidance from Hearst Health reaches more than 75 percent of patients discharged from hospitals, 20 million patient home visits, more than 133 million insured individuals, 1.8 billion retail pharmacy prescriptions and 3.25 billion prescription claims.

19.    Defendant Homecare Homebase, Inc., based in Dallas, Texas, is 85 percent owned by Hearst. Homecare Homebase is a leading healthcare software company. Homecare Homebase provides a fully integrated Software-as-a-Service ("SaaS") application for homecare and hospice agencies. Seven (7) of the top ten (10) home health and hospice agencies use its software, making the Homecare Homebase software the nation's #1 homecare software. The software solutions service is used for over 350,000 patients every day, accounting for more than 25% of the annual Medicare revenue for home health and hospice. Homecare Homebase software generates over

$125 million in annual revenues and has over 2,200 installed locations across the nation, with more than 63,000 users.

20.     Homecare Homebase's SaaS solution enables real-time information exchange among field staff using hand-held Android devices, and office staff and physicians using the web-based tool in the back office. Homecare Homebase markets its products as a wireless solution that aids in the operational, clinical, and financial success of homecare and hospice agencies.

21.     Hearst and Homecare Homebase are referred to collectively herein as the "Hearst Defendants."

## MEDICARE HOME HEALTH COVERAGE

22.     Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq.*, establishes the Health Insurance for the Aged and Disabled Program, more popularly known as the Medicare program. Medicare is a federally funded and administered health care program for certain groups of persons, primarily the elderly and the disabled. It is administered by the Secretary of Health and Human Services ("HHS") through the CMS, a department of HHS.

23.     As part of its coverage, Medicare pays for some "home health services" for qualified patients. "Home health services" are defined as "items and services" provided on a "visiting basis" by a home health agency ("HHA") to individuals in their place of residence. 42 U.S.C. § 1395x.

24.     To qualify for home healthcare reimbursement under Medicare, a patient must: (1) be homebound--*i.e.,* the patient is generally confined to her home and can leave only by use of considerable effort; (2) need part-time skilled nursing services or speech therapy, physical therapy, or continuing occupational therapy as determined by a physician; and (3) be under a plan of care

established and periodically reviewed by a physician and administered by a qualified HHA. *See* 42 U.S.C. §§ 1395f; 1395x(o).

25.     When a patient qualifies for home healthcare services, Medicare will pay for: (1) part-time skilled nursing care; (2) physical, occupational, or speech therapy; (3) medical social services (counseling); (4) part-time home health aide services; and (5) medical equipment and supplies. *Id*.

26.     Beneficiaries are not required to make any copayments or contributions for these services. Medicare pays for home healthcare with both Part A and Part B funds.

27.     Medicare pays for home healthcare by way of a Prospective Payment System ("PPS"). *See* 42 U.S.C. § 1395fff; 42 C.F.R. § 484. The PPS for home health care was amended effective December 31, 2019. Prior to December 31, 2019, the PPS was based on a "national prospective 60-day episode payment," a rate based on the average cost of care over a 60-day episode for the patient's diagnostic group. 42 C.F.R. § 484.205. Payments made under the PPS for home healthcare were adjusted to reflect the level of market input prices in the geographical area where services are delivered. *Id*.

28.     A patient is placed in a diagnostic group based upon the patient's comprehensive initial assessment by the HHA. 42 C.F.R. § 484.55. Upon a physician's referral, an HHA is required to make an initial assessment visit and perform a comprehensive assessment encompassing the patient's clinical, functional, and service characteristics. *Id*. The initial assessment is conducted by a registered nurse, unless the referral is only for rehabilitation therapy services (e.g., speech language pathology, physical therapy), in which case the appropriate therapist may conduct the initial evaluation. *Id*.

29.     Accordingly, a registered nurse or therapist must evaluate the patient's eligibility for Medicare home healthcare, including homebound status, and must determine the patient's care needs using the Outcome and Assessment Information Set ("OASIS") instrument. *Id*. OASIS is the clinical data set that currently must be completed by HHAs for patient assessment. *Medicare Claims Processing Manual*, Ch. 10 – Home Health Agency Billing, 10.1.3.

30.     The OASIS diagnostic items describe the patient's observable medical condition (clinical), physical capabilities (functional), and expected therapeutic needs (service). Based upon the OASIS information--and in turn upon the expected cost of caring for the patient--the patient's "case mix assignment" was determined and the patient is assigned to one of eighty (80) Home Health Resource Groups ("HHRGs").

31.     The patient's HHRG assignment and other OASIS information were represented by a Health Insurance Prospective Payment System ("HIPPS") code that is used by Medicare to determine the rate of payment to the HHA for a given patient.

32.     Once the HAA submitted the patient's OASIS information, partial payment was made by CMS based on a presumptive 60-day Treatment Plan under the PPS in effect through December 31, 2019. 42 C.F.R. § 484.205.

33.     The initial base rate may have been subject to upward adjustment, such as where there is a significant change in condition resulting in a new case-mix assignment, or downward adjustment, such as where the number of predicted therapy visits is substantially under the number actually performed. 42 C.F.R. § 484.205. Throughout the patient's episode, the HHA is required to maintain clinical notes documenting the patient's condition, health services performed, and continued need for skilled care. *See* 42 U.S.C. 1395x(o); 42 C.F.R. § 484.84.

34.     Under the PPS in effect through December 31, 2019, a case-mix adjusted payment for a 60-day episode is made using one of 153 Home Care Resource Group ("HCRGs"). The case-mix adjusted payment accounts for differences in patients' expected resource needs. On Medicare claims, these HCRGs are represented as Health Insurance Prospective Payment System ("HIPPS") codes. HIPPS codes allow the HCRG code to be carried more efficiently and include additional information necessary for non-routine supply payments. HIPPS code rates represent the case-mix adjustments on which Medicare payment determinations are made.

35.     The 153 HCRGs were divided into five (5) categories based on the amount of therapy provided and the episode's timing in a sequence of episodes. Four (4) of the categories are based on a combination of whether the episode is an early episode (first or second episode) or late episode (third and subsequent episode), and whether the episode has zero (0) to thirteen (13) therapy visits or fourteen (14) to nineteen (19) visits. A fifth separate category existed for episodes that had twenty (20) or more therapy visits, and it was not affected by episode timing. These separate categories permitted the case-mix system to differentiate between the resource use of different levels of therapy utilization and multiple episodes. The system was calibrated to provide higher payments for later episodes in a sequence of consecutive episodes (third and subsequent episodes), and raised payment as therapy visits increase. Federal Register Volume 83, Number 219 (Tuesday, November 13, 2018).

36.     If, for any reason, the HHA provided four (4) or fewer visits during a patient's home health episode, the episode was subject to a "low utilization payment adjustment" ("LUPA"). 42 C.F.R. § 484.230. Rather than being entitled to the full prospective payment amount, the HHA was entitled to payment on a per-visit basis. *Id*. Accordingly, the HHA may have been obligated to repay amounts already received as a prospective payment.

11

37.    In order to continue receiving covered care for another 60-day episode, the patient had to be re-assessed by the HHA within the final five days of the initial episode and be re-certified by a physician as requiring and qualifying for home healthcare. 42 C.F.R § 484.205.

38.    Medicare will not pay for home health services provided to patients unless those patients are homebound and require intermittent skilled nursing care or skilled therapy. *See* 42 U.S.C. § 1395f.

39.    Effective January 1, 2020, the home healthcare PPS transitioned to a Patient-Driven Groupings Model ("PDGM") using 30-day periods as the payment model. 30-day periods are categorized into 432 case-mix groups for the purposes of adjusting payment in the PDGM. In particular, 30-day periods are placed into different subgroups for each of the following broad categories: admission source, timing of the 30-day period, clinical grouping (musculoskeletal rehabilitation; neuro/stroke rehabilitation; wounds; medication management, teaching, and assessment ("MMTA") - surgical aftercare; MMTA - cardiac and circulatory; MMTA - endocrine; MMTA - gastrointestinal tract and genitourinary system; MMTA - infectious disease, neoplasms, and blood-forming diseases; MMTA - respiratory; MMTA- other; behavioral health; or complex nursing interventions), functional impairment level, and comorbidity adjustment.

40.    Payments for 30-day periods with a low number of visits are not case-mix adjusted, but instead paid on a per-visit basis using the national per-visit rates. Each of the 432 different PDGM payment groups has a threshold that determines if the 30-day period receives this LUPA. For each payment group, the 10th percentile value of visits is used to create a payment group specific LUPA threshold with a minimum threshold of at least two visits for each group. A 30-day period with a total number of visits below the LUPA threshold are paid per-visit rather than being paid the case-mix adjusted 30-day payment rate..

41.     It is a universal requirement of the Medicare program that all services provided must be reasonable and medically necessary. *See* 42 U.S.C. §1395y(a)(l)(A). Medicare providers may not bill the United States for medically unnecessary services or for procedures performed solely to generate profit of the provider. *Id*.

42.     To enroll as a Medicare provider, a provider required to submit a Medicare Enrollment Application for Institutional Providers. *See* CMS Form 855A. In submitting Form 855A, a provider makes the following "Certification Statement" to CMS:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal Anti- Kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

*See* CMS-855A.

