# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA, et al., ex rel., MARK SCHIEBER,

               Plaintiff-Relator,

v.

HOLY REDEEMER HEALTHCARE SYSTEM, INC., HOLY REDEEMER HOME CARE INC., HOLY REDEEMER HOSPICE, HEARST CORPORATION, and HOMECARE HOMEBASE, INC.,

               Defendants.

Hon. Claire C. Cecchi

Civil Action No. 19-12675

**PLAINTIFF-RELATOR'S OMNIBUS RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6)**

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................. ii

TABLE OF AUTHORITIES ........................................................ vi

PRELIMINARY STATEMENT ..................................................... 1

SUMMARY OF ALLEGATIONS ................................................... 4

    I.  THE HOMECARE HOMEBASE SOFTWARE ................................. 6

    II.  LOW-UTILIZATION PAYMENT ADJUSTMENT ("LUPA") CLAIMS ................................................................................ 7

    III.  INCREASE IN SEVERITY INDEX ............................................. 8

    IV.  HOLY REDEEMER CHANGES RECORDS ................................... 9

    V.  HOLY REDEEMER REQUIRES THERAPISTS TO BILL FOR AT LEAST 45 MINUTES PER VISIT. ................................................ 9

LEGAL ARGUMENT ................................................................ 10

    I.  THE AMENDED COMPLAINT PLEADS PLAUSIBLE FCA VIOLATIONS WITH SUFFICIENT PARTICULARITY ................. 11

        A.  Holy Redeemer ................................................................ 14

            1.  Physician Certifications In Reliance on Holy Redeemer Therapists Do Not Nullify Holy Redeemer's False Claims .......... 16

            2.  The Amended Complaint Does Not Misstate the Law ........... 17

            3.  Holy Redeemer's Lawful Behavior Explanation Actually Supports an Inference of Knowledge of the False Claims ........... 18

        B.  HCHB ............................................................................. 19

            1.  Relator Sufficiently Pleads Falsity as to HCHB .................... 19

               a.  Factual Falsity ........................................................... 19

               b.  HCHB Cannot Offer A "Legitimate Explanation" For Its Prompts To Increase the Amount of Therapy Visits .............. 21

               c.  Legal Falsity .............................................................. 23

        C.  Relator Sufficiently Pleads the Hearst Defendants' Knowledge ..... 25

D.  Relator Sufficiently Pleads That HCHB Caused False Claims To Be Presented or False Statements To Be Made or Used ....................28

E.  Relator Sufficiently Alleges Materiality ....................................32

II.  RELATOR SUFFICIENTLY PLEADS A CLAIM FOR RETALIATION AGAINST HOLY REDEEMER ...........................34

III.  RELATOR ADEQUATELY PLEADS A CONSPIRACY CLAIM .....39

IV.  THE STATE LAW CLAIMS ARE ADEQUATELY PLED............40

A.  Relator Has Adequately Plead a Nationwide Fraudulent Scheme by the Hearst Defendants ...............................................................40

B.  Relator's Claims Under The New Jersey False Claims Act Against Holy Redeemer Should Be Sustained .................................42

C.  The Hearst Defendants' Argument That The State FCA Claims Should Be Dismissed Lacks Merit....................................................43

D. Material differences exist between the federal FCA and the Texas Medicaid Fraud Prevention Act .............................................45

E.  The States Have Declined to Intervene ....................................50

V.  REQUEST FOR LEAVE TO AMEND..........................................51

CONCLUSION ............................................................................................51

# TABLE OF AUTHORITIES

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)..............................................................................10

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007)........................................................................10, 12

*Barrows v. Burwell,*
Civ. No. 13-4179,  2015 WL 264727  (2d Cir. Jan. 22, 2015) ..........................30

*Carlson v. DynCorp International LLC,*
657 Fed.Appx. 168 (4th Cir. 2016)................................................................36

*County of Hawai'i v. UniDev,* LLC,
2010 U.S. Dist. LEXIS 12150, 2010 WL 520696 (D. Haw. 2010) ....................43

*Craftmatic Sec. Litig. v. Kraftsow,*
890 F.2d 628 (3d Cir. 1989)......................................................................13

*Druding v. Care Alternatives, Inc.,*
164 F.Supp.3d 621 (D.N.J. 2016)................................................................22

*Erie R. Co. v. Tompkins,*
304 U.S. 64 (1938).....................................................................................46

*Flanagan v. Bahal,*
2015 WL 9450826 (D.N.J. Dec. 22, 2015) ....................................................13

*Foglia v. Renal Ventures Mgmt., LLC,*
754 F.3d 153 (3d Cir. 2014)..............................................  2, 11, 12, 13,16

*Halasa v. ITT Educ. Servs., Inc.,*
690 F.3d 844 (7th Cir. 2012) ......................................................................35

*Hale v. Moreland Altobelli Assoc., Inc.,*
2014 WL 12235187 (N.D. Ga. Sept. 4, 2014) ................................................35

*Harris v. Blue Ridge Health Servs.,*
388 F. Supp. 3d 633 (M.D.N.C. 2019) .......................................................44

*Hutchins v. Wilenz, Goldman & Spitzer,*
253 F.3d 176 (3d Cir. 2001) ...............................................................37, 38

*In re Xerox,*
555 S.W.3d 518 (Tex. 2018) ..............................................................46, 47

*Lewis v. City of Alexandria,*
287 Va. 474, 756 S.E.2d 465 (Va. 2014) ...............................................44

*Lippincott v. Whisenhunt,*
462 S.W.3d 507 (Tex. 2015) ...................................................................49

*Mann v. Olsten Certified Healthcare Corp.,*
49 F.Supp.2d 1307 (M.D. Ala. 1999)......................................................38

*Marbury v. Talladega College,*
2014 U.S. Dist. LEXIS 7635 (N.D. Al. 2014) .......................................35

*Morrow v. Balaski,*
719 F.3d 160 (3d Cir. 2013) ....................................................................10

*New York v. Amgen Inc.,*
652 F.3d 103 (1st Cir. 2011)....................................................................43

*Olson v. Fairview Health Servs. of Minn.,*
No. 13-2607, 2015 U.S. Dist. LEXIS 31823,
2015 WL 1189823 (D. Minn. March 16, 2015)......................................44

*Prairie View A&M Univ. v. Chatha,*
381 S.W.3d 500 (Tex. 2012) ...................................................................46

*Scibetta v. Acclaimed Healthcare,*
2021 U.S. Dist. LEXIS 224791, 2021 WL 5450296 (D.N.J. 2021) ....................42

*Smith v. Clark/Smoot/Russell,*
796 F.3d 424 (4th Cir. 2015) .................................................................39

iv

*United States ex rel. Wilkins v. United Health Grp., Inc.*,
659 F.3d 295 (3d Cir. 2011) ........................................................................25

*Universal Health Servs., Inc. v. U.S. ex rel. Escobar*,
136 S. Ct. 1989, 195 L. Ed. 2d 348 (2016) ........................................ 24, 32, 19

*U.S. v. All Children's Health Sys., Inc.*,
No. 8:11-CV-1687-T-27EAJ, 2013 U.S. Dist. LEXIS 53932,
2013 WL 1651811 (M.D. Fla. Apr. 16, 2013) ................................................43

*U.S. v. APS Healthcare, Inc.*,
2013 U.S. Dist. LEXIS 13355, 2013 WL 420402 (D. Nev. 2013) .....................44

*U.S. v. Cmty. Recovery Res., Inc.*, No. 2:13-cv-01004-TLN-AC, 2017 U.S. Dist.
LEXIS 79096 (E.D. Cal. May 22, 2017) ........................................................45

*U.S. v. Eastwick Coll.*,
657 F. App'x 89 (3d Cir. 2016).....................................................................24

*U.S. v. Genesis Global Healthcare*,
2021 U.S. Dist. LEXIS 178879, 2021 WL 4268279 (N.D. Ga. 2021).................43

*U.S. v. Kindred Healthcare, Inc.*,
517 F. Supp. 3d 367, 2021 U.S. Dist. LEXIS 22241, 2021 WL 409981 .............26

*U.S. v. Medco Health Sys., Inc.*,
No. CIV. 12-522 (NLH), 2014 U.S. Dist. LEXIS 135767,
2014 WL 4798637 (D.N.J. Sept. 26, 2014)................................................39, 40

*U.S. v. Omnicare, Inc.*,
903 F.3d 78  (3d Cir. 2018).........................................................................12

*U.S. ex rel. Absher v. Momence Meadows Nursing Ctr., Inc.*,
764 F.3d 699 (7th Cir. 2014) .......................................................................43

*U.S. ex rel. Bates v. Dentsply Int'l, Inc.*,
No. 12-7199, 2014 WL 4384503 (E.D. Pa. Sep. 4, 2014) ..................................29

*U.S. ex rel. Boggs v. Bright Smile Family Dentistry, P.L.C.*,
2013 U.S. Dist. LEXIS 55322, 2013 WL 1688898 (W.D. Okla. 2013)...............44

*U.S. ex rel. Brown v. Celgene Corp.,*
No. 10-3165, 2014 WL 3605896 (C.D. Cal. July 10, 2014) .........................30, 41

*U.S. ex rel. Carpenter v. Abbott Labs.,*
723 F. Supp. 2d 395 (D. Mass. 2010) ............................................................ 30

*U.S. ex rel. Collins v. Molina Healthcare, Inc.,*
2019 U.S. Dist. LEXIS 237061, 2019 WL 11816475 (D. Mass 2019) ...............44

*U.S. ex rel. Dahlstrom v. Sauk-Suiattle Indian Tribe,*
2019 U.S. Dist. LEXIS 147714, 2019 WL 4082944 (W.D. Wash 2019) .............44

*U.S. ex rel. Druding v. Care Alts.,*
952 F.3d 89 (3d Cir. 2020) ...........................................................................19

*U.S. ex rel. Escobar v. United Health Servs., Inc. ,*
842 F. 3d 103 (1st Cir. 2016) .........................................................................32

*U.S. ex rel. Franklin v. Parke-Davis,*
147 F.Supp.2d 39 (D. Mass. 2001) .................................................................30

*U.S. ex rel. Galmines v. Novartis Pharm. Corp.,*
No. 06-3213, 2013 WL 2649704 (E.D. Pa. June 13, 2013) ..............................29

*U.S. ex rel. Govindarajan v. Dental Health Programs, Inc.,*
No. 3:18-cv-00463-E, 2020 WL 3064712 (N.D. Tex. June 8, 2020)...................47

*U.S. ex rel. Grant v. United Airlines Inc.,*
912 F.3d 190  (4th Cir. 2018)  ..................................................................34, 36

*U.S. ex rel. Grenadvor v. Ukrainian Vill. Pharmacy, Inc.,*
772 F.3d 1102 (7th Cir.2014) ........................................................................36

*U.S. ex rel. Grubbs v. Ravikumar Kanneganti,*
565 F.3d 180 (5th Cir. 2009) ....................................................................11, 12

*U.S. ex rel. Herrera v. Bon Secours Cottage Health Servs.,*
665 F. Supp. 2d 782 (E.D. Mich. 2008).........................................................44