43.     Medicare is billed by submitting a claim form (CMS Form 1450) to the fiscal intermediary ("FI") responsible for administering Medicare home health claims on behalf of the United States. *See* CMS Form 1450. Each time a claim is submitted to the United States through the FI, the provider certifies that the claim is true, correct, and complete, and that it complied with all laws and regulations.

## STATE MEDICAID HOME HEALTH COVERAGE

44.     Medicaid is a federal health insurance system that is administered by the states and is available to low-income individuals and families who meet eligibility requirements determined by federal and state law (herein referred to as "Medicaid beneficiaries" or "Medicaid recipients"). Medicaid pays for items and services pursuant to plans developed by the states and approved by the HHS through the CMS. 42 U.S.C. § 1396a(a)-(b). States pay health care providers according

to established rates, and the federal government then pays a statutorily established share of "the total amount expended . . . as medical assistance under the State plan." *See* 42 U.S.C. § 1396b(a)(1).

45.     States electing to participate in the Medicaid program must comply with the requirements imposed by the Social Security Act and regulations promulgated by the Secretary of HHS. States participating in the Medicaid program created various state Medicaid programs, waiver programs, and the like, which reimbursed healthcare practitioners, healthcare facilities, home healthcare agencies, and/or healthcare plans for rendering Medicaid-covered services to Medicaid patients.

46.     In New Jersey, the Department of Human Services ("DHS"), is the State agency responsible for operating the Medicaid program. Within DHS, the Division of Medical Assistance and Health Services administers the Medicaid program. DHS employees work at Medical Assistance Customer Centers ("MACC") throughout the State to assist Medicaid beneficiaries. DHS uses the Medicaid Management Information System ("MMIS"), a computerized payment and information reporting system, to process and pay Medicaid claims, including personal care services claims. The Federal Government's share of costs is known as the Federal medical assistance percentage ("FMAP"). Currently, the FMAP in New Jersey is 50%.

47.     In 1995, New Jersey Medicaid began moving Medicaid beneficiaries from a traditional fee-for-service health insurance program, in which healthcare providers bill Medicaid directly, into managed care. Under managed care, clients enroll in a health plan which manages their healthcare and offers special services in addition to the benefits to which Medicaid clients are entitled.

48.     Five (5) health plans participate in New Jersey's NJ FamilyCare program, New Jersey's publicly funded health insurance program that includes CHIP, Medicaid and Medicaid expansion populations. They are: Aetna, AMERIGROUP NJ, Horizon NJ Health, UnitedHealthcare Community Plan, and WellCare.

49.     N.J.A.C. § 10:60-2.1 addresses coverage for home health agency services. It provides in relevant part:

(a)     Home health care services covered by the New Jersey Medicaid and NJ FamilyCare fee-for-service programs are limited to those services provided directly by a home health agency approved to participate in the New Jersey Medicaid/NJ FamilyCare program or through arrangement by that agency for other services.

1. Medicaid/NJ FamilyCare reimbursement is available for these services when provided to Medicaid or NJ FamilyCare fee-for-service beneficiaries in their place of residence, such as a private home, residential hotel, residential health care facility, rooming house and boarding home.

*        *        *

(b)     Covered home health care services are those services provided according to medical, nursing and other health care related needs, as documented in the individual plan of care, on the basis of medical necessity and on the goals to be achieved and/or maintained.

*        *        *

(c)     The types of home health agency services covered include professional nursing by a public health nurse, registered professional nurse, or licensed practical nurse; homemaker home health aide services; physical therapy; speech-language pathology services; occupational therapy; medical social services; nutritional services; certain medical supplies; and personal care assistant services, as defined in this section.

*        *        *

5. Special therapies include physical therapy, speech-language pathology services and occupational therapy. Special therapists/pathologists shall review the initial plan of care and any change in the plan of care with the attending physician and the professional nursing staff of the home health agency. The attending physician shall be given an evaluation of the progress of therapies provided as well as the beneficiary's reaction to treatment and any change in the beneficiary's condition. The attending physician shall approve of any changes in the plan of care and delivery of therapy services.

i.      The attending physician shall prescribe in writing the specific methods to be used by the therapist and the frequency of therapy services.

15

"Physical therapy as needed" or a similarly worded blanket order by the attending physician is not acceptable.

ii.    Special therapists shall provide instruction to the home health agency staff, the beneficiary, the family and/or interested persons in follow-up supportive procedures to be carried out between the intermittent services of the therapists to produce the optimal and desired results.

(1) When the agency provides or arranges for physical therapy services, they shall be provided by a licensed physical therapist. The duties of the physical therapist shall include, but not be limited to, the following:

(A)    Evaluating and identifying the beneficiary's physical therapy needs;

(B)    Developing long and short-term goals to meet the individualized needs of the beneficiary and a treatment plan to meet these goals. Physical therapy orders shall be related to the active treatment program designed by the attending physician to assist the beneficiary to his or her maximum level of function which has been lost or reduced by reason of illness or injury;

(C)    Observing and reporting to the attending physician the beneficiary's reaction to treatment, as well as, any changes in the beneficiary's condition;

(D)    Documenting clinical progress notes reflecting restorative procedures needed by the beneficiary, care provided and the beneficiary's response to therapy along with the notification and approval received from the physician; and

(E)    Physical therapy services which may include, but not be limited to, active and passive range of motion exercises, ambulation training, and training for the use of prosthetic and orthotic devices. Physical therapy does not include physical medicine procedures, administered directly by a physician or by a physical therapist which are purely palliative; for example, applications of heat in any form, massage, routine and/or group exercises, assistance in any activity or in the use of simple mechanical devices not requiring the special skill of a qualified physical therapist.

50.    N.J.A.C. § 10:60-2.2 further provides that the requirements for certification for home health services:

(a)    To qualify for payment of home health services by the New Jersey Medicaid/NJ FamilyCare fee-for-service program, the beneficiary's need for services shall be certified in writing to the home health agency by the attending physician/practitioner. The nurse or therapist shall immediately record and sign verbal orders and obtain the physician's/practitioner's counter signature, within 30 days of the date of the order.

16

(b)     Except as provided in (b)1 below, home health services shall not be provided or reimbursed, except when provided in accordance with all of the certification and "face-to-face" encounter provisions of Sections 6407(a) and (d), 3108 and 10605 of the Patient Protection and Affordable Care Act, 111 Pub.L. 148, as amended and supplemented, incorporated herein by reference, 42 U.S.C. § 1395n, incorporated herein by reference, and 42 CFR 424.22(a) and (b), incorporated herein by reference.

*          *          *

2.     The "face-to-face" encounter between an authorized physician/practitioner and a NJ Medicaid/FamilyCare beneficiary for the initial certification for the provision of home care services must occur no more than 90 days prior to the date home care is started or within 30 days of the start of home care, including the date of the encounter.

i.     Recertification of the need for home care services shall be done at least every 60 days and must be signed and dated by the physician/practitioner who reviews the plan of care. A face-to-face encounter is not required for recertification.

3.     An authorized physician/practitioner must provide the home care provider the date, time, and location of the "face-to-face encounter" and his or her signature confirming that the encounter was conducted.

4.     Home care providers are required to maintain proof of a "face-to-face encounter" including the date, time, location, and signature of the authorizing physician/practitioner. Such documentation may be subject to review by the New Jersey Department of Human Services or its authorized agent.

5.     Failure to comply with the "face-to-face encounter" and documentation requirements in (b) and (b)2, 3, and 4 above, may result in the recoupment of Medicaid/NJ FamilyCare payments for home care services.

51.     N.J.A.C. § 10:60-2.3 provides the requirements for the plan of care:

(a)     The plan of care shall be developed by agency personnel in cooperation with the attending physician, and be approved by the attending physician. It shall include, but not be limited to, medical, nursing, and social care information. The plan shall be re-evaluated by the nursing staff at least every 60 days and revised as necessary, appropriate to the beneficiary's condition. The following shall be part of the plan of care:

*          *          *

4.     The number and nature of service visits to be provided by the home health agency.

52.    N.J.A.C. § 10:60-2.5 provides for the basis of payment for home health services:

(a)    Effective for services rendered on or after January 1, 1999, home health agencies shall be reimbursed the lesser of reasonable and customary charges or the service-specific unit rates described in this subsection. The following are the service-specific Statewide unit rates by each service:

| Revenue Code | Description | Base Amount Per Unit |
| --- | --- | --- |
| 420 | Physical Therapy | $ 24.06 |
| 430 | Occupational Therapy | $ 23.81 |
| 440 | Speech Therapy | $ 20.27 |
| 550 | Skilled Nursing | $ 29.14 |
| 560 | Medical Social Services and Dietary/ Nutritional Services | $ 25.90 |
| 570 | Home Health Aide | $ 6.22 |

(b)    Effective January 1, 2000, and thereafter, the reimbursement rates shall be the service-specific Statewide per unit rates found in (a) above, incrementally adjusted each January 1, beginning on January 1, 2000, using Standard and Poor's DRI Home Health Market Basket Index, published in the New Jersey Register as a notice of administrative change, in accordance with N.J.A.C. 1:30-2.7, and posted on the DMAHS' fiscal agent's website https://www.njmmis.com under "Rate and Code Information". Home health agencies shall maintain both unit and visit statistics for all services provided to Medicaid/NJ FamilyCare fee-for-service beneficiaries.