*U.S. ex rel. Integra Med Analytics, LLC v. Creative Sols. In Healthcare, Inc.,*
2019 U.S. Dist. LEXIS 196490, 2019 WL 5970283 (W.D. Tex. 2019)..............23

*U.S. ex rel. Integra Med Analytics LLC v. Providence Health & Servs.*,
2019 U.S. Dist. LEXIS 125352 (C.D. Cal 2019) ...............................................28

*U.S. ex rel. John Carbon v. Care New Eng. Health Sys.*,
2021 U.S. Dist. LEXIS 201528, 2021 WL 4860736 (D.R.I. 2021).....................44

*U.S. ex rel. Judd v. Quest Diagnostics, Inc.*,
No. 10-4914, 2014 WL 2435659 (D.N.J. 2014)..................................................13

*U.S. ex rel. Kester v. Novartis Pharmaceuticals Corp.*,
23, F.Supp. 3d 242  (S.D.N.Y. 2014) ..................................................................13

*U.S. ex rel. Lampkin v. Johnson & Johnson, Inc.*,
No. CIV.A. 08-05362 (JAP), 2013 U.S. Dist. LEXIS 76448, 2013
WL 2404238 (D.N.J. May 31, 2013) ...................................................................39

*U.S. ex rel. Lovato ex rel. Lovato v. Kindred Healthcare, Inc.*,
2020 U.S. Dist. LEXIS 252097 (D. Col. 2020) ..................................................43

*U.S. ex rel. Marshall v. Univ. of TN Med. Ctr. Home Care Servs., LLC*,
2021 U.S. Dist. LEXIS 159167, 2021 WL 3743189 (E.D. Tenn. 2021) ..............44

*U.S. ex rel. Olcott, v. Southwest Home Health Care, Inc.*, No. 12:cv-6050CVE-
FHM, 2018 WL 4568635 (N.D. Okla. Sept. 24, 2018).............................31, 32

*U.S. ex rel. Patel v. Catholic Health Initiatives*,
312 F. Supp.3d 584 (S.D. Tex. 2018), *aff'd sub nom.*
*United States ex rel. Patel v. Catholic Health Initiatives*,
792 F. App'x 296 (5th Cir. 2019*)*.................................................................47, 49

*U.S. ex rel. Perri v. Novartis Pharms. Corp.*,
2019 U.S. Dist. LEXIS 28594, 2019 WL 6880006 (D.N.J. 2019) ................21, 37

*U.S. ex rel. Pervez v. Beth Isr. Med. Ctr.*,
736 F. Supp. 2d 804 (S.D.N.Y. 2010) .................................................................46

*U.S. ex rel. Petratos v. Genentech Inc.*,
855 F.3d 481 (3d Cir. 2019) ...............................................................................23

*U.S. ex rel. Petrowski v. Epic Systems Corp.*,
No. 8:15-CV-1408-T-30JSS, 2018 U.S. Dist. LEXIS 28119 (M.D. Fla. 2018) ....31

*U.S. ex rel. Polansky v. Exec. Health Res., Inc.,*
196 F. Supp. 3d 477 (E.D. Pa. 2016) ......................................................29, 41

*U.S. ex rel. Portilla v. Riverview Post Acute Care Ctr.,*
No. 12-1842, 2014 WL 1293882 (D.N.J. Mar. 31, 2014)................................48

*U.S. ex rel. Rahimi v. Zydus Pharm. (USA), Inc.,*
No. CV 15-6536-BRM-DEA, 2017 U.S. Dist. LEXIS 63401,
2017 WL 1503986 (D.N.J. Apr. 26, 2017) ...................................................49

*U.S. ex rel. Rembert v. Bozeman Health Deaconess Hosp.,*
2017 U.S. Dist. LEXIS 17275, 2017 WL 514205 (D. Mon. 2017) ....................44

*U.S. ex rel. Schmidt v. Zimmer, Inc.,*
386 F.3d 235 (3d Cir. 2004)...................................................................29

*U.S., ex rel. Simpson v. Bayer Corp.,*
No. 05-3895, 2014 WL 1418293 (D.N.J. Apr. 11, 2014) ................................50

*United States ex rel. Spay v. CVS Caremark Corp.,*
875 F.3d 746 (3d Cir. 2017) ...............................................................32, 42

*U.S. ex rel. Sullivan v. Atrium Med. Corp.,*
No. SA-13-CA-244-OLG, 2015 WL 13799885 (W.D. Tex. 2015)....................28

*U.S. ex rel. Thayer v. Planned Parenthood of the Heartland,*
765 F.3d 914 (8th Cir. 2014)..................................................................43

*U.S. ex rel. Tran v. Computer Sciences Corp.,*
2014 WL 2989948 (D.D.C. July 3, 2014).....................................................30

*U.S. ex rel. Wall v. Vista Hospice Care, Inc.,*
No. 3:07-CV-604, 2012 U.S. Dist. LEXIS 193347,
2012 WL 12886423 (N.D. Tex. July 23, 2012) ..............................................23

## Rules & Statutes

42 C.F.R. §424.22..............................................................................16

42 U.S.C. § 484.20......................................................................................26

42 C.F.R. § 485.55......................................................................................16

42 U.S.C. § 1320c-5(a)................................................................................25

42 U.S.C. § 1395y(a)(1)(A).........................................................................23

42 U.S.C. § 1396h............................................................................*passim*

Fed. R. Civ. P. 8(a) ....................................................................................34

Fed. R. Civ. P. 9(b) .........................................................................*passim*

Fed. R. Civ. P. 12(b)(6) ...............................................................................13

Fed. R. Civ. P. 15........................................................................................51

Federal False Claims Act, 31 U.S.C. § 3729 et seq. .................................*passim*

Tex. Hum. Res. Code § 36.001 ....................................................................48

Texas Medicaid Fraud Prev. Act, Tex. Hum. Res. Code §§36.002 ..................45

Tex. Hum. Res. Code § 36.104 ....................................................................54

Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111–21,
123 Stat. 1617 (2009)...................................................................................35

Dodd–Frank Wall Street Reform and Consumer Protection Act,
Pub. L. 111–203, § 1079A(c), 124 Stat. 1376 (2010).....................................35

## Other

*Medicare Benefit Policy Manual*, Chapter 7,
Home Health Services, § 30.5.1.2 – Supporting Documentation Requirements....33

U.S. Dept. of Justice, Office of Public Affairs, *Louisville Based MD2U, a Regional Provider of Home-Based Care, and Its Principal Owners Admit to Violating the Federal False Claims Act and Being Liable for Millions* (Jul. 7, 2016) .................................................................. 17

HHS Office Of Inspector General, *Special Fraud Alert – Physician Liability for Certifications In the Provision Of Medical Equipment and Supplies and Home Health Services* ....................................................... 17

## PRELIMINARY STATEMENT

Relator, Mark Schieber, filed this *qui tam* action on behalf of the United States, and 27 states[1] and the District of Columbia (collectively, the "States") against Holy Redeemer Healthcare System, Inc., Holy Redeemer Home Care, Inc., Holy Redeemer Hospice (collectively, "Holy Redeemer"), Hearst Corporation ("Hearst") and Homecare Homebase, LLC ("HCHB" or Homecare Homebase) (Hearst and HCHB are collectively, the "Hearst Defendants") under the federal False Claims Act, 31 U.S.C. § 3729 *et seq.*, as well as the States' respective false claims statutes and the insurance fraud statutes of the states of Illinois and California. Relator filed this action under seal on May 17, 2019. (ECF No. 1.) The seal was extended until June 4, 2021 when the United States entered a Notice of Election to Decline Intervention[2] (ECF No. 3) and the Court ordered the case unsealed on July 22, 2021 (ECF No. 4). Relator filed his First Amended Complaint on August 11, 2021 ("FAC" or "Amended Complaint"). (ECF No. 5.)

---

[1]    The 27 states include California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Vermont, Virginia and Washington (the "States").

[2]    The United States' Notice of Election to Decline Intervention also states that the States "have elected to decline to intervene."

1

The Amended Complaint alleges that Defendants defrauded the United States and States through a system, pattern and practice of fraudulently increasing reimbursement for home health services by (1) instructing employees and using the Homecare Homebase software to (a) falsely increase the number of therapy visits that are medically necessary for homecare patients; and (b) falsely represent the severity of the patients in their care; and (2) falsely provide unnecessary services to patients for the sole purpose of inflating the time spent on services in order in increase reimbursement rates.

Defendants' motions to dismiss ignore the standard set forth by the Third Circuit in evaluating FCA claims. Unlike several other Circuits, the Third Circuit does not require the detailed and specific allegations that Defendants assert are required in a complaint. Instead, the Third Circuit requires the "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 155-56 (3d Cir. 2014) (internal citations omitted). Moreover, an FCA claimant need not plead "the exact content of the false claims in question" to survive a motion to dismiss based on Rule 9(b). *Id.* at 156. Relator has done just that in the Amended Complaint.

The Holy Redeemer Defendants move for dismissal primarily on the ground

that the services provided by Holy Redeemer must have been medically necessary, because a patient's physician must certify the medical necessity of Holy Redeemer's services, and Realtor has not alleged that any physician was involved in the fraudulent scheme. This argument is meritless as it directly contradicts federal regulations and CMS guidance regarding Holy Redeemer's responsibilities in developing the plan of care and specifically, determining the number of visits required.

The Hearst Defendants argue that Relator has not plead falsity, knowledge, causation or materiality. In doing so the Hearst Defendants ignore the critical role they have played in this fraud. HCHB developed and marketed its software to thousands of home health agencies across the country based solely on increasing revenues by increasing the amount of therapist visits. The software does not care about medical necessity; rather, only seeks to encourage the provider to add more unnecessary visits so that the government pays more.

With regard to the State FCA claims, which are substantially similar to the federal FCA, Relator has sufficiently alleged violations against the New Jersey False Claims Act against Holy Redeemer and a nationwide scheme by HCHB. Moreover, each of the States that have not intervened notified the Court through the United States and have been put on notice of the federal government's declination and

Relator's decision to move forward in this action in his individual capacity.

Finally, Holy Redeemer's efforts to have the retaliation claims dismissed must fail as Relator sufficiently alleges facts that he (1) engaged in protected activity by refusing to accept changes to patient severity and number of visits made by Holy Redeemer reviewers, expressing concerns to his manager and a human resources director regarding reviewers, and filing a *qui tam* action, and (2) was retaliated against as a result when his hours were reduced and he was ultimately terminated after engaging in the protected activity.

Accordingly, the claims in the Amended Complaint should be sustained.

## SUMMARY OF ALLEGATIONS

Relator, Mark Schieber, has been a licensed physical therapist for 34 years, 18 of which he spent as an employee of Holy Redeemer. FAC, ¶ 10. Defendant Holy Redeemer is the largest provider of home health and hospice services in New Jersey, and also provides care in Philadelphia, Bucks, and Montgomery Counties in Pennsylvania. Holy Redeemer operates the following providers: Holy Redeemer Home Health and Hospice Services, Holy Redeemer Visiting Nurse Agency, Inc., Visiting Nurse and Health Services, Inc., Holy Redeemer Home Care, Inc., Holy Redeemer Hospice, Inc., VNA Home Care of Mercer County, Inc., Holy Redeemer Support at Home, and Visiting Nurses of Mercer County. *Id.*, ¶¶ 12-16.