(c)    Effective January 1, 1999, home health agencies shall bill the Medicaid/NJ FamilyCare fiscal agent as follows:

1.    The unit of service shall be a 15 minute interval of a skilled nursing visit, a home health aide visit, a speech therapy visit, a physical therapy visit, an occupational therapy visit, or a medical social service visit, as defined in N.J.A.C. 10:60-1.4(d). A home health agency shall not bill when a Medicaid/NJ FamilyCare fee-for-service beneficiary is not home or cannot be found, and hands-on medical care was not provided;

i.    The service-specific Statewide rate shall be billed for each full 15 minute interval of face-to-face service in which hands-on medical care was provided to a Medicaid/NJ FamilyCare fee-for-service beneficiary;

a.    For instance, one unit of service shall be billed for services provided from the initial minute through 29 minutes. The second unit of service shall be billed for services provided from 30 minutes through 44 minutes. The third unit of service shall be billed for services provided from 45 minutes to 59 minutes and the fourth unit of service shall be billed for services provided from 60 minutes through 74 minutes;

53.    According to DMAHS website referenced in N.J.A.C. § 10:60-2.5(b), the current statewide reimbursement rates are as follows:

| Year | Physical Therapy HH420 | Occupational Therapy HH430 | Speech Therapy HH440 | Skilled Nursing HH550 | Medical Social Services HH560 | Home Health Aide HH570 |
|---|---|---|---|---|---|---|
| 2019 | $41.18 | $40.74 | $34.67 | $49.87 | $44.32 | $10.63 |

54.    According to the DMAHS website, Holy Redeemer's rates are as follows:

| Name and Address | Physical Therapy HH420 | Occupational Therapy HH430 | Speech Therapy HH440 | Skilled Nursing HH550 | Medical Social Services HH560 | Home Health Aide HH570 |
|---|---|---|---|---|---|---|
| HOLY REDEEMER 160 E NINTH AVE | $51.88 | $50.33 | $46.63 | $54.95 | $58.71 | $9.12 |
| HOLY REDEEMER VN & HH CARE 6550 DELILAH ROAD | $66.51 | $61.75 | $71.50 | $54.59 | $54.63 | $10.76 |

## DEFENDANTS' FRAUDULENT SCHEME

55.    Under the home healthcare PPS system in effect through December 31, 2019, the Homecare Homebase software was intentionally designed to inflate reimbursements from Medicare, Medicaid, and private health insurance by causing providers to "upcode" claims made to Medicare and Medicaid and to bill for medically unnecessary services.

56.    In order to inflate revenue from Medicare, Medicaid, and private insurance, Holy Redeemer Defendants instructed Holy Redeemer staff to: (1) inflate the number of home health

visits a patient needed; (2) the severity of the patient's condition, and (3) inflate the duration of those visits without necessity or justification.

57.     Relator's duties at Holy Redeemer included conducting initial evaluations of new patients for Holy Redeemer home health services. As part of that process, Relator traveled to a patient's home and opened a case in OASIS using the Homecare Homebase software on his handheld device. Relator and all Holy Redeemer therapists and nurses that do homecare visits access the Homecare Homebase online system using a tablet provided by Holy Redeemer. Holy Redeemer has been using the Homecare Homebase software for the last eight (8) to nine (9) years.

58.     During the initial evaluation visit under the pre-January 1, 2020 PPS, the nurse or therapist determined: (1) the number of visits required during the 60-day period, (2) the length of those visits, and (3) the severity index for the patient. These determinations were based on a physical examination of the patient. During the initial evaluation visit, the nurse or therapist inputs the number of necessary visits and the severity index into the Homecare Homebase software. The severity index is a measure of the severity of the patient's condition on a scale of 0 to 4, with 4 being the most severe. For the last six (6) to seven (7) years prior to the change in the PPS for home healthcare at beginning of 2020, Holy Redeemer, with the assistance and encouragement of the Homecare Homebase software, "upcoded" all three of these data points, thereby increasing the reimbursement sought for homecare services from both Medicare and Medicaid.

### Holy Redeemer Upcoded the Number of Visits and Bills Medicare and Medicaid for Visits That Are Not Medically Necessary

59.     During monthly staff meetings led by Holy Redeemer manager Tracy DiBease at Holy Redeemer's Mercer County office, Relator and other therapists were consistently encouraged to increase reimbursements by unjustifiably increasing the number of visits a patient required.

60.    When a nurse or therapist input the number of necessary visits into the Homecare Homebase software, the software automatically and repeatedly prompted the provider to select a higher number of necessary visits. If the provider declined to enter a higher number of visits, then the software would again prompt the user to select a higher number of visits a second time when finalizing the entry for submission.

61.    For example, if Relator determined that a patient needed twelve (12) visits, entered the number twelve (12) visits, then the software prompted Relator to instead select fourteen (14) visits. Relator received the following prompt from the Homecare Homebase software:

"There are 12 therapy visits. The next level begins at 14. Are further edits needed?"

62.    The Homecare Homebase software did not include a medical necessity check function.

63.    The Homecare Homebase software is also used by another provider where Relator works and the software gave the same prompt when used at that provider.

64.    Upon information and belief, most nurses and therapists simply accepted the prompt to increase the number of visits.

65.    Similarly, if Relator selected four (4) visits, then the software would prompt Relator to increase his assessment to six (6) visits. As noted above, if a patient needed four (4) visits or less, then a LUPA occurred and the HHA was paid based on a national standardized per visit payment by discipline instead of an episode payment for a 60-day under the PPS. By increasing the number to six (6) visits, Defendants circumvented this downward adjustment.

66.    On numerous occasions, when Relator selected four (4) or less visits, the Homebase Homecare software prompted Relator to select additional visits. The software stated as follows:

"The number of currently plotted billable visits may result in a LUPA status at EOE. Do you want to add additional visits?"

67. The Homecare Homebase software is also used by another provider where Relator works and the software gave the same prompt when used at that provider.

68. Upon information and belief, most nurses and therapists simply accepted the prompt to increase the number of visits.

69. Tellingly, when the PPS for home healthcare changed at the beginning of 2020, the Homecare Homebase software stopped prompting nurses and therapists to increase the number of visits. Upon information and belief, the number of visits performed by nurses and therapists declined for a particular diagnosis after the PPS change to PDGM.

***Holy Redeemer Upcode the Severity Index In Order To Receive Higher Reimbursement Rates***

70. Under the home healthcare PPS system in effect through December 31, 2019, for each homecare visit, a therapist had to select the severity of the patient's condition on a scale of 0 to 4. Homecare Homebase offered the following options to direct them as follows:

0- Asymptomatic, no treatment needed at this time.

1- Symptoms well controlled with current therapy.

2- Symptoms controlled with difficulty, affecting daily functioning; patient needs ongoing monitoring.

3- Symptoms poorly controlled, patient needs frequent adjustments in treatment and dose monitoring.

4- Symptoms poorly controlled, history of rehospitalizations.

71. The severity of a patient's condition was included in the calculation of the reimbursement rate under the HCRG. A higher severity score resulted in Holy Redeemer receiving a higher reimbursement rate. Holy Redeemer managers routinely directed at office-wide meetings attended by physical therapists, speech therapists, and occupational therapists that the therapists *must* select a minimum severity score of 3 when evaluating patients. Tracy DiBease, the current

manager, as well as former managers Gogilavanni Pillai, Kathleen Pierfy, and Cindy Moore each directed therapists at the staff meetings to increase the severity index.

### Holy Redeemer Upcoded the Length of Visits and Bills Medicare and Medicaid for Homecare Time that Are Not Medically Necessary

72.    Therapy is billed in 15-minute increments. During monthly staff meetings, Holy Redeemer manager DiBease directed the therapists doing homecare visits that they *must* bill for at least a 45-minute visit, even if the circumstances do not require it. Relator was told by his managers that in order for Holy Redeemer to make a profit on homecare visits, the visits must be at least 45 minutes.

73.    If a patient does not actually require 45 minutes of therapy, Holy Redeemer instructed therapists that they must come up with unnecessary tasks/procedures to fill the time.

74.    Holy Redeemer generates reports that provide specific names of patients and dates where visit times were under 45 minutes. Relator's manager, Ms. DiBease typically emails the individual therapist and requests them to respond to her email and tell her why the visits were under 45 minutes.

75.    Thus, Defendants are able to bill for at least three (3) units of service at a minimum, regardless if it is medically necessary or not.

### Holy Redeemer Changes Records

76.    Even though Relator declined to change the number of visits on the Homecare Homebase software or selected a lower severity level than 3, Holy Redeemer reviewers changed the number of visits or the severity level, often after the fact, and without the nurses or therapists' knowledge or consent. On several occasions, Relator received notices on his tablet that one of his patient's records had been changed. For example, on February 6, 2019, Jordan Madhu, a Holy Redeemer reviewer, changed the severity level for one of Relator's patients from "2" to "3" and

the number of visits from "5" to "7". Relator declined to accept the edits because, based on his evaluation of the patient, the initial coding was appropriate. Upon information and belief, other Holy Redeemer therapists willingly accept Holy Redeemer reviewer's edits to records.

77. On January 15, 2019, Relator met with his manager Ms. DiBease and a director in Holy Redeemer's human resources department to discuss his concerns about reviewers' changing the professional's assessment. Neither management nor the director ever addressed Relator's concerns.