Defendant HCHB, based in Dallas, Texas, is a leading healthcare software company. HCHB is part of the Hearst Health network and is 85 percent owned by Hearst.  HCHB provides a fully integrated software-as-a-service application for homecare and hospice agencies.  HCHB has for years aggressively marketed its software to home health agencies nationwide. HCHB's core business is to contract with home health agencies to license them HCHB's software that is designed to maximize payments by the government to the home health agency.  FAC, ¶¶ 19-20. This is done by encouraging providers, such as Holy Redeemer, to upcode and increase the number of visits that a patient requires, even though there is no medical necessity for the additional visits. Thus, the HCHB software ostensibly provides the agency with a basis on which to convert less profitable Medicare Part B billings, to more lucrative Medicare Part B billings.  FAC, ¶ 55.

Significantly, 7 of the top 10 home health and hospice agencies use its software, making HCHB the nation's #1 homecare software.  The software solutions service over 350,000 patients every day, accounting for more than 25% of the annual Medicare revenue for home health and hospice. HCHB generates over $125 million in annual revenues and has over 2200 installed locations across the nation and over 63,000 users. FAC, ¶¶ 19-20

## I.    THE HOMECARE HOMEBASE SOFTWARE

Therapists and nurses that do homecare visits access the Homecare Homebase online system using a tablet provided by Holy Redeemer.  FAC, ¶ 57. Typically, homecare services are prescribed based on a physician's orders.  FAC, ¶¶ 28, 50. Once an HHA such as Holy Redeemer receives the physician's order, Holy Redeemer will send a nurse to evaluate the patient.  However, at times, a therapist may be sent to evaluate the patient if only rehabilitation therapy services (such as physical therapy) are prescribed by the physician.  *Id.*, ¶¶ 28, 57, 58. On numerous occasions, Relator has been directed to evaluate a new patient.  As part of that process, Relator (and other nurses and therapists) travels to the patient's home and opens a case in OASIS using the HCHB software on his handheld device.  *Id.*, ¶ 57. As part of the evaluation, Relator (and other nurses and therapists) must select how many therapy visits are required during the 60-day episode.[3]  Relator (and other nurses and therapists) makes his selection based on his actual physical examination of the patient.  Once Relator (and other nurses and therapists) makes his decision, he must input the number of necessary visits into the HCHB software.  *Id.*, ¶ 58.

---

[3]    As discussed in the Amended Complaint, the fraudulent acts were done in connection with the Prospective Payment System ("PPS") that was effective until December 31, 2019.  As of January 1, 2020, the home healthcare PPS transitioned to a Patient Driven Groupings Model ("PDGM").  FAC, ¶ 39.

However, the software repeatedly prompts Relator (and other nurses and therapists) into selecting a higher number of necessary visits because higher number of visits will provide for a higher reimbursement under Medicare. If a nurse declines to enter a higher number of visits, then the software again will prompt them to select a higher number of visits when the user is finalizing the entry for submission. *Id.*, ¶¶ 60-66. Upon information and belief, most nurses and therapists simply accepted the prompts to increase the number of visits. *Id.*, ¶ 65.

For example, if a nurse selected that the patient needs 12 visits, then the software would automatically encourage them to instead select 14 visits. Notably, the Relator has received the following prompt from the HCHB software:

> There are 12 therapy visits. The next level
> begins at 14. Are further edits needed?

FAC, ¶ 61. Similarly, if a nurse selected 5 visits, then the software would encourage them to select 6 visits. As noted above, if a patient needs 5 visits or less, then the HHA is paid per visit. In excess of 5, then it is paid more under the PPS. *Id.*, ¶¶ 65-66.

## II.    LOW-UTILIZATION PAYMENT ADJUSTMENT ("LUPA") CLAIMS

A LUPA occurs when four or fewer visits are provided in a 60-day episode. Instead of payment being based on the HIPPS code, payment is based on a national

standardized per visit payment by discipline instead of an episode payment for a 60-day period. *Id.*, ¶¶ 40, 65

There have been numerous occasions where Relator has selected four or less visits. When that occurs, the Homebase Homecare software automatically prompts for additional visits. It states as follows:

> The number of currently plotted billable visits may result on a LUPA status at EOE. Do you want to add additional visits?

*Id.*, ¶ 66.

### III.    INCREASE IN SEVERITY INDEX

Relator and other therapists have been directed by Holy Redeemer on numerous occasions that when assessing patients, they are to use a minimum severity index of 3. For each homecare visit, a therapist must select the severity of the patient's condition on a scale of 0 to 4. HCHB gives the following selections:

> 0 – Asymptomatic, no treatment needed at this time.
>
> 1 – Symptoms well controlled with current therapy.
>
> 2 – Symptoms controlled with difficulty, affecting daily functioning; patient needs ongoing monitoring.
>
> 3 – Symptoms poorly controlled, patient needs frequent adjustments in treatment and dose monitoring.
>
> 4 - Symptoms poorly controlled, history of rehospitalizations.

Relator has been expressly told by Holy Redeemer managers at office-wide

meetings attended by other therapists that they <u>must</u> code the severity at a minimum of 3. This would justify further homecare visits and higher reimbursements for Holy Redeemer. *Id.*, ¶¶ 70-71.

## IV.   HOLY REDEEMER CHANGES RECORDS

Holy Redeemer reviewers change the number of visits or the severity level even though the evaluating nurse or therapist selected a lower number of visits or severity level. On several occasions, Relator has received notices on his tablet that one of his patient's records have been changed. For example, on February 6, 2019, Jordan Madhu, a Holy Redeemer reviewer, changed the severity level for one of Relator's patients from '2' to '3' and the number of visits from '5' to '7'. Relator declined to accept the edits because based on his evaluation of the patient, the initial coding was appropriate. Given the pressure put on by management on all the therapists to increase revenues, Relator reasonably believes that other therapists routinely accept Holy Redeemer reviewer's edits to records. *Id.*, ¶¶ 76-77.

## V.   HOLY REDEEMER REQUIRES THERAPISTS TO BILL FOR AT LEAST 45 MINUTES PER VISIT

Relator has attended staff meetings where Holy Redeemer managers have directed the therapists doing homecare visits that they must bill for at least a 45-minute visit even if the circumstances do not require it. If a patient does not actually require 45 minutes of therapy, therapists are told that they must come up with

9

additional unnecessary tasks/procedures to fill the time. Relator has been told that in order for Holy Redeemer to make a profit on homecare visits, the minimum time must be at least a 45-minute visit. If the reimbursement is for a 30-minute or less visit, Holy Redeemer will lose money. Billing for at least 45 minutes pushes the reimbursement rate under Medicaid to the third unit of service that covers visits from 45 to 59 minutes. *Id.*, ¶¶ 72-75.

## <u>LEGAL ARGUMENT</u>

A complaint is sufficient when it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Courts "must accept the allegations in the complaint as true ... [but] are not compelled to accept unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." *Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013) (quotations omitted).

## I.    THE AMENDED COMPLAINT PLEADS PLAUSIBLE FCA VIOLATIONS WITH SUFFICIENT PARTICULARITY

The purpose of Rule 9(b) is to provide defendants with "fair notice of the plaintiffs' claims." *Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 156-57 (3d Cir. 2014)(internal quotations omitted). In *Foglia*, the Third Circuit considered the Rule 9(b) requirement and its application to FCA cases and concluded that it is sufficient for a plaintiff to allege "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted" or the details of an actually submitted false claim. *Id.* at 157-58 (quoting *U.S. ex rel. Grubbs v. Ravikumar Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009) ("We hold that to plead with particularity the circumstances constituting fraud for a False Claims Act §3729(a)(l) claim, a relator's FAC, if it cannot allege the details of an actually submitted false claim, may nevertheless survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.''). The Third Circuit explained that requiring "'representative samples' of the alleged fraudulent conduct, specifying the time, place, and content of the acts and the identity of the actors," as some of its sister courts require, "would be 'one small step shy of requiring production of actual documentation with the FAC, a level of proof not demanded to win at trial and significantly more than any federal pleading rule contemplates" and

11

that such a "rigid" pleading standard would "undermin[e] the FCA's effectiveness as a tool to combat fraud against the United States." *Id.* at *7. As the Fifth Circuit observed in *Grubbs*, a case cited with approval by the Third Circuit in *Foglia*, "Rule 9(b) supplements but does not supplant Rule 8(a)'s notice pleading." *Grubbs*, 565 F.3d at 186. The Fifth Circuit further observed that "Rule 9(b) does not reflect a subscription to fact pleading and requires only simple, concise, and direct allegations of the circumstances constituting fraud, which after *Twombly* must make relief plausible ...." *Id.* at 186 (internal quotations and citations omitted); *accord Foglia*, 754 F.3d at 158 (a complaint must allege sufficient facts to state a "plausible ground for relief"). Further, as noted by the Third Circuit when construing *Foglia* in *U.S. v. Omnicare, Inc.*, 903 F.3d 78, 91-92 (3d Cir. 2018), "an inference of illegality based on facts that could plausibly have either a legal or illegal explanation would be insufficient to meet Rule 9(b)'s burden, because a relator must establish a strong inference that false claims were submitted and the possibility of a legitimate explanation undermines the strength of the inference of illegality." 903 F.3d at 92 (internal quotations omitted). Here, Relator's Complaint satisfies the standard applied to FCA actions as set forth in *Foglia*. Accordingly, Defendants' contentions that Plaintiff-Relator's claims should be dismissed because they fail to identify any

particular false claim for payment (HR Mot.[4] at 16, 10, 21) simply applies the wrong standard.

Moreover, allegations made "upon information and belief" satisfy Rule 9(b) when supported by well-pleaded facts detailing the basis for the belief and where, as here, essential information lies uniquely within another party's control. *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 646 (3d Cir. 1989).[5] Holy Redeemer's claims

---

[4]    "HR Mot." refers to Holy Redeemer Health System's, Holy Redeemer Home Care, Inc.'s, and Holy Redeemer Hospice, Inc.'s Motion to Dismiss the Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) (ECF No. 27-1). "Hearst Mot." refers to Brief in Support of Defendants Hearst Corporation and HomeCare HomeBase LLC's Motion to Dismiss (ECF No. 24-1).

[5]    *Flanagan v. Bahal*, 2015 WL 9450826, at *5 (D.N.J. Dec. 22, 2015), cited by Holy Redeemer (HR Mot. at 20) is distinguishable because there the relator, a medical assistant and receptionist, could not explain why the tests were medically unnecessary, whereas, here, the Relator is a therapist whose job it was to determine and document medical necessity. Moreover, here, management instructed all therapists across the board to engage in the upcoding alleged. *U.S. ex rel. Kester v. Novartis Pharma. Corp.*, 23, F. Supp. 3d 242, 266 (S.D.N.Y. 2014), cited by Holy Redeemer (HR Mot. at 22) is distinguishable because, there, the government had intervened and the government has access to claims data and documents obtained through a Civil Investigatory Demand ("CID") that a relator does not have, and, therefore, cannot claim that the essential information lies uniquely within another party's control. Moreover, unlike the Third Circuit, the Second Circuit has not yet ruled that a Relator need not plead specific false claims. *U.S. ex rel. Judd v. Quest Diagnostics, Inc.*, No. 10-4914, 2014 WL 2435659 (D.N.J. 2014) cited by Hearst (Hearst Mot. at 17) is distinguishable because the allegations in *Judd* could not demonstrate that the same alleged fraudulent conduct was taking place at other providers. Here, however, there are specific allegations that the HCHB prompts

13

data is within its control, not Relator's. Accordingly, it is appropriate for Relator to plead that Defendants submitted or caused to be submitted false claims upon information and belief, where, as here, Relator has plead the facts upon which his belief is based. This is consistent with the Third Circuit case law discussed above holding that relators need not identify a specific false claim at the pleadings stage. Moreover, as the Hearst Defendants acknowledge, Relator is not a Hearst insider, and though he was employed by Holy Redeemer, he was not someone with a corporate position or corporate knowledge, and did not have access to Holy Redeemer's claims data.