## RETALIATORY CONDUCT

78. After Relator complained to his manager and human resources in January 2019, Holy Redeemer cut Relator's hours and phased him out from any future work. Prior to his complaints, Relator was assigned approximately 20 visits per week. After his complaints, Relator's assigned visits were phased down to zero visits. Relator's last date of employment at Holy Redeemer was in September 2019.

## FEDERAL FCA CLAIMS

## COUNT ONE

### PRESENTING OR CAUSING TO BE PRESENTED
### FALSE CLAIMS UNDER 31 U.S.C. § 3729(A)(1)(A)
### AGAINST HRHS, HOLY REDEEMER HOME CARE, INC.
### AND THE HEARST DEFENDANTS

79. Relator adopts and incorporates the previous allegations as though fully set forth herein.

80. By and through the fraudulent schemes described herein, Defendants knowingly-- by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information--presented or caused to be presented false or fraudulent claims to the United States for payment or approval, to wit:

a.      Defendants submitted false claims for home healthcare PPS payments that were fraudulently inflated by false OASIS patient assessment data, in violation of 42 U.S.C. § 1395f and 42 U.S.C. § 484.20;

b.      Defendants submitted false claims for home healthcare services that were not medically necessary; and

c.      Defendants submitted false claims for home health services premised upon Defendants' fraudulent certifications of compliance with Medicare regulations as made on CMS Forms 885A and 1450 and elsewhere.

81.     The United States paid the false claims described herein.

82.     Defendants' fraudulent actions, as described *supra*, are part of a widespread, systematic pattern and practice of knowingly submitting or causing to be submitted false claims to the United States.

83.     Defendants' fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to Defendants and others by the United States through Medicare and Medicaid for such false or fraudulent claims, and the United States is entitled to penalties of at least $11,463 and up to $22,927 for each and every violation of 31 U.S.C. § 3729 arising from Defendants' unlawful conduct as described herein.

## COUNT TWO

**MAKING OR USING FALSE STATEMENTS OR RECORDS MATERIAL
TO A FALSE CLAIM UNDER 31 U.S.C. § 3729(A)(1)(B)
AGAINST HRHS, HOLY REDEEMER HOME CARE, INC.
AND THE HEARST DEFENDANTS**

84.     Relator adopts and incorporates the previous allegations as though fully set forth herein.

25

85.     By and through the fraudulent schemes described herein, Defendants knowingly--by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information--made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim or to get a false or fraudulent claim paid or approved by the United States, to wit:

a.     Defendants made and used false OASIS patient assessment data that inaccurately reflected patient conditions;

b.     Defendants provided false information on CMS Form 1450 that reflected fraudulently inflated OASIS scores and were intended to, and did, elicit fraudulently inflated home health PPS payments; and

c.     Defendants presented and provided false information on CMS Form 1450 and 855A and made other false certifications regarding past, present, or future compliance with a prerequisite for payment or reimbursement by the United States through Medicare or Medicaid when, in fact, Defendants intended to--and did--defraud the government by falsely claiming inflated home health PPS payments.

86.     The false records or statements described herein were material to the false claims submitted or caused to be submitted by Defendants to the United States, and were material to the government's decision to pay.

87.     In reliance upon Defendants' false statements and records, the United States paid false claims submitted by Defendants that it would not have paid if not for those false statements and records.

88.     Defendants' fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed by the United States for such false or fraudulent claims.

## COUNT THREE

### FALSE CLAIMS CONSPIRACY UNDER 31 U.S.C. § 3729(A)(1)(C) AGAINST HRHS, HOLY REDEEMER HOME CARE, INC. AND THE HEARST DEFENDANTS

89.     Relator adopts and incorporates the previous allegations as though fully set forth herein.

90.     Defendants' entered into a conspiracy or conspiracies through their employees and offices to defraud the United States by upcoding home health therapy visits.

91.     As a result of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled to at least $11,463 and up to $22,927 for each and every violation of 31 U.S.C. § 3729 arising from Defendants' unlawful conduct as described herein.

## COUNT FOUR

### "REVERSE FALSE CLAIMS" UNDER 31 U.S.C. § 3729(A)(1)(G) AGAINST HRHS, HOLY REDEEMER HOME CARE, INC. AND THE HEARST DEFENDANTS

92.     Relator adopts and incorporates the previous allegations as though fully set forth herein.

93.     By and through the fraudulent schemes described herein, Defendants knowingly-- by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information--made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the United States, or knowingly concealed

or knowingly and improperly avoided an obligation to pay or transmit money or property to the United States, to wit:

    a.  Defendants knew that they had received millions of dollars in home health PPS payments that were fraudulently inflated by false patient OASIS assessment information, yet Defendants took no action to satisfy their obligations to the United States to repay or refund those payments and instead retained the funds received and continued to bill the United States.

    b.  As a result of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled to at least $11,463 and up to $22,927 for each and every violation of 31 U.S.C. § 3729 arising from Defendants' unlawful conduct as described herein.

94.    As a result of Defendants' fraudulent conduct, the United States has suffered damage in the amount of funds that belong to the United States but are improperly retained by Defendants.

## STATE FCA CLAIMS

## COUNT FIVE

**CALIFORNIA FALSE CLAIMS ACT**
**CAL GOVT CODE §12651(A)(1)-(3)**
**AGAINST THE HEARST DEFENDANTS**

95.    Relator adopts and incorporates the previous allegations as though fully set forth herein.

96.    This is a claim for treble damages and penalties under the California False Claims Act.

97.      By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the California State Government for payment or approval.

98.      By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the California State Government to approve and pay such false and fraudulent claims.

99.      The California State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendant' illegal business practices.

100.     By reason of the Defendants' acts, the State of California has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

101.     The State of California is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT SIX

**COLORADO MEDICAID FALSE CLAIMS ACT
C.R.S. § 25.5-4-304 *ET SEQ.*
AGAINST THE HEARST DEFENDANTS**

102.     Relator adopts and incorporates the previous allegations as though fully set forth herein.

103.     This is a claim for treble damages and civil penalties under the Colorado Medicaid False Claims Act C.R.S. § 25.5-4-304 *et seq*.

104.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, to an officer or employee of the State of Colorado, false or fraudulent claims for payment or approval under the "Colorado Medical Assistance Act".

105.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to secure the payment or approval by the State of Colorado false or fraudulent claims under the "Colorado Medical Assistance Act".

106.    By virtue of the acts described above, Defendants conspired with each other and with others to defraud the State of Colorado by securing the allowance or payment of a false or fraudulent claim under the "Colorado Medical Assistance Act".

107.    The Colorado Medicaid Program, unaware of the falsity or fraudulent nature of Defendants' illegal conduct, paid for claims that otherwise would not have been allowed.

108.    By reason of these improper payments, the Colorado Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

109.    The State of Colorado is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**COUNT SEVEN**

**CONNECTICUT MEDICAID FALSE CLAIMS ACT**
**CHAPTER 319V SEC. L 7B-301A *ET SEQ.***
**AGAINST THE HEARST DEFENDANTS**

110.    Relator adopts and incorporates the previous allegations as though fully set forth herein.

111.    This is a claim for treble damages and penalties under the Connecticut Medicaid False Claims Act CHAPTER 319v Sec. 17b-30la *et seq.*

112.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, to an officer or employee of the State of Connecticut, false or fraudulent claims for payment or approval under medical assistance programs administered by the Department of Social Services.

113.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to secure the payment or approval by the State of Connecticut of false or fraudulent claims under medical assistance programs administered by the Department of Social Services.

114.    By virtue of the acts described above, Defendants conspired with each other and with others to defraud the State of Connecticut by securing the allowance or payment of a false or fraudulent claim under medical assistance programs administered by the Department of Social Services.

115.    The Connecticut State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal inducements and/or business practices.

116.    By reason of the Defendants' acts, the State of Connecticut has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

117.    The State of Connecticut is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

31

## COUNT EIGHT

### DELAWARE FALSE CLAIMS AND REPORTING ACT
### 6 DEL C. §1201(A)(1)-(3)
### AGAINST THE HEARST DEFENDANTS

118.    Relator adopts and incorporates the previous allegations as though fully set forth herein.

119.    This is a claim for treble damages and penalties under the Delaware False Claims and Reporting Act.

120.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Delaware State Government for payment or approval.

121.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Delaware State Government to approve and pay such false and fraudulent claims.

122.    The Delaware State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal business practices.

123.    By reason of the Defendants' acts, the State of Delaware has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

124.    The State of Delaware is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT NINE

### DISTRICT OF COLUMBIA FALSE CLAIMS ACT
### D.C. CODE ANN. § 2-308.14 (A)(1)-(3), (7)
### AGAINST THE HEARST DEFENDANTS

125.     Relator adopts and incorporates the previous allegations as though fully set forth herein.

126.     This is a claim for treble damages and penalties under the District of Columbia False Claims Act.

127.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the District of Columbia Government for payment or approval.

128.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the District of Columbia Government to approve and pay such false and fraudulent claims.

129.     The District of Columbia Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal business practices.

130.     By reason of the Defendants' acts, the District of Columbia has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

131.     District of Columbia is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT TEN

### FLORIDA FALSE CLAIMS ACT
### FLA. STAT. ANN. §68.082(2)
### AGAINST THE HEARST DEFENDANTS

132.    Relator adopts and incorporates the previous allegations as though fully set forth herein.

133.    This is a claim for treble damages and penalties under the Florida False Claims Act.

134.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Florida State Government for payment or approval.