### A. Holy Redeemer

The Amended Complaint alleges particular facts of Holy Redeemer's scheme to inflate reimbursements by pressuring therapists in multiple different ways to increase the number of visits needed by patients, increase the severity of the patients' conditions, and extend the length of home health visits. First, the Amended Complaint alleges that, during monthly staff meetings, Holy Redeemer management told therapists to increase the number of visits required by patients, and increase the severity index for patients, in order to increase reimbursements to Holy Redeemer.

---

encouraging upcoding of visits is taking place at other providers outside of Holy Redeemer.

14

FAC, ¶¶ 6, 59, 71, 72-75. Holy Redeemer management tracked when visits were under 45 minutes and asked therapists why the therapist had billed for less than 45 minutes. *Id.*, ¶ 74. Next, the Amended Complaint alleges that the software utilized by Holy Redeemer prompted therapists multiple times while entering data for a patient to increase the number of visits in order to get to a higher reimbursement level. *Id.*, ¶¶60-66. If therapists failed to increase the number of visits and severity after being told to do so by Holy Redeemer management and prompted to do so by the software utilized by Holy Redeemer, Holy Redeemer reviewers then went into the patient profiles and increased the severity and number of visits. *Id.*, ¶¶ 76-77. While Holy Redeemer contends that therapists were given the "choice" to accept the increase in the number of visits, severity and length of visits, or not, when Relator refused to do so and expressed concerns to his supervisors regarding reviewers changing his assessment of patients, Holy Redeemer reduced his hours until finally terminating him altogether. *Id.*, ¶¶ 6, 77-78. This leads to a plausible inference that other therapists simply acquiesced to Holy Redeemer's pressure to upcode in order to keep their jobs. These allegations provide reliable indicia that lead to a reasonable inference that claims were actually submitted, because Holy Redeemer prompted the upcoding at multiple steps in the process and terminated Relator when he refused to participate and complained about the upcoding. Accordingly, the allegations are

sufficient to "provide defendants with fair notice of the plaintiff's claims." *Foglia*, 754 F.3d 156-57. More is not required at the pleadings stage.

### 1. *Physician Certifications Made in Reliance on Holy Redeemer Therapists Do Not Nullify Holy Redeemer's False Claims*

Holy Redeemer contends that the FCA scheme is not plausible because a physician is required to certify the medical necessity of the services Holy Redeemer provided. (HR Mot. at 1-2, 17-19.) However, Holy Redeemer ignores that physicians only certify that the patient needs home health services generally. *See* 42 C.F.R. §424.22; *see also* FAC, ¶ 24. The physician does not perform the initial assessment to determine the frequency and duration of visits; rather, this is performed by the home health agency. *See* 42 C.F.R. § 485.55; *see also* FAC, ¶ 28. Accordingly, physicians rely upon the home health agency's nurse or therapist to determine the patient's specific needs, including the frequency and duration of visits. Under Holy Redeemer's logic, a home health agency could never be guilty of submitting false claims unless the doctor was in on the fraud. This is simply not the case. Indeed, the HHS OIG has warned physicians that:

> While the OIG believes that the actual incidence of physicians' intentionally submitting false or misleading certifications of medical necessity for durable medical equipment or home health care is relatively infrequent, physician laxity in reviewing and completing these certifications contributes to fraudulent and ***abusive practices by unscrupulous suppliers and home health providers***. … While a physician's signature on a false or misleading certification made

16

through mistake, simple negligence, or inadvertence will not result in personal liability, ***the physician may unwittingly be facilitating the perpetration of fraud on Medicare by suppliers or providers***. [emphasis added][6]

### 2. The Amended Complaint Does Not Misstate the Law

Relator alleges that Holy Redeemer's fraudulent scheme to inflate reimbursements from government healthcare programs involved increasing: (1) the number of visits, (2) the length of visits, and (3) the severity of the patient's condition. Holy Redeemer argues that the fraudulent scheme rests on a misstatement of law because *one* of those three factors, the length of the visit, does not impact reimbursement under Medicare. However, Holy Redeemer acknowledges that length of a visit *does* impact reimbursement under Medicaid. (HR Mot. at 23, n. 9.) Moreover, Holy Redeemer does not dispute that the number of visits and severity of the patient's condition impact reimbursement under Medicare. Each of the three

---

[6]     HHS Office Of Inspector General, *Special Fraud Alert - Physician Liability for Certifications In the Provision Of Medical Equipment and Supplies and Home Health Services*, available at: https://oig.hhs.gov/documents/special-fraud-alerts/872/dme.htm. *See also, e.g.* U.S. Dept. of Justice, Office of Public Affairs, *Louisville Based MD2U, a Regional Provider of Home-Based Care, and Its Principal Owners Admit to Violating the Federal False Claims Act and Being Liable for Millions* (Jul. 7, 2016), https://www.justice.gov/opa/pr/louisville-based-md2u-regional-provider-home-based-care-and-its-principal-owners-admit ("Management instructed [nonphysician providers] to schedule patient visits more frequently than necessary ...").

factors individually impact reimbursement under a government healthcare program. Accordingly, the fraudulent scheme is not based on a misstatement of law.

### 3. Holy Redeemer's Lawful Behavior Explanation Actually Supports an Inference of Knowledge of the False Claims

Using circular logic, Holy Redeemer contends that its managers' instructions to therapists that they "must" select a severity score of 3 was lawful behavior, because if a patient's severity score were below 3, then home health services may not be medically necessary. (HR. Mot. at 24-25.) However, the therapist conducts the assessment of the patient and is to make an independent assessment of that patient's severity. There can be no plausible reason for a manager to instruct therapists to select a severity level of 3 other than to ensure reimbursement for the services.

Holy Redeemer's argument that the Amended Complaint fails to meet Rule 9(b)'s pleading requirements because it fails to set forth any specific facts or examples in which a patient's severity score should have been 0, 1, or 2 applies the wrong standard. As discussed in greater detail above, Relator is not required to plead specific instances of false claims. Relator provides facts of meetings where multiple managers instructed therapists to select 3 or higher for patients' severity and facts of a specific instance in which Holy Redeemer reviewers changed the severity score for one of Relator's patients from a 2 to a 3. FAC ¶¶ 70, 76. While that particular

18

instance did not result in a false claim because Relator rejected the change, Relator has pleaded facts that support the plausible inference that other therapists simply accepted such changes in order to retain their employment, because Relator's hours were cut and he was ultimately terminated after he rejected reviewers' changes and met with his manager and a human resources director to express his concerns regarding reviewers changing his professional assessment of patients' severity and needs. *Id.*, ¶¶ 76-77.

### B. HCHB

#### 1. *Relator Sufficiently Pleads Falsity as to HCHB*

The crux of the claims against HCHB is that due to HCHB's software, unnecessary therapy visits were made by homecare agencies with reckless disregard for whether a patient actually needed the additional therapy visits, and HCHB's business practices contributed to those false claims.

The falsity element "asks whether [a] claim submitted to the government as reimbursable was in fact reimbursable, based on the conditions for payment set by the government." *U.S. ex rel. Druding v. Care Alts.*, 952 F.3d 89, 97 (3d Cir. 2020).

##### a. *Factual Falsity*

Relator has sufficiently pled that HCHB caused home health agencies including Holy Redeemer, to submit bills for therapy services that were factually false. Relator alleges that the bills home health agencies submitted after review by

19

the HCHB software were factually false because claims for reimbursement for therapy services are false on their face or literally false — the bills indicate that the beneficiaries who receive the services needed a higher number of therapy visits when in fact they do not meet Medicare and Medicaid's requirements and therefore should instead have been lower. *See* FAC, ¶ 60.

Indeed, but for the manipulation by the HCHB software, the necessary and truthful quantity of therapy visits would have been less than ultimately submitted to the government for payment. As alleged in the First Amended Complaint, a provider (a nurse or therapist) does the evaluation of the patient's medical condition and decides based on a number of factors how many therapy visits are necessary. This includes therapy from several disciplines, including physical and occupational. *Id.*, ¶ 58. For example, a provider's evaluation may conclude that a patient requires 12 necessary visits. However, because the next level of payment under the PPS is for 14 visits, the HCHB software will encourage upcoding the number of visits necessary to 14. This is false on its face as the true number of medically necessary visits is 12.

20

### b. HCHB Cannot Offer A "Legitimate Explanation" For Its Prompts To Increase the Amount of Therapy Visits

The Hearst Defendants only suggests the generic explanation for the increased number of visits is due to "medical necessity." Hearst Mot. at 22. However, this explanation misses the mark, as it is nothing more than a denial of the allegations. Instead, *Omnicare* requires a legitimate explanation of the alleged wrongful conduct. *See U.S. ex rel. Perri v. Novartis Pharms. Corp.*, 2019 U.S. Dist. LEXIS 28594, 2019 WL 6880006 (D.N.J. 2019) (legitimate explanation provided by defendant for keeping more expensive drug on formulary when a cheaper drug was available). Here the alleged wrongful conduct is that the HCHB software prompts the user to increase the amount of therapy visits solely to get to the next level of payment. HCHB has not and cannot come up with a reason why its software has the prompts in the first place. Indeed, the only plausible explanation is that HCHB has provided the prompts because an increase in visits to the next payment level means an increase in dollars paid by the government. The software does not care about medical necessity, it only cares about increasing revenues. Significantly, the Amended Complaint contains allegations that HCHB markets its software to home health agencies for that very purpose – it promises increased revenues if an agency uses its software. HCHB does not argue that a legitimate explanation for the prompts is that its software actually does a medical necessity review so as to justify its prompts.

21

Indeed, the Amended Complaint alleges that the software does not even have a medical necessity checker. FAC, ¶ 62. In addition, if medical necessity was a legitimate explanation, then the HCHB software would provide prompts to decrease the number of visits, but it does not, as such prompts may decrease the agency's revenues. Or, the software could prompt the user to increase the number of visits to stay within the original payment threshold where visits would increase and payment would not change. For example, if the user states 12 visits are required, and the next payment level is 14, the software will not prompt to change the number of visits to 13, which would keep payment in the same tier. Instead, the HCHB software, as designed, only prompts to push visits to the next payment level.[7]

Significantly, issues of medical necessity are not premised simply on the number of visits necessary to hit the next threshold of payment by Medicare. Rather, the regulations provide that the number of visits is determined after assessment of the patient's condition. HCHB does not claim that its software has looked at anything

---

[7]    Hearst Defendants' reliance on *Druding v. Care Alternatives, Inc.*, 164 F.Supp.3d 621 (D.N.J. 2016) is misplaced.  In *Druding* the Court found generalized allegations made upon information and belief that unnamed individual staff of defendant had generally requested changes in documentation to be insufficient to satisfy Rule 9(b).  Here, that is not the case, as Relator alleges – not upon information and belief - that software developed by HCHB purposely encouraged – not merely requested – upcoding of medically necessary therapy visits to increase revenues.

beyond the threshold of payments before providing the prompts encouraging the user to bump up the number of visits so that revenues can be increased.