135.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Florida State Government to approve and pay such false and fraudulent claims.

136.    The Florida State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal business practices.

137.    By reason of the Defendants' acts, the State of Florida has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

138.    The State of Florida is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## <u>COUNT ELEVEN</u>

**GEORGIA FALSE MEDICAID CLAIMS ACT**
**O.C.G.A. §§ 49-4-168 *ET SEQ.***
**AGAINST THE HEARST DEFENDANTS**

139.    Relator adopts and incorporates the previous allegations as though fully set forth herein.

140.    This is a claim for treble damages and penalties under the Georgia False Medicaid Claims Act.

141.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Georgia State Government for payment or approval.

142.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Georgia State Government to approve and pay such false and fraudulent claims.

143.    The Georgia State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal business practices.

144.    By reason of the Defendants' acts, the State of Georgia has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

145.    The State of Georgia is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT TWELVE

### HAWAII FALSE CLAIMS ACT
### HAW. REV. STAT. §661-21(A)
### AGAINST THE HEARST DEFENDANTS

146.    Relator adopts and incorporates the previous allegations as though fully set forth herein.

147.    This is a claim for treble damages and penalties under the Hawaii False Claims Act.

148.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Hawaii State Government for payment or approval.

149.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Hawaii State Government to approve and pay such false and fraudulent claims.

150.    The Hawaii State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal business practices.

151.    By reason of the Defendants' acts, the State of Hawaii has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

152.    The State of Hawaii is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT THIRTEEN

**ILLINOIS FALSE CLAIMS ACT**
**740 ILL. COMP. STAT. §175/1 *ET SEQ.*, AS AMENDED 2010**
**AGAINST THE HEARST DEFENDANTS**

153.    Relator adopts and incorporates the previous allegations as though fully set forth herein.

154.    This is a claim for treble damages and penalties under the Illinois Whistleblower Reward and Protection Act.

155.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Illinois State Government for payment or approval.

156.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Illinois State Government to approve and pay such false and fraudulent claims.

157.    The Illinois State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal business practices.

158.    By reason of the Defendants' acts, the State of Illinois has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

159.    The State of Illinois is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT FOURTEEN

### INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT
### I.C. 5-11-5.5
### AGAINST THE HEARST DEFENDANTS

160.    Relator adopts and incorporates the previous allegations as though fully set forth herein.

161.    This is a claim for treble damages and penalties under the Indiana False Claims and Whistleblower Protection Act.

162.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Indiana State Government for payment or approval.

163.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Indiana State Government to approve and pay such false and fraudulent claims.

164.    The Indiana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal business practices.

165.    By reason of the Defendants' acts, the State of Indiana has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

166.    The State of Indiana is entitled to the maximum penalty for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT FIFTEEN

### IOWA MEDICAID FALSE CLAIMS ACT
### IOWA CODE ANN. §685.1 *ET SEQ.*
### AGAINST THE HEARST DEFENDANTS

167.    Relator adopts and incorporates the previous allegations as though fully set forth herein.

168.    This is a claim for treble damages and penalties against all Defendants on behalf of the State of Iowa under the Iowa Medicaid False Claims Act, Iowa Code §685.1, *et seq.*

169.    By virtue of the above-described acts, Defendants knowingly made or caused to be made false claims for Defendants drugs to the State of Iowa.

170.    By virtue of the above-described acts, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the State of Iowa to approve and pay such false and fraudulent claims.

171.    The Iowa State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal inducements and/or business practices.

172.    By reason of the Defendants' unlawful acts, the State of Iowa has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

173.    The State of Iowa is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants plus treble damages.

## COUNT SIXTEEN

**LOUISIANA MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW
LA. REV. STAT. §437 ET. SEQ
AGAINST THE HEARST DEFENDANTS**

174.    Relator adopts and incorporates the previous allegations as though fully set forth herein.

175.    This is a claim for treble damages and penalties under the Louisiana Medical Assistance Programs Integrity Law.

176.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Louisiana State Government for payment or approval.

177.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Louisiana State Government to approve and pay such false and fraudulent claims.

178.    The Louisiana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal business practices.

179.    By reason of the Defendants' acts, the State of Louisiana has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

180.    The State of Louisiana is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT SEVENTEEN

### MASSACHUSETTS FALSE CLAIMS LAW
### MASS. GEN. LAWS CH. 12 §5B(1)-(3)
### AGAINST THE HEARST DEFENDANTS

181.    Relator adopts and incorporates the previous allegations as though fully set forth herein.

182.    This is a claim for treble damages and penalties under the Massachusetts False Claims Law.

183.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Massachusetts State Government for payment or approval.

184.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Massachusetts State Government to approve and pay such false and fraudulent claims.

185.    The Massachusetts State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal business practices.

186.    By reason of the Defendants' acts, the Commonwealth of Massachusetts has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

187.    The Commonwealth of Massachusetts is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT EIGHTTEEN

**MICHIGAN MEDICAID FALSE CLAIMS ACT**
**MCL 400.601-400.613**
**AGAINST THE HEARST DEFENDANTS**

188.    Relator adopts and incorporates the previous allegations as though fully set forth herein.

189.    This is a claim for treble damages and penalties under the Michigan Medicaid False Claims Act.

190.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Michigan State Government for payment or approval.

191.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Michigan State Government to approve and pay such false and fraudulent claims.

192.    The Michigan State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal business practices.

193.    By reason of the Defendants' acts, the State of Michigan has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

194.    The State of Michigan is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT NINETEEN

**MINNESOTA FALSE CLAIMS ACT**
**MINN. STAT. § 15C.01 *ET SEQ.***
**AGAINST THE HEARST DEFENDANTS**

195.    Relator adopts and incorporates the previous allegations as though fully set forth herein.

196.    This is a claim for treble damages and penalties under the Minnesota False Claims Act, Minn, Stat, §15C.01 *et seq*.

197.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, to an officer or employee of the State of Minnesota and/or political subdivisions, false or fraudulent claims for payment or approval.

198.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to get false or fraudulent claims paid ort approved by the State of Minnesota and its political subdivisions.

199.    By virtue of the acts described above, Defendants knowingly conspired to either: 1) present a false or fraudulent claim to the State of Minnesota or a political subdivision for payment or approval; or, 2) makes, use, or cause to be made or used a false record or statement to obtain payment or approval of a false or fraudulent claim

200.    The Minnesota State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal inducements and/or business practices.

201.    By reason of the Defendants' acts, the State of Minnesota has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

202.    The State of Minnesota is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT TWENTY

**MONTANA FALSE CLAIMS ACT**
**MONT. CODE ANN. § 17-8-401 *ET SEQ.***
**AGAINST THE HEARST DEFENDANTS**

203.    Relator adopts and incorporates the previous allegations as though fully set forth herein.

204.    This is a claim for treble damages and civil penalties under the Montana False Claims Act, Mont. Code Ann., § 17-8-401 *et seq.*

205.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, to an officer or employee of the State of Montana and/or political subdivisions, false or fraudulent claims for payment or approval.

206.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to get false or fraudulent claims paid ort approved by the State of Montana and/ or its political subdivisions.

207.    The Montana Medicaid Program, unaware of the falsity or fraudulent nature of Defendants' illegal conduct, paid for claims that otherwise would not have been allowed.

208.    By reason of these improper payments, the Montana Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

209.    The State of Montana is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

44

## COUNT TWENTY-ONE

**NEVADA FALSE CLAIMS ACT**
**NEV. REV. STAT. ANN. §357.040(1)(A)-(C)**
**AGAINST THE HEARST DEFENDANTS**

210.    Relator adopts and incorporates the previous allegations as though fully set forth herein.

211.    This is a claim for treble damages and penalties under the Nevada False Claims Act.

212.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Nevada State Government for payment or approval.

213.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Nevada State Government to approve and pay such false and fraudulent claims.

214.    The Nevada State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal business practices.

215.    By reason of the Defendants' acts, the State of Nevada has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

216.    The State of Nevada is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

45

## COUNT TWENTY-TWO

### NEW JERSEY FALSE CLAIMS ACT
### N.J. STAT. § 2A: 32C-1 *ET SEQ.*
### AGAINST HRHS, HOLY REDEEMER HOME CARE, INC.
### AND THE HEARST DEFENDANTS

217.    Relator adopts and incorporates the previous allegations as though fully set forth herein.

218.    As a result of the conduct described in these allegations, Defendants have violated sections (a), (b), (c), and (g) of the N.J.S.A. 2A:32C-3, defining liability under the NJFCA.

219.    The New Jersey False Claims Act, N.J.S.A. 2A:32C-3, provides:

> A person shall be jointly and severally liable to the State for a civil penalty of not less than and not more than the civil penalty allowed under the federal False Claims Act (31 U.S.C.s.3729 *et seq.*), as may be adjusted in accordance with the inflation adjustment procedures prescribed in the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub.L. l 01-410, for each false or fraudulent claim, plus three times the amount of damages which the State sustains, if the person commits any of the following acts: a. Knowingly presents or causes to be presented to an employee, officer or agent of the State, or to any contractor, grantee, or other recipient of State funds, a false or fraudulent claim for payment or approval.