In any event, issues of medical necessity should not be resolved at the motion to dismiss. *See U.S. ex rel. Integra Med Analytics, LLC v. Creative Sols. In Healthcare, Inc.*, 2019 U.S. Dist. LEXIS 196490, *15-16, 2019 WL 5970283 (W.D. Tex. 2019) (finding relator satisfied pleading burden on falsity as issues of medical necessity are better suited for summary judgment, not motion to dismiss); *U.S. ex rel. Wall v. Vista Hospice Care, Inc.*, No. 3:07-CV-604, 2012 U.S. Dist. LEXIS 193347, 2012 WL 12886423, at *5 (N.D. Tex. July 23, 2012) ("[Relator] satisfies her pleading obligations, by alleging that [defendant] had a practice of certifying patients with a reckless disregard for their actual condition.").

Accordingly, Relator has satisfied Rule 9(b) for pleading factual falsity.

### c. *Legal Falsity*

If a claim "does not comply with statutory conditions for payment," including that the items and services claimed are "'reasonable and necessary for the diagnosis and treatment of illness or injury,'" as required by the Medicare statute, it is a legally false claim. *U.S. ex rel. Petratos v. Genentech Inc.,* 855 F.3d 481, 487 (3d Cir. 2019) (quoting 42 U.S.C. § 1395y(a)(1)(A)).

23

Where a claim of legal falsity is based on a certification of compliance with a legal provision, such certification may be express or implied. *United States ex rel. Wilkins v. United Health Grp. Inc.*, 659 F.3d 295, 306 (3d Cir. 2011). "'Under the 'express false certification' theory, [a claimant] is liable under the FCA for falsely certifying that it is in compliance with' a material statute, regulation, or contractual provision." *U.S. v. Eastwick Coll.*, 657 F. App'x 89, 94 (3d Cir. 2016) (*quoting Wilkins*, 659 F.3d at 305). In addition to express misrepresentations, the FCA also "encompasses claims that make . . . certain misleading omissions." *Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 136 S. Ct. 1989, 1999, 195 L. Ed. 2d 348 (2016). Under the implied false certification theory, a submitted claim "impliedly certifies compliance with all conditions of payment[, b]ut if that claim fails to disclose the defendant's violation of a material statutory, regulatory, or contractual requirement, so the theory goes, the [claimant] has made a misrepresentation that renders the claim 'false or fraudulent' under [the FCA]." *Id.* at 1995.

It is indisputable that, at all times relevant to this action, it was a condition of payment under Medicare and Medicaid that the billed therapy services must be medically reasonable and necessary. *See* 42 U.S.C. § 1395y(a)(l)(A) ("[N]o payment may be made under part A or part B of this subchapter for any expenses incurred for items or services ... which ... are not reasonable and necessary for the diagnosis or

24

treatment of illness or injury or to improve the functioning of a malformed body member .... "); 42 U.S.C. § 1320c-5(a).

The Complaint alleges that HCHB "caused to be submitted" … "false claims for home health services premised upon Defendants' fraudulent certifications of compliance with Medicare regulations as made on CMS Forms 885A and 1450 and elsewhere." FAC, ¶¶ 85-89.

HCHB argues that because it did not directly certify compliance, it cannot have submitted a legally false claim.  Hearst Mot. at 23. This argument fails as the False Claims Act expressly provides that direct compliance is not required. 31 U.S.C. § 3729(a)(1)(A) (imposing False Claims Act liability if a defendant "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval"). *See U.S. v. Kindred Healthcare, Inc*., 517 F. Supp. 3d 367, 388   (E.D. Pa. 2021) (finding legal falsity satisfied where relator alleged that defendants themselves did not directly submit false Form 1500s, as long as it is alleged that defendant "caused" the submission.).

### C. Relator Sufficiently Pleads the Hearst Defendants' Knowledge

Knowledge is an essential element of a relator's claim under the FCA. *See* 31 U.S.C. § 3729(a)(1)(A)-(B). The FCA defines "knowing" as "actual knowledge," "deliberate ignorance of the truth or falsity of the information," or "reckless

disregard of the truth or falsity of the information." *Id.* § 3729(b)(1)(A)(i)-(iii). "Proof of specific intent to defraud" is not required. *Id*. § 3729(b)(1)(B). Moreover, under Rule 9(b), "allegations of knowledge may be alleged generally and need not be pled with particularity." *Exec. Health Res.*, 196 F. Supp. 3d at 503.

As alleged in the Amended Complaint, the HCHB software is used by seven of the top ten home health and hospice agencies, "making the Homecare Homebase software the nation's #1 homecare software. The software solutions service is used for over 350,000 patients every day, accounting for more than 25% of the annual Medicare revenue for home health and hospice. Homecare Homebase software generates over $125 million in annual revenues and has over 2,200 installed locations across the nation, with more than 63,000 users." FAC, ¶ 19.

The Amended Complaint further alleges that HCHB had knowledge of a false claim:

> By and through the fraudulent schemes described herein, Defendants knowingly--by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information--presented or caused to be presented false or fraudulent claims to the United States for payment or approval, to wit:
>
> a.    Defendants submitted false claims for home healthcare PPS payments that were fraudulently inflated by false OASIS patient assessment data, in violation of 42 U.S.C. § 1395f and 42 U.S.C. § 484.20;
>
> b.    Defendants submitted false claims for home healthcare services that were not medically necessary; and

> c. Defendants submitted false claims for home health services premised upon Defendants' fraudulent certifications of compliance with Medicare regulations as made on CMS Forms 885A and 1450 and elsewhere.

*Id.*, ¶ 80. *See also, id.*, ¶ 85. Such allegations are sufficient at the pleading stage.

In addition, while HCHB may not have had actual knowledge of each and every time the software prompted the increase in visits, it certainly developed the software's coding around the payment thresholds set by CMS that encouraged the upcoding prompts. *See* FAC, ¶ 55 ("Homecare Homebase software was intentionally designed to inflate reimbursements from Medicare, Medicaid, and private health insurance by causing providers to 'upcode' claims made to Medicare and Medicaid and to bill for medically unnecessary services.").

Notably, when the Medicare payment model changed from PPS to the Patient-Driven Groupings Model ("PDGM"), HCHB likewise changed its software coding to track the new PDGM model and no longer appears to prompt additional visits. FAC, ¶ 69. That is because additional visits within a prescribed time period no longer result in additional payments. For HCHB to claim it lacks knowledge is simply not plausible.

At the very least, HCHB's conduct amounts to a reckless disregard for the Medicare rules on payments for only medically necessary therapy visits. The HCHB

software purposely encourages increased visits without taking into account whether the additional visits are medically necessary. *See U.S. ex rel. Integra Med Analytics LLC v. Providence Health & Servs.*, 2019 U.S. Dist. LEXIS 125352 (C.D. Cal 2019) *reversed on other grounds* (finding knowledge adequately plead where complaint alleged that software that was intended to increase Medicare revenue by providing leading queries gave "rise to a plausible inference that Defendants were primarily focused on increasing their Medicare revenue such that they at least recklessly disregarded the possibility that the tactics they used could lead to improper upcoding.").[8]

Accordingly, Relator satisfies Rule 9(b)'s pleading requirements for knowledge.

### D. Relator Sufficiently Pleads That HCHB Caused False Claims To Be Presented Or False Statements To Be Made Or Used[9]

In the FCA context, the Third Circuit has found that even when one party may make "its own decision to file a false certification, this is not inconsistent with a

---

[8]      Hearst Defendants' reliance on *U.S. ex rel. Sullivan v. Atrium Med. Corp.*, No. SA-13-CA-244-OLG, 2015 WL 13799885 (W.D. Tex. 2015) (Hearst Mot. at 21) is distinguishable. Atrium was an off-label marketing action, which the district court expressly stated was different from a case involving medically unnecessary services, as is the situation in this action.

[9]      Relator withdraws its Reverse False Claims claim against the Hearst Defendants.

conclusion that [another party] caused that filing" when the latter party's scheme was a "substantial factor in bringing about" the false filings. *U.S. ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 244 (3d Cir. 2004). *See also U.S. ex rel. Polansky v. Exec. Health Res., Inc.*, 196 F. Supp. 3d 477, 495 (E.D. Pa. 2016) (relator's allegations of EHR's role within the hospital review process and its influence on its clients' final billing decisions are sufficient to plead causation.).

It is well-settled that where a defendant's fraudulent conduct was a "substantial factor" in bringing about the presentation of a false claim by another party and the submission of the false claim was foreseeable or a "normal consequence" of the defendant's fraudulent conduct, then the defendant has "caused" the presentation of a false claim in violation of the FCA notwithstanding the fact that the provider who presented the false claim made an independent judgment in filing the claim. *U.S. ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 244 (3d Cir. 2004) (Causation under FCA sufficiently alleged where complaint plausibly suggests doctors wrote off-label prescriptions because of defendant Novartis' off-label marketing).[10]

---

[10]    *See also, e.g., U.S. ex rel. Bates v. Dentsply Int'l, Inc.*, No. 12-7199, 2014 WL 4384503, at *8-9 (E.D. Pa. Sep. 4, 2014) (same); *U.S. ex rel. Galmines v. Novartis Pharm. Corp.*, No. 06-3213, 2013 WL 2649704, at *1 (E.D. Pa. June 13, 2013) (causation under FCA sufficiently alleged where complaint plausibly suggests

Defendants' briefing is laced with attempts to convince this Court that it is the provider with the home health agency that decides the number of therapy visits required based on a plan of care and ultimately the billing decision. As the Amended Complaint illustrates, however, in actual practice this is far from the truth, especially in the case of Holy Redeemer where the upcoded number of therapy visits encouraged by the HCHB software prompts are generally accepted by most providers. FAC, ¶ 64. *See Barrows v. Burwell*, Civ. No. 13-4179, 2015 WL 264727 (2d Cir. Jan. 22, 2015) (denying motion to dismiss where the plaintiff had alleged that inpatient decisions were in actual practice not left to the discretion of the treating physician but were instead guided by standardized review criteria utilized by the

---

doctors wrote off-label prescriptions because of defendant Novartis' off-label marketing); *U.S. ex rel. Brown v. Celgene Corp.*, No. 10-3165, 2014 WL 3605896, at *8 (C.D. Cal. July 10, 2014)(same); *U.S. ex rel. Carpenter v. Abbott Labs.*, 723 F. Supp. 2d 395 (D. Mass. 2010)(allegations that defendants' literature compared its drug favorably with other drugs approved for off-label use and failed to reflect unfavorable information satisfied "substantial factor" test); *U.S. ex rel. Tran v. Computer Sciences Corp.*, 2014 WL 2989948, at *14 (D.D.C. July 3, 2014)(where defendant small business participated in planning and participating in pass through scheme giving work to large company that submitted false claim, "substantial factor" test satisfied*); U.S. ex rel. Franklin v. Parke-Davis*, 147 F.Supp.2d 39, 52-53 (D. Mass. 200l)("[W]hen all reasonable inferences are drawn in favor of the Relator, the participation of doctors and pharmacists in the submission of false Medicaid claims was not only foreseeable, it was an intended consequence of the alleged scheme of fraud.").

hospital. The Court held that discovery must proceed on the precise issue of how such decisions are made and finalized prior to billing.).