220.    From at least 2013 to the present, Defendants knowingly submitted claims to the New Jersey Medicaid program for reimbursement for home healthcare services that were not medically necessary and did not meet the State Medicaid requirements. In order to ensure their fraudulent claims were paid by the New Jersey Medicaid program, Defendants fraudulently altered patient charts and/or falsified entries on patient charts; falsely documented that the patients needed more visits than medically necessary, falsely documented the patients' severity levels, and provided lengthier services than necessary.

221.    Each claim for reimbursement for such home healthcare services represents a false or fraudulent claim for payment under the statute.

222.    If the State of New Jersey had known that Defendants were fraudulently altering patient records, falsely documenting that the patients had more severe conditions than they actually had, or falsely documenting that more home care visits were necessary when they were not, or falsely providing longer home care visits than necessary, it would not have paid the claims.

223.    The State of New Jersey has been damaged, and continues to be damaged, by the Defendants' wrongful conduct and is entitled to a substantial amount of damages, to be determined at trial, and a civil penalty for each false or fraudulent claim of not less than and not more than the civil penalty allowed under the FCA, as may be adjusted in accordance with the inflation adjustment procedures prescribed in the federal Civil Penalties Inflation Adjustment Act of 1990, plus three times the amount of damages the State sustains arising from Defendants' unlawful conduct as described herein.

## COUNT TWENTY-THREE

### NEW MEXICO MEDICAID FALSE CLAIMS ACT
### N.M. STAT. ANN. §27-14-1 *ET SEQ.*
### AND
### NEW MEXICO FRAUD AGAINST TAXPAYERS ACT
### N.M. STAT. ANN. §44-9-1 ET SEQ
### AGAINST THE HEARST DEFENDANTS

224.    Relator adopts and incorporates the previous allegations as though fully set forth herein.

225.    This is a claim for treble damages and penalties under the New Mexico Medicaid False Claims Act and the New Mexico Fraud Against Taxpayers Act.

226.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the New Mexico State Government for payment or approval.

227.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New Mexico State Government to approve and pay such false and fraudulent claims.

228.    The New Mexico State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal business practices.

229.    By reason of the Defendants' acts, the State of New Mexico has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

230.    The State of New Mexico is entitled to civil penalties for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT TWENTY-FOUR

**NEW YORK FALSE CLAIMS ACT**
**N.Y. STATE FIN. §§ 187 *ET SEQ.***
**AGAINST THE HEARST DEFENDANTS**

231.    Relator adopts and incorporates the previous allegations as though fully set forth herein.

232.    This is a claim for treble damages and penalties under the New York State False Claims Act.

233.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the New York State Government for payment or approval.

234.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New York State Government to approve and pay such false and fraudulent claims.

235.    The New York State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal business practices.

236.    By reason of the Defendants' acts, the State of New York has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

237.    The State of New York is entitled to the maximum penalty of $12,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT TWENTY-FIVE

### NORTH CAROLINA FALSE CLAIMS ACT
### N.C. GEN. STAT. §§1-605 *ET SEQ.*
### AGAINST THE HEARST DEFENDANTS

238.    Relator adopts and incorporates the previous allegations as though fully set forth herein.

239.    This is a claim for treble damages and penalties under the North Carolina False Claims Act.

240.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the North Carolina State Government for payment or approval.

241.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the North Carolina State Government to approve and pay such false and fraudulent claims.

242.    The North Carolina State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal business practices.

243.    By reason of the Defendants' acts, the State of North Carolina has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

244.    The State of North Carolina is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT TWENTY-SIX

### OKLAHOMA MEDICAID FALSE CLAIMS ACT
### 63 OKLA. ST. ANN. §§ 5053, *ET SEQ.*
### AGAINST THE HEARST DEFENDANTS

245.    Relator adopts and incorporates the previous allegations as though fully set forth herein.

246.    This is a claim for treble damages and penalties under the Oklahoma Medicaid False Claims Act.

247.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Oklahoma State Government for payment or approval.

248.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Oklahoma State Government to approve and pay such false and fraudulent claims.

249.     The Oklahoma State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal business practices.

250.     By reason of the Defendants' acts, the State of Oklahoma has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

251.     The State of Oklahoma is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT TWENTY-SEVEN

### RHODE ISLAND FALSE CLAIMS ACT
### R.I. GEN. LAWS § 9-1.1-1 *ET SEQ.*
### AGAINST THE HEARST DEFENDANTS

252.     Relator adopts and incorporates the previous allegations as though fully set forth herein.

253.     This is a claim for treble damages and penalties under the Rhode Island False Claims Act.

254.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Rhode Island State Government for payment or approval.

255.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Rhode Island State Government to approve and pay such false and fraudulent claims.

256.     The Rhode Island State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal business practices.

257.     By reason of the Defendants' acts, the State of Rhode Island has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

258.     The State of Rhode Island is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT TWENTY-EIGHT

### TENNESSEE MEDICAID FALSE CLAIMS ACT
### TENN CODE ANN. §§ 71-5-181, *ET SEQ.*
### AGAINST THE HEARST DEFENDANTS

259.     Relator adopts and incorporates the previous allegations as though fully set forth herein.

260.     This is a claim for treble damages and penalties under the Tennessee Medicaid False Claims Law.

261.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Tennessee State Government for payment or approval.

262.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Tennessee State Government to approve and pay such false and fraudulent claims.

263.     The Tennessee State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal business practices.

264.     By reason of the Defendants' acts, the State of Tennessee has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

265.     The State of Tennessee is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT TWENTY-NINE

### TEXAS MEDICAID FRAUD PREVENTION LAW
### TEX. HUM. RES. CODE ANN. §36.002
### AGAINST THE HEARST DEFENDANTS

266.     Relator adopts and incorporates the previous allegations as though fully set forth herein.

267.     Under the Texas Medicaid Fraud Prevention Act ("TMFPA"), an unlawful act subjects a Defendant to liability for the value of payment related to the unlawful act.

268.     There are thirteen unlawful acts specified in the TMFPA:

a.     knowingly makes or causes to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under

the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

b.    knowingly conceals or fails to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

c.    knowingly applies for and receives a benefit or payment on behalf of another person under the Medicaid program and converts any part of the benefit or payment to a use other than for the benefit of the person on whose behalf it was received;

d.    knowingly makes, causes to be made, induces, or seeks to induce the making of a false statement or misrepresentation of material fact concerning: (A) the conditions or operation of a facility in order that the facility may qualify for certification or recertification required by the Medicaid program, including certification or recertification as: (i) a hospital; (ii) a nursing facility or skilled nursing facility; (iii) a hospice; (iv) an ICF-IID; (v) an assisted living facility; or (vi) a home health agency; or (B) information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program;

e.    except as authorized under the Medicaid program, knowingly pays, charges, solicits, accepts, or receives, in addition to an amount paid under the Medicaid program, a gift, money, a donation, or other consideration as a condition to the provision of a service or product or the continued provision of a service or product if the cost of the service or product is paid for, in whole or in part, under the Medicaid program;

f.    knowingly presents or causes to be presented a claim for payment under the Medicaid program for a product provided or a service rendered by a person who: (A) is not

licensed to provide the product or render the service, if a license is required; or (B) is not licensed in the manner claimed;

g.      knowingly makes or causes to be made a claim under the Medicaid program for: (A) a service or product that has not been approved or acquiesced in by a treating physician or health care practitioner; (B) a service or product that is substantially inadequate or inappropriate when compared to generally recognized standards within the particular discipline or within the health care industry; or (C) a product that has been adulterated, debased, mislabeled, or that is otherwise inappropriate;

h.      makes a claim under the Medicaid program and knowingly fails to indicate the type of license and the identification number of the licensed health care provider who actually provided the service;

i.      conspires to commit a violation of these enumerated acts;

j.      is a managed care organization that contracts with the commission or other state agency to provide or arrange to provide health care benefits or services to individuals eligible under the Medicaid program and knowingly: (A) fails to provide to an individual a health care benefit or service that the organization is required to provide under the contract; (B) fails to provide to the commission or appropriate state agency information required to be provided by law, commission or agency rule, or contractual provision; or (C) engages in a fraudulent activity in connection with the enrollment of an individual eligible under the Medicaid program in the organization's managed care plan or in connection with marketing the organization's services to an individual eligible under the Medicaid program;

k.      knowingly obstructs an investigation by the attorney general of an alleged unlawful act under this section;

l.      knowingly makes, uses, or causes the making or use of a false record or statement material to an obligation to pay or transmit money or property to this state under the Medicaid program, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to this state under the Medicaid program; or

m.      knowingly engages in conduct that constitutes a violation under Section 32.039(b).

n.      By virtue of the facts set forth above, Defendants committed unlawful acts as defined by the TMFPA.

269.    By virtue of the facts described above, Defendants conspired to commit unlawful acts, in violation of the TMFPA.

270.    Pursuant to Tex. Hum. Res. Code Ann. § 36.052, a person who commits an unlawful act is liable to the State of Texas for: (1) the amount of any payment or the value of any monetary or in-kind benefit provided under the Medicaid program, directly or indirectly, as a result of the unlawful act, including any payment made to a third party; (2) interest on the amount of the payment or the value of the benefit described by Subdivision (1); (3) a civil penalty; and (4) two times the amount of the payment or the value of the benefit described by Subdivision (1).