Hearst Defendants' reliance on *U.S. ex rel. Petrowski v. Epic Systems Corp.*, No. 8:15-CV-1408-T-30JSS, 2018 U.S. Dist. LEXIS 28119, *10 (M.D. Fla. 2018) is misplaced. As a threshold matter, the Eleventh Circuit's standard for FCA claims is much more rigorous than the standard required by Third Circuit, including requiring detailed and specific information about individual claims that is not required by the Third Circuit. In addition, unlike the HCHB software, the software at issue in *Petrowski* did not provide leading inquiries to the users for the sole purpose of increasing Medicare and Medicaid reimbursements; rather, the Epic software contained old code that was not updated to reflect revised CMS regulations.

Similarly, in *U.S. ex rel. Olcott, v. Southwest Home Health Care, Inc*., No. 12-cv-605CVE-FHM, 2018 U.S. Dist. LEXIS 162547 (N.D. Okla. Sep. 24, 2018) the district court dismissed the claims against a software company where a relator had alleged that the fraudulent practices predated the implementation of the software by many years and therefore, the court concluded there was no causation. Moreover, the court determined that one individual that was the software company's representative was acting outside the scope of her employment when allegedly assisting with the fraud on one specific claim. In this case, Relator has alleged Holy

31

Redeemer had been using the HCHB software for six to seven years and that the HCHB software itself (not some rogue representative) was central to the upcoding practices. Accordingly, Hearst's reliance on *Olcott* is unavailing.

### E. Relator Sufficiently Alleges Materiality

A "misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act." *Universal Health Servs., Inc. v. United States ex rel. Escobar,* 136 S. Ct. 1989, 1996 195 L. Ed. 2d 348 (2016). "Material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *United States ex rel. Spay v. CVS Caremark Corp.*, 875 F.3d 746, 761 (3d Cir. 2017) (internal quotation marks omitted). "[C]ourts are to conduct a holistic approach to determining materiality in connection with a payment decision, with no one factor being necessarily dispositive." *U.S. ex rel. Escobar v. United Health Servs., Inc.*, 842 F.3d 103, 109 (1st Cir. 2016).

The Medicare Benefit Policy Manual, published by CMS, makes clear that the government will not pay for home health services unless there is sufficient evidence in the documentation that the patient is eligible to receive the services:

> If the documentation used as the basis for the certification of
> eligibility is not sufficient to demonstrate that the patient is or was

32

> eligible to receive services under the Medicare home health benefit, payment will not be rendered for home health services provided.

Medicare Benefit Policy Manual, Chapter 7, Home Health Services, § 30.5.1.2 – Supporting Documentation Requirements. It follows that to be eligible for the number of therapy visits billed to Medicare, for which the guidelines require there be medical necessity and properly supported and documented, that Medicare would not in fact pay for medically unnecessary therapy visits.

In addition, HCHB impliedly concedes materiality given that HCHS has specifically developed its software to trigger prompts based on the government's tiered payment system, and therefore, it cannot colorably claim that the number of therapy visits is not material to the government's decision to pay.

HCHS argues that materiality has not been properly alleged because Relator does not allege that HCHB's prompts encouraging upcoding of unnecessary therapy visits "were material to Holy Redeemer's therapists or nurses …" Hearst Mot. at 28-29. However, that is not the correct focus of the materiality inquiry. Rather, the inquiry concerns the government's decision to pay. In any event, Relator does allege that the Holy Redeemer providers largely accepted the prompts from HCHB, which infers that the providers believed them to be material. Significantly, HCHB does not argue that the Amended Complaint does not adequately allege that the government would not have paid the claims had it known of the false statements.

33

## II.    RELATOR SUFFICIENTLY PLEADS A CLAIM FOR RETALIATION AGAINST HOLY REDEEMER

"Unlike [] substantive FCA claims, retaliation claims under § 3730(h) are not subject to Rule 9(b)'s heightened particularity requirement. Instead, a plaintiff need only satisfy Rule 8(a)'s notice-pleading standard. *See* Fed. R. Civ. P. 8(a)." *United States ex rel. Grant v. United Airlines Inc.*, 912 F.3d 190, 200 (4th Cir. 2018). The FCA's anti-retaliation provision provides relief for "[a]ny employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against ... because of lawful acts done ... in furtherance of an action [under the FCA] or other efforts to stop 1 or more violations of [the FCA]." 31 U.S.C. § 3730(h).

Relator has adequately alleged a claim for retaliation by pleading facts that he (1) engaged in protected activity by refusing to accept changes to patient severity and number of visits made by Holy Redeemer reviewers and expressing concerns to his manager and a human resources director regarding reviewers, FAC, ¶¶ 76-77, and (2) was retaliated against as a result when his hours were reduced and he was ultimately terminated after engaging in the protected activity, *Id.*, ¶ 78.

Holy Redeemer challenges whether Relator engaged in protected activity. There are two types of protected activity under the FCA: (1)    lawful acts "in furtherance of an action" under the FCA, and (2) "other efforts to stop 1 or more

34

violations of" the FCA. 31 U.S.C. § 3730(h). Prior to 2010, protected activity only included the first type - lawful acts "in furtherance of an action" under the FCA. However, Congress expanded the types of conduct protected under the FCA by amending the FCA in 2009 and 2010 to make clear that protected conduct includes not just lawful acts "in furtherance of an action" under the FCA, but, also, "other efforts to stop 1 or more violations of" the FCA. *See* Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111–21, 123 Stat. 1617, 1624–25 (2009); Dodd–Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111–203, § 1079A(c), 124 Stat. 1376, 2079 (2010). "Courts have concluded that [the 2009 and 2010] amendments [to the FCA] broadens whistleblower protection against retaliation to include protecting such activities as reporting misconduct internally." *Hale v. Moreland Altobelli Assoc.*, Inc., 2014 WL 12235187, at *4 (N.D. Ga. Sept. 4, 2014) (citing *Halasa v. ITT Educ. Servs., Inc.*, 690 F.3d 844, 847-48 (7th Cir. 2012)); *Marbury v. Talladega College*, 2014 U.S. Dist. LEXIS 7635, *22 (N.D. Al. 2014) (citations omitted) ("Congress stated that the 'language is intended to make clear that [§ 3730(h)] protects not only steps taken in furtherance of a potential or actual *qui tam* action, but also ... taken to remedy ... misconduct through methods such as internal reporting to a supervisor or company compliance department.'")).

35

Holy Redeemer focuses exclusively on the first type of protected activity, i.e. lawful actions in furtherance of an action under the FCA, and ignores the second type of protected activity, "other efforts to stop 1 or more violations of" the FCA. Holy Redeemer cites to Third Circuit case law predating the 2009 and 2010 amendments to the FCA to argue that Relator did not put Holy Redeemer on notice of the distinct possibility of FCA litigation. However, "applying the distinct possibility standard to cover both the old and the new language in § 3730(h) would render the latter a nullity in contradiction to the well-established canon that courts engaged in statutory interpretation must give each word some operative effect." *Carlson v. DynCorp International LLC*, 657 Fed.Appx. 168, 171 (4th Cir. 2016) (quotations omitted); *accord United States ex rel. Grant v. United Airlines Inc.*, 912 F.3d 190, 200 (4th Cir. 2018) ("A plain reading of this provision suggests the incongruousness of attempting to subject it to the "distinct possibility" standard. The apparent purpose of the amendment is to untether these newly protected efforts from the need to show that an FCA action is in the offing. Indeed, we and other circuits have recognized that the amended language broadens the scope of protected activity."); *see also U.S. ex rel. Grenadyor v. Ukrainian Vill. Pharmacy, Inc.*, 772

F.3d 1102, 1108 (7th Cir.2014) (Posner, J.) (indicating that amended statute covers more than prior version).[11]

By refusing to accept Holy Redeemer reviewers' changes to a patient's severity and number of visits, Relator stopped a violation of the FCA. When Relator met with his manager and a human resources director to express his concerns regarding back office reviewers changing his professional assessment of patients' severity and needs, he was attempting to stop one or more violations of the FCA. By refusing to participate in inflating patient severity and number of visits needed, Relator was stopping violations of the FCA. This is protected conduct under the FCA retaliation provisions as expanded by Congress in its 2009 amendments. Moreover, Holy Redeemer does not challenge that Relator's filing of this *qui tam* action was protected conduct under the FCA and New Jersey FCA.

---

[11]    The single district court case cited by Holy Redeemer from after the 2010 amendments for application of the "distinct possibility" standard, *U.S. ex rel. Perri v. Novartis Pharmaceuticals Corp.*, 2019 WL 688006, at *19 (D.N.J. 2019), quotes a pre-2010 Third Circuit case which only defines "protected conduct" as the first type, conduct in furtherance of FCA litigation. (HR Mot. at 26.)  The other case cited by Holy Redeemer, *Hutchins v. Wilenz, Goldman & Spitzer*, 253 F.3d 176, 188 (3d Cir. 2001) predates the 2009 and 2010 FCA amendments expanding the definition of protected conduct. (HR Mot. at 27.) Relator has not identified a Third Circuit opinion directly addressing whether the "distinct possibility" standard applies to the "efforts to stop 1 or more violations" of the FCA prong after Congress expanded the types of conduct protected under the FCA retaliation provisions by adding this prong.

Moreover, even prior to the 2009 and 2010 amendments to the FCA and under the "district possibility" standard, protected conduct included internal reports of FCA violations. *Hutchins*, 253 F.3d at 187. "[W]hen an employee informs her employer about the discovery of suspected fraud and the employer takes no action to correct it, the employer has reason to fear that the employee will file a qui-tam action or report suspected fraud to the government, unless the employee by words or actions affirmatively indicates otherwise." *Mann v. Olsten Certified Healthcare Corp.*, 49 F.Supp.2d 1307, 1315 (M.D. Ala. 1999). While reporting regulatory violations alone may not be protected conduct, because not every regulatory violation results in the submission of false claims, where, as here, the violations were to the payment regulations, therefore, resulted in the submission of false claims, such conduct is protected under the FCA.