271.    Accordingly, the State of Texas is entitled to two times the amount of any payments obtained by the Defendants from the Texas Medicaid program as a result of Defendants' unlawful acts, along with appropriate interest and civil penalties.

## COUNT THIRTY

**VERMONT FALSE CLAIMS ACT**
**32 V.S.A. § 631**
**AGAINST THE HEARST DEFENDANTS**

272.    Relator adopts and incorporates the previous allegations as though fully set forth herein.

273.    This is a claim for treble damages and penalties under the Vermont False Claims Act.

274.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Vermont State Government for payment or approval.

275.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Vermont State Government to approve and pay such false and fraudulent claims.

276.    The Vermont State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal business practices.

277.    By reason of the Defendants' acts, the State of Vermont has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

278.    The State of Vermont is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT THIRTY-ONE

### VIRGINIA FRAUD AGAINST TAXPAYERS ACT
### VA. CODE ANN. §§ 8.01-216.1, ET SEQ.
### AGAINST THE HEARST DEFENDANTS

279.    Relator adopts and incorporates the previous allegations as though fully set forth herein.

280.    This is a claim for treble damages and penalties under the Virginia Fraud Against Taxpayers Act.

281.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Virginia State Government for payment or approval.

282.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Virginia State Government to approve and pay such false and fraudulent claims.

283.    The Virginia State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal business practices.

284.    By reason of the Defendants' acts, the Commonwealth of Virginia has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

285.    The Commonwealth of Virginia is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT THIRTY-TWO

### WASHINGTON MEDICAID FRAUD FALSE CLAIMS ACT
### WASH. REV. CODE ANN. §§ 74.66.005, *ET SEQ.*
### AGAINST THE HEARST DEFENDANTS

286.    Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

287.    This is a claim for treble damages and penalties under the Washington Medicaid False Claims Act.

288.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Washington State Government for payment or approval.

289.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Washington State Government to approve and pay such false and fraudulent claims.

290.    The Washington State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal inducements and/or business practices.

291.    By reason of the Defendants' acts, the State of Washington has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

292.    The State of Washington is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## STATE INSURANCE FRAUD CLAIMS

### COUNT THIRTY-THREE

**CALIFORNIA INSURANCE FRAUDS PREVENTION ACT
CAL. INS. CODE § 1871 *ET SEQ*
AGAINST THE HEARST DEFENDANTS**

293.    Relator adopts and incorporates the previous allegations as though fully set forth herein.

294.    This is a claim for treble damages and civil penalties under the California Insurance Frauds Prevention Act, Cal. Ins. Code § 1871 *et seq*.

295.    By virtue of the conduct described above, Defendants caused to be presented, or knowingly assisted or conspired in presenting or causing to be presented, to the insurers in the State of California fraudulent claims, in violation of California Penal Code § 550(b)(1), among other provisions.

296.    Moreover, by virtue of the conduct described above, Defendants knowingly caused to be made fraudulent bills intended to be presented to the insurers in connection with, or in support of, claims for the payment of compensation under contracts of insurance knowing that the statements contained false or misleading information concerning material facts, in violation of Penal Code § 550(b)(2), among other provisions.

297.    By virtue of the misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented false or fraudulent claims for the payment of a loss or injury, including payment of a loss or injury under a contract of insurance; prepared, made, and subscribed writings, with the intent to present or use them, or to allow them to be presented, in support of false or fraudulent claims; and made or caused to be

60

made false or fraudulent claims for payment of a health care benefit in violation of Penal Code § 550 (a)(1), (5), and (6), among other provisions.

298.    By virtue of the conduct described above, Defendants caused false claims to be submitted to insurance companies for the payment of health care benefits. Had the private insurance companies known that Defendants had "upcoded" the medically necessary number of therapy visits and length of visits, as well as the severity of the patients' condition, and/or that Defendant caused to be presented, or knowingly assisted or conspired in presenting or causing to be presented statements containing false or misleading information concerning material facts, these companies would not have provided reimbursement for these services.

299.    By virtue of the conduct described above, Defendants' conduct represents the inducement of health care benefits through a pattern and practice of fraudulent conduct and constitutes false claims within the meaning of Cal. Ins. Code § 1871.7(b) and Sections 549 & 550(a)(6) of the California Penal Code, among other provisions.

300.    By reason of these payments, insurers have been damaged, and continue to be damaged, in a substantial amount.

## COUNT THIRTY-FOUR

### ILLINOIS INSURANCE CLAIMS FRAUD PREVENTION ACT
### 740 ILCS 92/1 *ET SEQ.*
### AGAINST THE HEARST DEFENDANTS

301.    Relator adopts and incorporates the previous allegations as though fully set forth herein.

302.    This is a claim for treble damages and civil penalties under the Illinois Insurance Claims Fraud Prevention Act, 740 ILCS 92/1 *et seq.*

303.     By virtue of the conduct described above, Defendants caused to be made, or knowingly assisted or conspired in making or causing to be made false claims on a policy of insurance issued by an insurance company or a self-insured entity in the State of Illinois intending to deprive that insurance company or self-insured entity permanently of the use and benefit of property, in violation of Section 17-10.5 of the Illinois Criminal Code, among other provisions.

304.     Moreover, Defendants violated Section 17-10.5 of the Illinois Criminal Code three or more times within an 18-month period arising out of separate incidents or transactions.

305.     By virtue of the conduct described above, Defendants caused false claims to be submitted to insurance companies and self-insured entities for the payment of health care benefits. Had the private insurance companies or self-insured entities known that Defendants had "upcoded" the medically necessary number of therapy visits and length of visits, and/or that Defendant caused to be presented, or knowingly assisted or conspired in presenting or causing to be presented statements containing false or misleading information concerning material facts these companies would not have provided reimbursement for these services.

306.     By reason of these payments, insurers have been damaged, and continue to be damaged, in a substantial amount.

307.     The State of Illinois is entitled to the maximum penalty of $10,000 for each and every false or false claim made or caused to be made by Defendants, plus an assessment of three times the amount of each false claim.

**RETALIATION CLAIMS**

**COUNT THIRTY-FIVE**

**FALSE CLAIMS ACT**
**31 U.S.C. § 3730(h)**
**(WRONGFUL AND RETALIATORY TERMINATION OF RELATOR)**

308.    Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

309.    The False Claims Act entitles an employee "to all relief necessary to make that employee . . . whole," if that employee is "discharged . . . or in any other manner discriminated against in the terms and condition of employment because of lawful acts done by the employee . . . to stop 1 or more violations of [the False Claims Act]." 31 U.S.C. § 3730(h)(1).

310.    An employee so wronged shall be reinstated with equal status, double back pay with interest, and "compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees." *Id.* § 3730(h)(2).

311.    Relator engaged in protected activity by, among other things, filing this action in an attempt to stop the violations described above.

312.    After Relator complained about the fraudulent practices alleged herein, he was discharged in retaliation for filing this action

313.    Due to the Holy Redeemer Defendants' unlawful retaliation, Relator has suffered a loss of employment opportunities and earnings and a loss of future earning capacity, and Relator has suffered and continues to suffer non-monetary damages, including but not limited to emotional and physical distress, humiliation, embarrassment, loss of esteem, and loss of enjoyment of life.

## COUNT THIRTY-SIX

## NEW JERSEY FALSE CLAIMS ACT
## N.J. STAT. § 2A:32C-10
## (WRONGFUL AND RETALIATORY TERMINATION OF RELATOR)

314.    Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

315.    The New Jersey False Claims Act provides that "No employer shall discharge, demote, suspend, threaten, harass, deny promotion to, or in any other manner discriminate against an employee in the terms and conditions of employment because of" disclosure of information to the government that is a violation of the New Jersey False Claims Act. N.J. Stat. § 2A:32C-10.

316.    The New Jersey False Claims Act entitles an employee to "all relief necessary to make the employee whole, including reinstatement with the same seniority status such employee would have had but for the discrimination, two times the amount of back pay, interest on the back pay, compensation for any special damage sustained as a result of the discrimination, and, where appropriate, punitive damages. In addition, the Defendant shall be required to pay litigation costs and reasonable attorney's fees associated with an action brought under this section." N.J. Stat. § 2A:32C-10(c).

317.    Relator engaged in protected activity by, among other things, filing this action in an attempt to stop the violations described above.

318.    After Relator complained about the fraudulent practices alleged herein, he was discharged in retaliation for filing this action

319.    Due to the Defendants' unlawful retaliation, Relator has suffered a loss of employment opportunities and earnings and a loss of future earning capacity, and Relator has

suffered and continues to suffer non-monetary damages, including but not limited to emotional and physical distress, humiliation, embarrassment, loss of esteem, and loss of enjoyment of life.