Moreover, Relator engaged in the second kind of protected conduct under the statute when he filed this *qui tam* action and cooperated with government investigators. Holy Redeemer challenges whether Relator was discriminated against because of his protected conduct, arguing that Holy Redeemer was not aware that Relator had filed this *qui tam* action. However, whether Holy Redeemer had knowledge of this action is a question of fact not appropriate for determination at the pleadings stage. "It strains credulity to believe that Congress would require a

38

defendant to have knowledge of a sealed action for a retaliation claim to survive the pleading stage." *Smith v. Clark/Smoot/Russell*, 796 F.3d 424, 433 (4th Cir. 2015). Here, Holy Redeemer reduced Relator's hours and ultimately terminated him after he refused to increase the severity and number of visits of patients to obtain higher reimbursements from government healthcare programs and filed this *qui tam* action. This is sufficient at the pleading stage to establish that Relator was discriminated against because of his protected activity.

### III.    RELATOR ADEQUATELY PLEADS A CONSPIRACY CLAIM

"In order to state a conspiracy claim under the [Federal False Claims Act], a plaintiff must allege '(1) a conspiracy to get a false or fraudulent claim allowed or paid; and (2) an act in furtherance of the conspiracy.'" *U.S. v. Medco Health Sys., Inc.*, No. CIV. 12-522 (NLH), 2014 U.S. Dist. LEXIS 135767, 2014 WL 4798637, at * 11 (D.N.J. Sept. 26, 2014) (quoting *U.S. ex rel. Lampkin v. Johnson & Johnson, Inc.*, No. CIV.A. 08-05362 (JAP), 2013 U.S. Dist. LEXIS 76448, 2013 WL 2404238, at *5 (D.N.J. May 31, 2013)). The Amended Complaint alleges that "Defendants' entered into a conspiracy or conspiracies through their employees and offices to defraud the United States by upcoding home health therapy visits." FAC, ¶ 90. Holy Redeemer has not moved to dismiss the conspiracy claim. However, the Hearst Defendants argue that the allegations in the Amended Complaint are

insufficient.    Hearst Mot. at 30.    The Amended Complaint alleges that Holy Redeemer licensed the software from HCHB for the improper purpose of increasing revenues from medically unnecessary home health visits.    FAC, ¶¶ 4, 55, 57. Accordingly, Relator has adequately alleged the existence of an agreement between the parties. [12]

## IV.    THE STATE LAW CLAIMS ARE ADEQUATELY PLED

### A. Relator Has Adequately Pled a Nationwide Fraudulent Scheme by the Hearst Defendants

The Complaint alleges with sufficient particularity the details of a nationwide fraudulent systemic scheme against HCHB. *See e.g.*, FAC, ¶ 4 ("Homecare Homebase, Inc. has developed software used by Holy Redeemer and other home health agencies around the country to document and track home care visits."); ¶19 ("Seven (7) of the top ten (10) home health and hospice agencies use its software, making the Homecare Homebase software the nation's #1 homecare software.  The software solutions service is used for over 350,000 patients every day, accounting

---

[12]    In the event the Court finds the license for the HCHB software insufficient as the agreement necessary for a conspiracy claim, Relator requests that he be allowed to replead this claim once he takes discovery and finds sufficient evidence of an explicit agreement.  *See Medco Health*, 2014 U.S. Dist. LEXIS 135767 at *34 (granting relator opportunity to take discovery on conspiracy claim to support the existence an agreement).

for more than 25% of the annual Medicare revenue for home health and hospice. Homecare Homebase software generates over $125 million in annual revenues and has over 2,200 installed locations across the nation, with more than 63,000 users."); ¶¶ 95-292 (alleging that Hearst Defendants violated terms of specific statutes of 27 states). The Complaint further alleges that Relator has witnessed the same prompts in the HCHB software used by a provider other than Holy Redeemer. *See* FAC, ¶ 63 ("The Homecare Homebase software is also used by another provider where Relator works and the software gave the same prompt when used at that provider.") As the Complaint alleges that HCHB's entire business model was infected with fraud, its allegations apply equally to all locations in which HCHB operates. *See U.S. ex rel. Brown v. Celgene Corp.*, Civ. No. 10-3165, 2014 WL 3605896, at *10 (C.D. Cal. July 10, 2014)("Celgene argues that all of [Relator]'s non-California state law claims should be dismissed because [Relator] 'fails to allege any connection to or knowledge of activities in those other states.' This argument is not well taken. [Relator]'s [complaint] makes allegations about Celgene's nationwide, systemic practices, not California-specific allegations. There is no reason to conclude that Celgene's alleged misconduct was limited to California."); *U.S. ex rel. Polansky v. Exec. Health Res., Inc.*, 196 F. Supp. 3d 477, 496 (E.D. Pa. 2016) (finding state law claims sufficiently pled based on same allegations as federal FCA claim as relator

41

alleged a nationwide scheme); *see also U.S. ex rel. Spay v. CVS Caremark Corp.*, 913 F. Supp. 2d 125, 177 (E.D. Pa. 2012) ("Certainly, Plaintiff cannot be expected to plead with particularity each and every false claim nationwide without the benefit of at least some discovery, as such information rests solely within Defendants' control."). [13]

### B. Relator's Claims Under The New Jersey False Claims Act Against Holy Redeemer Should Be Sustained

Relator only asserts state FCA claims against Holy Redeemer under the New Jersey False Claims Act. *See* FAC, ¶¶ 217-223 (Count Twenty-Two). Accordingly, there is no need to address Holy Redeemer's arguments relating to state causes of action other than the cause of action under the New Jersey False Claims Act. For the reasons set forth above, Relator has sufficiently plead claims under the New Jersey False Claims Act. *Scibetta v. Acclaimed Healthcare*, 2021 U.S. Dist. LEXIS 224791, *14, 2021 WL 5450296 (D.N.J. 2021) ("Because the New Jersey False Claims Act

---

[13] The Hearst Defendants do not address the state insurance fraud claims under the California Insurance Fraud Prevention Act (Count Thirty-Three) or Illinois Insurance Claims Fraud Prevention Act (Count Thirty-Four) in their brief. Rather, they attempt to circumvent the Court's page limitations by including a four page chart addressing these claims. Such argument outside the page limit should, respectfully, be disregarded by the Court, especially since they did not prove prior to filing. Regardless, Relator has adequately pled claims under the State insurance fraud acts for the same reasons set forth herein with regard to the State FCAs.

essentially mirrors the Federal False Claims Act with respect to the applicable sections in the instant case, the Court's analysis is the same under both statutes.").

### C. The Hearst Defendants' Argument That The State FCA Claims Should Be Dismissed Lacks Merit

Section 1909 of the Social Security Act provides incentives to States that enact state false claims acts that establish liability to the State for false or fraudulent claims, as described in the FCA, with respect to Medicaid spending. *See* 42 U.S.C. 1396h. Accordingly, false claims adequately pled under the FCA are also adequately pled under the state FCAs, because the elements of the majority of the State FCAs are effectively identical to those under the federal FCA.[14] *See New York v. Amgen*

---

[14] *See, e.g., U.S. v. Cmty. Recovery Res., Inc.*, No. 2:13-cv-01004-TLN-AC, 2017 U.S. Dist. LEXIS 79096 (E.D. Cal. May 22, 2017) (California False Claims Act mirrors the federal FCA and Court can look to federal law); *U.S. ex rel. Lovato ex rel. Lovato v. Kindred Healthcare, Inc.*, 2020 U.S. Dist. LEXIS 252097, *23 (D. Col. 2020) (substantial similarities between the False Claims Act and the Colorado Medicaid False Claims Act); *U.S. v. All Children's Health Sys., Inc.*, No. 8:11-CV-1687-T-27EAJ, 2013 U.S. Dist. LEXIS 53932, 2013 WL 1651811, at *5 (M.D. Fla. Apr. 16, 2013) (Florida False Claims Act mirrors the federal False Claims Act and is subject to the same pleading standard); *U.S. v. Genesis Global Healthcare*, 2021 U.S. Dist. LEXIS 178879, *8, 2021 WL 4268279 (N.D. Ga. 2021 (Georgia FCA mirrors the federal FCA); *County of Hawai'i v. UniDev, LLC*, 2010 U.S. Dist. LEXIS 12150, *27, 2010 WL 520696 (D. Haw. 2010) ("language of Haw. Rev. Stat. § 661-21 is almost identical to the federal FCA's language in Section 3729."); *U.S. ex rel. Absher v. Momence Meadows Nursing Ctr., Inc.*, 764 F.3d 699, 704 n.5 (7th Cir. 2014) ("the [Illinois False Claims Act] closely mirrors the [federal False Claims Act]"); *Kuhn v. LaPorte County Comprehensive Mental Health Council*, 2008 U.S. Dist. LEXIS 68737, *8 (N.D. Ind. 2008) ("Indiana FCA "mirrors the Federal FCA

*Inc.*, 652 F.3d 103, 109 (1st Cir. 2011) ("Given the substantive similarity of the state FCAs invoked here and the federal FCA with respect to the provisions at issue in this litigation, the state statutes may be construed consistently with the federal act.").

---

in all material respects"); *U.S. ex rel. Thayer v. Planned Parenthood of the Heartland*, 765 F.3d 914, 916 n.1 (8th Cir. 2014) ("Because the FCA and the [Iowa] FCA are nearly identical, case law interpreting the FCA also applies to the [Iowa] FCA."); *U.S. ex rel. Rembert v. Bozeman Health Deaconess Hosp.*, 2017 U.S. Dist. LEXIS 17275, *3, 2017 WL 514205 (D. Mon. 2017) ("The Montana False Claims Act**23** is substantially similar to the federal FCA."); *U.S. ex rel. Collins v. Molina Healthcare, Inc.*, 2019 U.S. Dist. LEXIS 237061, *40, 2019 WL 11816475 (D. Mass 2019) (MFCA claims substantially similar to federal FCA claims); *U.S. ex rel. Herrera v. Bon Secours Cottage Health Servs.*, 665 F. Supp. 2d 782, 783 (E.D. Mich. 2008) (Michigan Medicaid False Claims Act is substantially similar to the FCA); *Olson v. Fairview Health Servs. of Minn.*, No. 13-2607, 2015 U.S. Dist. LEXIS 31823, 2015 WL 1189823, at *7 (D. Minn. March 16, 2015) ("Minnesota FCA parallels the federal FCA."); (S.D.N.Y. 2010) (NY FCA "is closely modeled on the federal FCA"); *Harris v. Blue Ridge Health Servs.*, 388 F. Supp. 3d 633, 639 (M.D.N.C. 2019)( NCFCA similar to federal FCA);*U.S. ex rel. Boggs v. Bright Smile Family Dentistry, P.L.C.*, 2013 U.S. Dist. LEXIS 55322, *11, 2013 WL 1688898 (W.D. Okla. 2013) (Oklahoma Medicaid FCA identical to federal FCA); *U.S. v. APS Healthcare, Inc.*, 2013 U.S. Dist. LEXIS 13355, *19, 2013 WL 420402 (D. Nev. 2013) ("Nevada FCA retaliation statute is substantially similar to the federal statute."); *U.S. ex rel. John Carbon v. Care New Eng. Health Sys.*, 2021 U.S. Dist. LEXIS 201528, *7, 2021 WL 4860736 (D.R.I. 2021) ("Rhode Island False Claims Act is nearly identical to federal False Claims Act."); *U.S. ex rel. Marshall v. Univ. of TN Med. Ctr. Home Care Servs., LLC*, 2021 U.S. Dist. LEXIS 159167, *3, 2021 WL 3743189 (E.D. Tenn. 2021) (Tennessee Medicaid False Claims Act similar to federal FCA); *Lewis v. City of Alexandria*, 287 Va. 474, 756 S.E.2d 465, 469 n.4 (Va. 2014) (Virginia Fraud Against Taxpayers Act is based on the federal FCA and courts look to the federal FCA for guidance in construing the VFATA); *U.S. ex rel. Dahlstrom v. Sauk-Suiattle Indian Tribe*, 2019 U.S. Dist. LEXIS 147714, *39, 2019 WL 4082944 (W.D. Wash 2019) (Washington is modeled after federal FCA).