## PRAYER FOR RELIEF

WHEREFORE, on each of these claims, Relator requests the following relief be ordered:

**As to the Federal FCA Claims:**

A.     Pursuant to 31 U.S.C. § 3729(a), Defendants pay an amount equal to three times the amount of damages the United States Government has sustained because of Defendants' actions, which Relator currently estimates to be in the tens of millions of dollars, plus a civil penalty of $22,927 for each false or fraudulent claim or such other penalty as the law may permit and/or require for each violation of the FCA;

B.     Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the False Claims Act and/or any other applicable provision of law;

C.     Relator be awarded all costs and expenses of this action, including attorneys' fees as provided by 31 U.S.C. § 3730(d) and any other applicable provision of the law;

D.     Relator be awarded such other and further relief as the Court may deem to be just and proper.

**As to the State Claims:**

E.     Relator and each named State Plaintiff be awarded statutory damages in an amount equal to three times the amount of actual damages sustained by each State as a result of Defendants' actions, as well as the maximum statutory civil penalty for each violation by Defendant within each State, all as provided by:

        i.   Cal. Gov't Code § 12651;

       ii.   Cal. Ins. Code § 1871.7(b);

iii.   Colo. Stat. Ann. § 25.5-4-304;

iv.   Conn. Gen. Stat. § 4-275;

v.   6 Del. C. § 1201;

vi.   Fla. Stat. Ann. § 68.082;

vii.   Ga. Code. Ann. § 49-4-168.1;

viii.   Haw. Rev. Stat. § 661-21;

ix.   740 Ill. Comp. Stat. Ann. § 175/3;

x.   740 Ill. Comp. Stat. § 92/5(b);

xi.   Ind. Code § 5-11-5.7-2;

xii.   Iowa Code § 685.2;

xiii.   La. Rev. Stat. § 46:438.6;

xiv.   Mass. Gen. Laws Ch. 12 § 5B;

xv.   Mich. Comp. Laws § 400.612;

xvi.   Minn. Stat. § 15C.01;

xvii.   Mont. Code Ann. § 17-8-403;

xviii.   Nev. Rev. Stat. Ann. § 357.040;

xix.   N.J.S.A. 2A:32C-3;

xx.   N.M. Stat. Ann. § 27-14-4;

xxi.   N.Y. Fin. Law § 189.1(g);

xxii.   N.C. Gen. Stat. § 1-607;

xxiii.   63 Okla. St. Ann. § 5053.1;

xxiv.   R.I. Gen. Laws 9-1.1-3;

xxv.   Tenn. Code Ann. § 71-5-182;

      xxvi.  32 V.S.A. § 631;

     xxvii.  Va. Code Ann. § 8.01-216.3;

    xxviii.  Wash. Rev. Code Ann. § 74.66.020;

     xxix.  D.C. Code Ann. § 2-308.14;  and

F.     Relator and Plaintiff State of Texas be awarded two times the amount of any payment or the value of any monetary or in-kind benefit provided under the Texas Medicaid program, directly or indirectly, as a result of the unlawful acts described above, plus interest on the amount of the payment or the value of the benefit, as well as the maximum statutory civil penalty for each violation of Tex. Hum. Res. Code Ann. § 36.052;

G.     Relator be awarded his relator's share of any judgment to the maximum amount provided pursuant to:

       i.  Cal. Gov't Code § 12651(g)(2);

      ii.  Cal. Ins. Code § 1871.7;

     iii.  Colo. Stat. Ann. § 25.5-4-306;

     iv.  Conn. Gen. Stat. §§ 4-278, 4-279;

      v.  6 Del. C. § 1205;

     vi.  Fla. Stat. Ann. § 68.085;

     vii.  Ga. Code. Ann. § 49-4-168.2(i);

    viii.  Haw. Rev. Stat. § 661-27;

     ix.  740 Ill. Comp. Stat. Ann. § 175/4(d);

      x.  740 Ill. Comp. Stat. Ann. § 92/25;

     xi.  Ind. Code § 5-11-5.7-6;

     xii.  Iowa Code § 685.3;

xiii.  La. Rev. Stat. § 46:439.4;

xiv.  Mass. Gen. Laws Ch. 12 § 5F;

xv.  Mich. Comp. Laws § 400.610a;

xvi.  Minn. Stat. §§ 15C.01, *et seq*.;

xvii.  Mont. Code Ann. § 17-8-410;

xviii.  Nev. Rev. Stat. Ann. § 357.210;

xix.  N.J.S.A. 2A:32C-7;

xx.  N.M. Stat. Ann. § 27-14-9;

xxi.  N.Y. Fin. Law § 190.6;

xxii.  N.C. Gen. Stat. § 1-610;

xxiii.  63 Okla. St. Ann. § 5053.4;

xxiv.  R.I. Gen. Laws 9-1.1-4;

xxv.  Tenn. Code Ann. § 71-5-183;

xxvi.  Tex. Hum. Res. Code Ann. § 36.110;

xxvii.  32 V.S.A. § 635;

xxviii.  Va. Code Ann. § 8.01-216.7;

xxix.  Wash. Rev. Code Ann. § 74.66.070;

xxx.  D.C. Code Ann. § 2-308.15; and

H.    Relator be awarded all costs and expenses associated with each of the pendent State FCA and insurance fraud claims, plus attorney's fees as provided pursuant to:

i.  Cal. Gov't Code § 12651(g)(8);

ii.  Cal. Ins. Code § 1871.7;

iii.  Colo. Stat. Ann. § 25.5-4-306;

iv.   Conn. Gen. Stat. §§ 4-278, 4-279;

v.   6 Del. C. § 1205;

vi.   Fla. Stat. Ann. § 68.086;

vii.   Ga. Code. Ann. § 49-4-168.2(i);

viii.   Haw. Rev. Stat. § 661-27;

ix.   740 Ill. Comp. Stat. Ann. § 175/4(d);

x.   740 Ill. Comp. Stat. Ann. § 92/25;

xi.   Ind. Code § 5-11-5.7-6;

xii.   Iowa Code § 685.3;

xiii.   La. Rev. Stat. § 46:439.4;

xiv.   Mass. Gen. Laws Ch. 12 § 5F;

xv.   Mich. Comp. Laws § 400.610a;

xvi.   Minn. Stat. § 15C.01, *et seq.*;

xvii.   Mont. Code Ann. § 17-8-410;

xviii.   Nev. Rev. Stat. Ann. § 357.180;

xix.   N.J.S.A. 2A:32C-8;

xx.   N.M. Stat. Ann. § 27-14-9;

xxi.   N.Y. Fin. Law § 190.7;

xxii.   N.C. Gen. Stat. § 1-610;

xxiii.   63 Okla. St. Ann. § 5053.4;

xxiv.   R.I. Gen. Laws § 9-1.1-4;

xxv.   Tenn. Code Ann. § 71-5-183;

xxvi.   Tex. Hum. Res. Code Ann. § 36.110;

xxvii.   32 V.S.A. § 635;

xxviii.   Va. Code Ann. § 8.01-216.7;

xxix.   Wash. Rev. Code Ann. § 74.66.070;

xxx.   D.C. Code Ann. § 2-308.15;  and

I.       Defendants cease and desist from further violations of the FCA, various state FCAs as set forth above, and the CIFPA and ICFPA;

J.       Relator and State Plaintiffs be awarded pre- and post-judgment interest on the awards ordered herein; and

K.       Relator and State Plaintiffs be awarded such further relief as the Court deems appropriate and just.

**As to the State Insurance Fraud Claims:**

L.       Relator and the States of California and Illinois be awarded statutory damages in an amount equal to three times the amount of actual damages sustained by each State and the as a result of Defendants' actions, as well as the maximum statutory civil penalty for each violation by Defendants;

M.       Relator be awarded his relator's share of any judgment to the maximum amount provided by the California Insurance Frauds Prevention Act and the Illinois Insurance Claims Fraud Prevention Act;

N.       Relator be awarded all costs and expenses associated with each state claim, plus attorney's fees as provided pursuant to the California Insurance Frauds Prevention Act and the Illinois Insurance Claims Fraud Prevention Act;

O.       Defendants cease and desist from further violations of the California Insurance Frauds Prevention Act and the Illinois Insurance Claims Fraud Prevention Act;

P.       Relator and the States of California and Illinois be awarded pre- and post-judgment interest on the awards ordered herein; and

Q.       Relator and the States of California and Illinois be awarded such further relief as the Court deems appropriate and just.

**As to Relator's Retaliation Claims:**

R.       Relator be awarded the maximum amount of damages allowed pursuant to 31 U.S.C. § 3730(h); and

S.       Relator be awarded the maximum amount of damages allowed pursuant to N.J. Stat. § 2A:32C-10.

## DEMAND FOR JURY TRIAL

Relator hereby demands a trial by jury as to all issues so triable.

Dated: August 11, 2021                        Respectfully submitted,


By: _/s/ Robert A. Magnanini_
Robert A. Magnanini
STONE & MAGNANINI LLP
100 Connell Drive, Suite 2200
Berkeley Heights, NJ 07922
Tel: (973) 218-1111
Fax: (973) 218-1106
rmagnanini@stonemagnalw.com

Kristi Stahnke McGregor
James M. Evangelista
David J. Worley
EVANGELISTA WORLEY LLC
500 Sugar Mill Rd.
Suite 245A
Atlanta, GA 30350
Tel: (404) 205-8400
Fax: (404) 205-8395
kristi@ewlawllc.com
jim@ewlawllc.com
david@ewlawllc.com

Arvind Khurana
KHURANA LAW FIRM, P.C.
405 Lexington Avenue, 7th Fl.
New York, NY 10174
Tel: (212) 847-0145
akhurana@khuranapc.com

*Attorneys for Plaintiff-Relator*