To the extent a State FCA differs from the federal FCA (like Texas, as discussed below), the State FCA may only be broader than the federal FCA in order for the State to continue to qualify for the financial incentives provided under the Social Security Act.

### D. Material differences exist between the federal FCA and the Texas Medicaid Fraud Prevention Act.

The Texas Medicaid Fraud Prevention Act ("TMFPA") does not mirror the FCA. Rather, the TMFPA sets out several unlawful acts that each proscribe specific conduct generally involving the Medicaid program. *See* Tex. Hum. Res. Code §§36.002(1)-(13). A key difference in relation to Defendants Hearst's and HCHB's Motion to Dismiss, and Defendant Holy Redeemer's Motion to Dismiss, is that, unlike the FCA, the plain language of a majority of the TMFPA unlawful acts do not require the presentment of a "false claim" to incur liability. Tex. Hum. Res. Code §§36.002(1), (2), (3), (4), (5), (9), (10), (11), (12) and (13). Defendants fail to acknowledge these substantial differences between the TMFPA and the FCA, which is fatal to their contention that the Texas cause of action fails "for the same reasons" as Relator's FCA claims. Hearst Mot. at 35; HR Mot. at 29 ("pleading insufficiencies chronicled above apply with equal force and serve as a basis for dismissal" of state claims).

45

Likewise, Defendants impermissibly seek to change the meaning of the TMFPA by requiring the Relator plead Defendants "presented or caused to be presented a false claim" to incur liability, which is contrary to the plain language of the TMFPA. Hearst Mot. at 25. *See generally id* at 25-28; HR Mot. at 2-3. In matters involving state law, federal courts apply the same law that would be applied by the highest court of that state. *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). In a case interpreting the TMFPA, the Texas Supreme Court declared that "[s]tatutory language is the 'surest guide to the Legislature's intent' because 'it is a fair assumption that the Legislature tries to say what it means.'" *In re Xerox*, 555 S.W.3d 518, 527 (Tex. 2018) (citing *Prairie View A&M Univ. v. Chatha*, 381 S.W.3d 500, 507 (Tex. 2012)). The Texas Supreme Court continued that "the Legislature selected statutory words, phrases, and expressions deliberately and purposefully and was just as careful in selecting the words, phrases, and expressions that were included or omitted." *In re Xerox,* 555 S.W.3d at 527.

The Texas Supreme Court particularly rejected the contention that the FCA and TMFPA should be read as identical when it stated: "Though the parties make comparisons to analogous federal and state fraud-prevention acts as it suits their arguments—including the federal False Claims Act…and similar false-claims or Medicaid-fraud statutes enacted by thirty-two state and local jurisdictions —these

46

comparisons are not probative. These statutes, while similar in aim and tactic, employ materially different language, and the language of our statutes controls the outcome here." *In re Xerox*, 555 S.W.3d at 535.

Federal courts also have declined to interpret the TMFPA as identical to the FCA. The federal district court in *United States ex rel. Govindarajan v. Dental Health Programs, Inc.*, recognized that the scope of the TMFPA "reach[] a broader range of false or fraudulent conduct less closely tied to the Medicaid claim submission process." *U.S. ex rel. Govindarajan v. Dental Health Programs, Inc.*, No. 3:18-cv-00463-E, 2020 WL 3064712, at *7 (N.D. Tex. June 8, 2020) (citing *U.S. ex rel. Patel v. Catholic Health Initiatives*, 312 F. Supp.3d 584, 606-07 (S.D. Tex. 2018), *aff'd sub nom. U.S. ex rel. Patel v. Catholic Health Initiatives*, 792 F. App'x 296 (5th Cir. 2019)) (brackets in original). The *Govindarajan* court noted that despite some similarities with the FCA, "the TMFPA's plain language controls with respect to claims brought under [the TMFPA]." *Id.* (citing *In re Xerox*, 555 S.W.3d at 535).

Defendant Hearst and HCHB's assertion that the state claims, including the Texas cause of action, "require substantially identical proofs to the federal FCA" has thus been rejected by both state and federal courts. Hearst Mot. at 35; HR Mot. at 35. Accordingly, Defendants' arguments that Relator's state claims should fail on

47

the same basis as the FCA claims should also be rejected. Defendants Hearst and HCHB's reliance on *U.S. ex rel. Portilla v. Riverview Post Acute Care Ctr.*, No. 12-1842, 2014 WL 1293882 at *18 (D.N.J. Mar. 31, 2014) is inapplicable to this case, where New Jersey was the only named plaintiff-state and that court focused solely on an FCA analysis.

The TMFPA defines "material" as "having a natural tendency to influence or to be capable of influencing." Tex. Hum. Res. Code § 36.001(5-a). The FCA, in contrast, defines "material" as "having a natural tendency to influence, or be capable of influencing, *the payment or receipt of money or property.*" 31 U.S.C. § 3729(b)(4) (italics added). The TMFPA lists thirteen unlawful acts but only three contain the word "material." *See* Tex. Hum. Res. Code §§ 36.002(1), (4) & (12). Two of those apply materiality to situations other than "the payment or receipt of money or property." *See* § 36.002(1) ("knowingly makes or causes to be made a false statement or misrepresentation of a **material** fact to permit a person to receive a *benefit* or payment under the Medicaid program that is not authorized or that is greater than the *benefit* or payment that is authorized; and § 36.002(4) ("knowingly makes, causes to be made, induces, or seeks to induce the making of a false statement or misrepresentation of **material** fact concerning" (A) *certification of facilities* and (B) *Medicaid information*); (bold and italics added). By its plain and ordinary language,

48

the TMFPA's definition of "material" is, unlike the FCA's, expressly not limited to a payment decision because the TMFPA applies materiality to conduct beyond influencing "the payment or receipt of money or property."

Defendants Hearst and HCHB fail to address how their analysis of FCA materiality applies to the Texas cause of action. Hearst Mot. at 28-29. Adding the FCA definition and its application only to "the payment or receipt of money or property" to the term "material" in the TMFPA is improper. *Lippincott v. Whisenhunt*, 462 S.W.3d 507, 508 (Tex. 2015) (*per curiam*) ("A court may not judicially amend a statute by adding words that are not contained in the language of the statute. Instead, it must apply the statute as written."); *U.S. ex rel. Patel*, 312 F. Supp. 3d at 607 (holding the court is inclined to accept Texas's position "that the 'false certification' doctrines developed by federal courts under the FCA are inapplicable to the TMFPA, as is the materiality requirement that the Supreme Court expounded in *Escobar*") (citing *U.S. ex rel. Escobar*, 136 S. Ct. 1989 (2016)).

Accordingly, if FCA claims are adequately pled under the federal FCA, they are adequately pled under State FCA statutes. *See U.S. ex rel. Rahimi v. Zydus Pharm. (USA), Inc.*, No. CV 15-6536-BRM-DEA, 2017 U.S. Dist. LEXIS 63401, 2017 WL 1503986, at *12 (D.N.J. Apr. 26, 2017) ("Thus, for the same reasons the Court declines to dismiss Relators' federal FCA claims, the Court likewise declines

to dismiss Relators' 'substantially similar' claims under the various states' *qui tam* statutes, because these statutes essentially mirror the federal FCA.").

### E.  The States Have Declined to Intervene

The Hearst Defendants' argument that the State Law FCA claims are procedurally defective because the States have not "affirmatively" given sufficient notice to the Court lacks merit. Hearst Mot. at 34. As a threshold matter, this Court has already deemed the declination notice sufficient by unsealing the case and restoring it to the active docket. *See* ECF No. 4. Moreover, none of the statutes cited by Hearst in Appendix C to its brief use the word "affirmatively." Indeed, none of the statutory language cited by Hearst set forth how notice can be provided.

Notably, Hearst's argument relies solely on *U.S., ex rel. Simpson v. Bayer Corp.*, No. 05-3895, 2014 WL 1418293 (D.N.J. Apr. 11, 2014). However, the declination notice in *Simpson* made no reference to the States' position regarding declination and there was nothing indicating that the States were aware of the federal government's declination or the relator's pursuit of the action individually. *See* Certification of Robert A. Magnanini, Esq., dated January 11, 2022, at *Exhibit 1*. In stark contrast, here in the declination notice filed by the federal government more than six months ago, the United States expressly notified the Court that the States "have elected to decline to intervene." (ECF No. 3.)  Moreover, the States were

50

provided copies of the federal government's declination notice. *Id.* (*see* certificate of service). Given how much time has now passed since the service of the declination notice on the States that expressly stated that the States had declined, if any State disputed that position, surely that State would have now come forward with a contrary position.

Accordingly, each of the States have constructively notified this Court that it does not intend to move forward with the action, and the respective State statutes have been complied with.

## V.    REQUEST FOR LEAVE TO AMEND

In the event the Court grants Defendants' Motion to Dismiss, Relator requests that dismissal be without prejudice for a period of at least sixty days to afford him an opportunity to amend the Complaint under Fed. R. Civ. P. 15.

## CONCLUSION

For the reasons set forth above, Plaintiff-Relator respectfully requests that this Court deny Defendants' motions to dismiss the Amended Complaint in their entirety.

Dated:  January 11, 2022

Respectfully submitted,

By: *s/ Robert A. Magnanini*
Robert A. Magnanini
STONE & MAGNANINI LLP
100 Connell Drive, Suite 2200
Berkeley Heights, NJ 07922
Tel: (973) 218-1111
Fax: (973) 218-1106
rmagnanini@stonemagnalw.com

Kristi Stahnke McGregor
EVANGELISTA WORLEY LLC
500 Sugar Mill Rd. Suite 245A
Atlanta, GA 30350
Tel: (404) 205-8400
Fax: (404) 205-8395
kristi@ewlawllc.com

Arvind Khurana
KHURANA LAW FIRM, P.C.
116 West 23rd St. 5th Fl.
New York, NY 10011
Tel: (212) 847-0145
akhurana@khuranapc.com

*Attorneys for Plaintiff-Relator*

52

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 11, 2022, the foregoing Plaintiff's Omnibus Response in Opposition to Defendants' Motions to Dismiss the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6) was filed electronically with the Court's Case Management/Electronic Case Files (CM/ECF) docketing system. Notice of this filing will be sent to all parties by operation of the CM/ECF system. Parties may access this filing through the CM/ECF system.

By: *s/ Robert A. Magnanini*
Robert A. Magnanini, Esq.
STONE & MAGNANINI LLP
rmagnanini@stonemagnalaw.com
100 Connell Drive, Suite 2200
Berkeley Heights, NJ 07922
Telephone: (973) 218-1111
Facsimile: (973) 218-1106

*Attorneys for Plaintiff-Relator*

53