NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, *ex rel.* MARK SCHIEBER, | : : : |
| Plaintiff, | : Civil Action No.: 19-12675 : |
| v. | : : |
| | : **OPINION** |
| HOLY REDEEMER HEALTHCARE SYSTEM, INC. *et al.* | : : : |
| Defendants. | : : |

**CECCHI, District Judge**

This matter comes before the Court by way of Defendants Hearst Corporation ("Defendant Hearst") and Homecare Homebase, LLC's ("Defendant HCHB" and together, "Defendants") motion to dismiss (ECF No. 24) Plaintiff-Relator Mark Schieber's ("Relator") First Amended Complaint (ECF No. 5, "FAC").[1] Relator filed an opposition to Defendants' motion (ECF No. 39) and Defendants filed a reply (ECF Nos. 44). At the Court's request, the parties also submitted supplemental briefing. ECF Nos. 77-78. The Court held oral argument on October 5, 2023. ECF Nos. 80, 84 ("Hr'g Tr."). For the reasons set forth below, Defendants' motion to dismiss (ECF Nos. 24) is **DENIED** in part and **GRANTED** in part.

---

[1] A separate motion to dismiss was filed by Defendants Holy Redeemer Healthcare System, Inc. ("Defendant HRHS"), Holy Redeemer Home Care, Inc. ("Defendant HRHC"), and Holy Redeemer Hospice, Inc. ("Defendant Holy Redeemer Hospice"). ECF No. 27. Because Relator and these Defendants (together, the "Holy Redeemer Defendants") have reached a settlement in principle, ECF No. 97, the Holy Redeemer Defendants' motion to dismiss (ECF No. 27) is hereby administratively terminated. Accordingly, the Court's opinion pertains only to Relator's claims against Defendants HCHB and Hearst.

I.  **BACKGROUND**

This action arises out of Relator's assertion that Defendants engaged in a scheme to defraud the United States and numerous individual states "through a system, pattern and practice of fraudulently increasing reimbursement [payments] for home health services." ECF No. 39 at 2. Plaintiff filed this *qui tam* action on behalf of the United States, and 27 individual states[2] and the District of Columbia (collectively, the "States") under the federal False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, the States' equivalent false claims statutes, and the insurance fraud statutes of Illinois and California. *See generally* FAC. On June 4, 2021, the United States notified the Court that it declined to intervene in this action, and that the States have likewise "elected to decline to intervene." ECF No. 3 at 1-2.

a.  **The Relevant Parties**

Relator is a licensed physical therapist and New Jersey resident who was a part-time employee of Defendant HRHC for approximately 17 years, until September 2019. FAC ¶ 10. Defendant HRHC is a New Jersey nonprofit corporation that operates a number of home care providers, including Defendant Holy Redeemer Hospice. *Id.* at ¶ 16. In addition to a variety of other services, the Holy Redeemer Defendants provide homecare, hospice, and palliative care services. *Id.* at ¶ 12.

Defendant Hearst is a publicly traded corporation that purportedly maintains interest in a number of healthcare information companies across the United States. *Id.* at ¶ 17-18. One of those healthcare information companies is Defendant HCHB, in which Defendant Hearst allegedly maintains a majority interest. *See id.* at ¶¶ 4, 17, 19. Defendant HCHB is an entity that "provides

---

[2] In addition to the District of Columbia, the 27 states include: California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Vermont, Virginia and Washington.

a fully integrated Software-as-a-Service ('SaaS') application for homecare and hospice agencies." FAC ¶ 19. According to the FAC, Defendant HCHB's SaaS application "enables real-time information exchange among field staff . . . and office staff and physicians" about patient care. FAC ¶ 20. According to Relator, the SaaS application is "the nation's #1 homecare software," servicing "over 350,000 patients every day, accounting for more than 25% of the annual Medicare revenue for home health and hospice." *Id.* at ¶ 19.

### b. The Home Health Coverage Framework

The federal Social Security Act, 42 U.S.C. § 1395, *et seq.*, provides Medicare coverage for certain "home health services," which are defined as "items and services" that are provided on a "visiting basis" by home health agencies. *See* 42 U.S.C. § 1395x. Coverage is only provided for services that are deemed reasonable and medically necessary. 42 U.S.C. § 1395y(a)(1)(A). A patient's qualification for coverage for home health services is determined after a registered nurse or therapist from a home health agency conducts a comprehensive assessment "encompassing the patient's clinical, functional, and service characteristics." ECF No. 5 at ¶ 28 (citing 42 C.F.R. § 484.55). At that time, the registered nurse or therapist will determine the patient's eligibility and care needs, which will impact Medicare's reimbursement payment rates. *Id.* at ¶¶ 29-31.

During the relevant time period, Medicare calculated its reimbursement payments for medically necessary home health services through use of a Prospective Payment System ("PPS"). *See* ECF No. 5 at ¶ 27; 42 U.S.C. § 1395fff; 42 C.F.R. § 484. The PPS utilized a "national prospective 60-day episode payment" method, whereby the Centers for Medicare and Medicaid Services ("CMS") would make a partial payment for the presumptive services that the patient would require for a 60-day period. ECF No. 5 at ¶¶ 27, 32. Simplified for purposes of the present action, CMS's payment structure would depend in part on the timing of the patient's "episode"

and the number of home therapy visits that were required during that episode. *Id.* at ¶ 35. For example, payment would differ for patients who required zero to thirteen therapy visits and patients who required fourteen to nineteen visits. *Id.* In other words, increased therapy visits resulted in raised reimbursement payments. *Id.* Relatedly, if a patient required only four or less therapy visits during an episode, CMS used a "low utilization payment adjustment" ("LUPA") to reimburse payments on a lower, "per-visit basis." *Id.* at ¶ 36 (citing 42 C.F.R. § 484.230). In the event that a patient requires less care than was originally expected, the home health agency "may [be] obligated to repay amounts already received [by CMS] as a prospective payment." *Id.*

Medicaid is a separate federal health insurance program for qualifying low-income individuals that is administered by participating states. *See* ECF No. 5 at ¶ 44. Care providers are paid by the state based on a set of established rates for certain types of care and the federal government reimburses the state for a statutorily determined share of the expenses paid. *Id.* (citing 42 U.S.C. § 1396b(a)(1)). In New Jersey, for example, the federal government currently covers 50% of the state's Medicaid services costs. *Id.* at ¶ 46. Like under Medicare, New Jersey Medicaid covers costs for home health services provided by eligible home health agencies. *Id.* at ¶ 49 (quoting N.J.A.C. § 10:60-2.1(a)). Home health services are covered only if the patient's need for such services is certified by an attending practitioner and certain "face-to-face encounter" requirements are met. *Id.* at ¶ 50 (quoting N.J.A.C. § 10:60-2.2). In New Jersey, qualifying home health agencies are reimbursed at the applicable pre-determined rates for every "full 15 minute interval of face-to-face service in which hands-on medical care was provided" to a patient. *Id.* at ¶ 52 (quoting N.J.A.C. § 10:60-2.5(c)(1)(i)).

### c. The Alleged Fraudulent Scheme

Relator alleges that Defendants engaged in a scheme to defraud the United States by seeking reimbursement for an overinflated amount of home health services. Relator claims that Defendant HCHB's SaaS application "was intentionally designed to inflate reimbursements from Medicare, Medicaid, and private health insurance." FAC ¶ 55. The SaaS application purportedly "caused" home health providers to "upcode" services claims because it "automatically and repeatedly prompted the provider to select a higher number of necessary visits." *Id.* at ¶¶ 55, 60. For example, if a provider determined that a patient required twelve home visits, the SaaS application would allegedly provide a prompt stating: "There are 12 therapy visits. The next level begins at 14. Are further edits needed?" *Id.* at ¶ 61. And if a provider input four or fewer visits, the SaaS application would purportedly "prompt [a provider] to increase his assessment to six (6) visits" to avoid the downward reimbursement afforded under the LUPA framework. *Id.* at ¶¶ 65-66. Relator alleges that he personally saw these prompts on the SaaS application during his time working for Defendant HRHC and another unnamed provider. *Id.* at ¶¶ 57, 61, 63, 65, 67. Relator further alleges that, "[u]pon information and belief, most nurses and therapists simply accepted the [SaaS] prompt to increase the number of visits."[3] *Id.* at ¶¶ 64, 68.

Relatedly, Relator alleged that the Holy Redeemer Defendants instructed their staff to inflate reimbursement revenues when using the SaaS application to code patient metrics. Specifically, they allegedly instructed staff to "(1) inflate the number of home health visits a

---

[3] Relator also alleges that, "when the PPS for home healthcare changed at the beginning of 2020, the [SaaS] software stopped prompting nurses and therapists to increase the number of visits." *Id.* at ¶ 69. As of January 1, 2020, the PPS model transitioned to a "patient-driven grouping model" ("PDGM"), whereby 30-day periods were used to assess the payment for a patient's required care. *Id.* at ¶ 39. Among other changes, the threshold range of home visits that impacts reimbursement costs (*i.e.*, whether CMS makes a set payment or invokes the LUPA per-visit payment structure) now varies considerably depending on a wide range of factors. *Id.* at ¶¶ 39-40.

patient needed, (2) [inflate] the severity of the patient's condition, and (3) inflate the duration of those visits without necessity or justification." *Id.* at ¶ 56.

### d. Procedural History

Relator filed his complaint in this action under seal on May 17, 2019. ECF No. 1. Soon thereafter, this Court administratively terminated the case pending the United States' decision to intervene. ECF No. 2. On June 4, 2021, the United States alerted the Court that it was declining to intervene in this case, as were the States. ECF No. 3 at 1. As such, the Court reinstated Relator's action on July 22, 2021. ECF No. 4. On August 11, 2021, Relator filed the operative First Amended Complaint. ECF No. 5. Thereafter, Defendants HCHB and Hearst filed a motion to dismiss the FAC, ECF No. 24, and the Court held oral argument on Defendants' motion, ECF Nos. 80, 84.

## II.     LEGAL STANDARD

To survive dismissal under Fed. R. Civ. P. 12(b)(6), a complaint must meet the pleading requirements of Rule 8(a)(2) and "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted). In evaluating the sufficiency of a complaint, a court must also draw all reasonable inferences in favor of the non-moving party. *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008). However, a complaint "that offers 'labels and conclusions' or . . . tenders 'naked assertions' devoid of further factual enhancement," will not withstand dismissal under Rule 12(b)(6). *Iqbal*, 556 U.S. at 678 (citations omitted). Likewise, a "pleading that offers . . . 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.*

A complaint asserting fraud claims under the FCA must comply with the requirements of Fed. R. Civ. P. 9(b). *See Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 155 (3d Cir. 2014).

Rule 9(b) states that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  In this Circuit, a viable FCA claim requires allegations of "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted."  *Foglia*, 754 F.3d at 156-57; *see also United States v. Johnson & Johnson*, No. 12-7758, 2017 WL 2367050, at *2 (D.N.J. May 31, 2017).  The complaint need not "identify a specific claim for payment *at the pleading stage* of the case to state a claim for relief."  *Johnson & Johnson*, 2017 WL 2367050, at *2 (quoting *Foglia*, 754 F.3d at 156) (emphasis in original).

### III.  DISCUSSION

#### a.  Relator's Claims Against Defendant Hearst

At the outset, Defendants HCHB and Hearst argue that all claims should be dismissed as to Defendant Hearst because Relator "does not allege any facts sufficient to show Hearst Corporation's direct involvement or participation in causing the alleged submission of fraudulent claims."  ECF No. 24-1 at 38.  The Court agrees.  The FAC is devoid of allegations relating to Defendant Hearst except to the extent that it asserts Defendant HCHB "is 85 percent owned by Hearst."  FAC ¶ 19.  As the Third Circuit has recognized, without more, "mere ownership of a subsidiary does not justify the imposition of liability on the parent."  *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 484 (3d Cir. 2001).  Tellingly, Relator does not respond to this argument in his opposition.  Therefore, consistent with the remainder of this Opinion, all claims are hereby dismissed without prejudice against Defendant Hearst.

#### b.  Relator's Claims Under the Federal False Claims Act

Relator asserts claims against Defendant HCHB under the FCA on three bases:  (i) presenting or causing to be presented a false claim under 31 U.S.C. § 3729(a)(1)(A); (ii) making

7

or using a false statement in connection with a claim under 31 U.S.C. § 3729(a)(1)(B); and (iii) conspiracy under 31 U.S.C. § 3729(a)(1)(C).[4]

### i. Submission of False Claims/Statements Under 31 U.S.C. § 3729(a)(1)(A) and 31 U.S.C. § 3729(a)(1)(B)

Under the FCA, it is "unlawful to knowingly submit a fraudulent claim to the government." *United States ex rel. Schumann v. Astrazeneca Pharm. L.P.*, 769 F.3d 837, 840 (3d Cir. 2014). In particular, an individual violates § 3729(a)(1)(A) if he or she "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). Similarly, an individual violates § 2729(a)(1)(B) if he or she "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B). The Third Circuit has held that such claims under the FCA require establishing four elements: falsity, causation, knowledge, and materiality. *United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 487 (3d Cir. 2017).

### 1. Falsity & Causation

"An actionable claim [under the FCA] can be factually or legally false." *United States ex rel. Bennett v. Bayer Corp.*, No. 17-CV-4188, 2022 WL 970219, at *6 (D.N.J. Mar. 31, 2022). A factually false claim is one in which "the claimant misrepresents what goods or services [were] provided to the Government."[5] *Id.* (quoting *United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 305 (3d Cir. 2011)). Defendant HCHB argues that the FAC fails to assert a factual falsity on its part because it fails to allege that any services provided by the Holy Redeemer

---

[4] Plaintiff also asserted a "reverse false claims" action (Count Four) against Defendants under 31 U.S.C. § 3729(a)(1)(G); however, in his opposition briefing, Relator "withdraws [his] Reverse False Claims claim against the Hearst Defendants." ECF No. 39 at 28 n.9. As such, Relator's § 3729(a)(1)(G) claim (Count Four) is dismissed with prejudice as to Defendants HCHB and Hearst.

[5] Because the Court finds that Relator's FAC adequately alleges that Defendant HCHB caused the submission of factually false claims and records, it need not assess Defendants' legal falsity argument. *See* ECF No. 24-1 at 23.

Defendants "were falsely or fraudulently increased by HCHB, that the [SaaS] software automatically increased the number of visits, or that HCHB inputted any 'objectively untrue' data in the software." ECF No. 24-1 at 19. Relatedly, they argue that the prompts provided by the SaaS application displayed objectively true statements. *Id.* at 20; Hr'g Tr. at 24:19-25:1.

At the outset, it is inconsequential that Defendant HCHB did not itself manipulate patient data in the SaaS application or submit any statements or claims for reimbursement. Liability under the FCA may attach to a party that "assist[s] the filing of a false claim in other ways," even if the party has not "reviewed, approved, or received . . . or participated in the[ ] preparation" of the claim. *United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 243 (3d Cir. 2004); *see also United States v. Albinson*, No. 09-CV-1791, 2010 WL 3258266, at *11 (D.N.J. Aug. 16, 2010); *United States ex rel. Perri v. Novartis Pharms. Corp.*, No. 15-cv-6547, 2019 WL 6880006, at *9 (D.N.J. Feb. 21, 2019) ("[D]efendants can be found liable under the FCA even if they did not actually present false claims to the government."). In the Third Circuit, "ordinary causation principles from negligence law [are used] in determining responsibility under the FCA." *Schmidt*, 386 F.3d at 244. A party may therefore cause a false claim or record to be submitted if the party was "a substantial factor in bringing about" the filing of the false claim or record. *See id.*; *see also Albinson*, 2010 WL 3258266, at *11.

Here, Relator alleges that Defendant HCHB caused home health providers to submit factually false claims through use of its SaaS application. FAC ¶ 60. In particular, Relator asserts that Defendant HCHB's SaaS application "automatically and repeatedly prompted the [Holy Redeemer Defendants'] provider[s] to select a higher number of [patient] visits" even if such visits were not medically necessary. *Id.* To the extent Relator must show that this inflation of patient metrics "was a normal consequence of the situation created by [Defendant HCHB's] scheme," *see*

9

*Schmidt*, 386 F.3d at 245, the FAC contends that the SaaS application was intentionally designed and marketed as a tool to raise revenues, FAC ¶¶ 20, 55; ECF No. 39 at 21; *see also Schmidt*, 386 F.3d at 244 ("Zimmer created and pursued a marketing scheme that it knew would, if successful, result in the submission . . . of compliance certifications required by Medicare that Zimmer knew would be false.").

In other words, even if the SaaS application's prompts were factually accurate, Relator contends that the software "was intentionally designed to inflate reimbursements from Medicare." *Id.* at ¶ 55. Relator alleges that the mere existence of the prompts and the particular language they employ (*i.e.*, only identifying higher patient-care levels) encouraged upcoding of patient metrics. Hr'g Tr. at 46:19-48:5. The FAC asserts that home health providers blindly complied with those prompts, *id.* at ¶ 64, and were thus caused to submit factually false records in support of fraudulent claims, *id.* at ¶ 85; *see also In re Plavix Marketing, Sales Practices & Prods. Liab. Litig.*, 123 F. Supp. 3d 584, 601 (D.N.J. 2015) (finding FCA claim may be facially viable where defendant's alleged "marketing [scheme] caused claims to be submitted for payment which did not comply with federal and state conditions for payment").

Defendant HCHB relies on *Integra Med Analytics LLC v. Providence Health & Services*, where the defendants allegedly provided doctors with leading tips and queries to "incentivize[ ] [them] to use language conducive to coding higher-paying secondary diagnoses" for patients. 854 F. App'x 840, 844 (9th Cir. 2021). The plaintiff pointed to statistics showing that the medical provider in question submitted claims with secondary diagnoses "at a higher rate than most other comparable institutions." *Id.* The Ninth Circuit dismissed the FCA claim because the plaintiff did "not rule out [the] obvious alternative explanation" that the defendant, one of the nation's largest healthcare providers, "was simply ahead of others in its industry." *Id.* ("Integra offers only a

*possible* explanation . . . to explain a statistical trend that is consistent with a plausible alternative (and legal) explanation.").

In response, Relator points to *United States ex rel. Osinek v. Kaiser Permanente*, where the district court upheld an FCA claim predicated on similar conduct. No. 13-cv-03891, 2023 WL 4054279, at *6-7 (N.D. Cal. June 15, 2023). The Court distinguished the case before it from *Integra*, where the plaintiff's "allegations *on their own* were not enough to support the conclusion that doctors [actually] 'recorded unsupported medical conditions'" as a result of the defendant's leading inquires. *Id.* at *6 (internal citation omitted). In contrast, among other things, the *Kaiser* plaintiff alleged that medical providers were given leading queries by the defendant, physicians were pressured to re-diagnose patients with prior ailments that were no longer reflected in the patient's files, physicians otherwise had their reports changed to characterize prior diagnoses as active ailments, and this conduct led to "more than just sporadic incorrect diagnosing." *Id.* at *5-7. On these facts, the district court found that the defendant's alleged conduct plausibly caused the submission of false claims. *See id.* at *6.

The Court is persuaded that Relator's allegations are more akin to those asserted in *Kaiser*. Here, Relator alleges that (i) the SaaS application's prompts only alert home health providers of the number of additional home visits needed to reach a *higher* reimbursement scale, (ii) the software would prompt the user a second time "[i]f the provider declined to enter a higher number of visits," and (iii) the prompt would allegedly appear only *after* the medical professional had already entered the patient data they deemed appropriate. *Id.* at ¶¶ 60-66. It is plausible that, as Relator alleges, Defendant HCHB intentionally designed the software prompts to help home health providers inflate their Medicare reimbursements. FAC at ¶ 55. When asked why such prompting was needed at all, Defendant HCHB merely stated that the information is helpful for the medical

11

provider to understand "the level of patient care [a] [patient] is going to need in that time period; and . . . where they fall within the billing framework."  Hr'g Tr. at 29:5-30:10.  While possible, Defendant HCHB's alternative explanation is not so plausible that it renders Relator's well-pleaded allegation implausible.  *See Kaiser*, 2023 WL 4054279, at *4 ("Kaiser's alternative explanation is not so convincing that Plaintiffs' explanation is thereby rendered implausible.").

In addition, like the *Kaiser* plaintiff and unlike the *Integra* plaintiff, Relator also plausibly alleges that home health providers were actually led to inflate patients' treatment records.  *See, e.g.*, FAC at ¶¶ 64, 68 (alleging that "most nurses and therapists simply accepted the prompt to increase the number of visits").  Indeed, Relator contends that management for the Holy Redeemer Defendants encouraged employees using the SaaS application "to increase reimbursements by unjustifiably increasing the number of visits a patient required," FAC at ¶ 59, or otherwise manually changed patient records to inflate those metrics, *id.* at ¶ 76.  While this conduct is not directly attributable to Defendant HCHB, it may still be liable to the extent it knew and/or contributed to this fraudulent scheme.  *See, e.g.*, *United States ex rel. Tran v. Computer Scis. Corp.*, 53 F. Supp. 3d 104, 127 (D.D.C. 2014) (collecting cases where "the non-submitting entity [who] was not the prime mover of the alleged fraud" was still potentially liable, and noting that "a court must look at the degree to which that party was involved in the scheme that results in the actual submission" of false claims).[6]

---

[6] The Court is not persuaded by Defendant HCHB's remaining out-of-circuit precedent.  *See, e.g.*, *United States ex rel. Petrowski v. Epic Sys. Corp.*, No. 15-CV-1408, 2018 WL 1027147, at *4 (M.D. Fla. Feb. 6, 2018) (dismissing FCA claim where complaint asserted "no facts as to how [relator] knew how other healthcare providers used the [defendant's] billing software" and failed to allege "that her former employer . . . actually submitted any false claims using [the defendant's] billing software"); *United States ex rel. Olcott v. Southwest Home Health Care, Inc.*, No. 12-CV-605, 2018 WL 4568635, at *4-5 (N.D. Okla. Sept. 24, 2018) (dismissing FCA claim where complaint lacked allegations that the identified employee "was acting at the direction of" or "within the scope of" his employment for the software company).  In contrast to these cases, as noted above, Relator alleges that Defendant HCHB designed and marketed a software that was intended to inflate home health agencies' reimbursement payments and that providers, specifically the Holy Redeemer Defendants, actually used the software to submit false claims.

12

For the reasons set forth above, at the pleadings stage, Relator has sufficiently asserted that Defendant HCHB's alleged conduct was a substantial factor in bringing about the submission of false records or claims.

### 2. Knowledge

Knowledge under the FCA is (i) "actual knowledge of the information"; (ii) "deliberate ignorance of the truth or falsity of the information"; or (iii) "reckless disregard of the truth or falsity of the information." *United States ex rel. Spay v. CVS Caremark Corp.*, 875 F.3d 746, 758 (3d Cir. 2017) (quoting 31 U.S.C. § 3729(b)(1)(A)(i)-(iii)). A relator need not allege any "specific intent to defraud." *Id.* (quoting 31 U.S.C. § 3729(b)(1)(b)); *see also United States v. Bracco USA, Inc.*, No. 20-CV-8719, 2022 WL 17959578, at *5 (D.N.J. Dec. 27, 2022) ("The FCA is extensive in its coverage and is intended to 'reach any person who knowingly assisted in causing the government to pay claims which were grounded in fraud.'" (quoting *Schmidt*, 386 F.3d at 243)). The Supreme Court recently clarified that "[t]he FCA's scienter element refers to [a defendant's] knowledge and subjective beliefs—not to what an objectively reasonable person may have known or believed." *United States ex rel. Schutte v. SuperValu, Inc.*, 598 U.S. 739, 749 (2023).

Defendant HCHB argues knowledge is inadequately pleaded in the FAC because Relator's "sole argument . . . is that HCHB developed the software's coding around the payment thresholds set by CMS that encouraged the upcoding prompts." ECF No. 44 at 7. The Court disagrees. The FAC alleges that Defendant HCHB is the creator of "the nation's #1 homecare software," which "generates over $125 million in annual revenues" and "account[s] for more than 25% of the annual Medicare revenue for home health and hospice." FAC ¶ 19. Relator explains, both in detail and from alleged personal experience, how the SaaS application "automatically and repeatedly prompted provider[s] to select a higher number of visits" after they had already "input the number

13

of necessary visits" into the software. *Id.* at ¶ 60.  Defendant HCHB points to Relator's admission that "HCHB may not have had actual knowledge of each and every time the software prompted [an] increase in visits." ECF No. 77 at 4 (internal citation omitted).  Even if true, based on Relator's allegations and Defendant HCHB's alleged market presence, it is still plausible that Defendant HCHB actually knew the software's prompts would lead home health providers to submit records claims containing inaccurate patient metrics.  *See* ECF No. 78 at 3; *see also SuperValu Inc.*, 598 U.S. at 752 (noting the focus is on a defendant's actual knowledge at the time the alleged false claim was submitted).  Indeed, the FAC alleges that Defendant HCHB's software was "intentionally designed to inflate reimbursements" by "causing providers to 'upcode' claims." FAC ¶ at 55.  Further speaking to Defendant HCHB's alleged knowledge, Relator contends that the SaaS application was programed to stop issuing these prompts when the number of home visits was no longer directly relevant for purposes of calculating Medicare reimbursements.  *Id.* at ¶ 69.

In any event, such allegations are sufficient to plead that Defendant HCHB exhibited at least deliberate ignorance to or a reckless disregard for the falsity of information being coded on its software in response to the prompts.  *See, e.g.*, *Schmidt*, 386 F.3d at 244 (finding knowledge sufficiently alleged where relator pleads that "[defendant] created and pursued a [ ] scheme that it knew would, if successful, result in the submission by [a separate party] . . . of [records] required by Medicare that [defendant] knew would be false"); *United States v. Wavefront, LLC*, No. 20-CV-5094, 2021 WL 37539, at *10 (D.N.J. Jan. 5, 2021) (finding knowledge adequately pleaded where the allegations "either explicitly state or support a reasonable inference that Defendants were aware of the falsity"); *see also* ECF No. 78 at 3.

14

### 3. Materiality

"[A] misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the [FCA]." *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 192 (2016). Materiality is defined as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money." 31 U.S.C. § 3729(b)(4).

In the FAC, Relator alleges that the "false records or statements [submitted or caused to be submitted by Defendants] . . . were material to the government's decision to pay." FAC ¶ 86. In particular, Relator alleges that "Medicare will not pay for home health services . . . unless those patients . . . require intermittent skilled nursing care or skilled therapy." FAC ¶ 38. He further alleges that Defendants would not have received payment for their purportedly false claims because "they contained unnecessary medical services that falsely represented the [beneficiaries'] medical conditions," *id.* at ¶ 3, and "Medicare providers may not bill the United States for medically unnecessary services," *id.* at ¶ 41; *see also United States v. Johnson & Johnson*, No. 12-CV-7758, 2017 WL 2367050, at *6 (D.N.J. May 31, 2017) (finding materiality sufficiently pleaded where complaint alleged that submitted claims were "ineligible for reimbursement"). In fact, Relator notes that medical necessity is a "universal requirement of the Medicare program." FAC ¶ 41; *see also Universal Health Servs.*, 579 U.S. at 194 ("[P]roof of materiality can include . . . evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance."). At this stage, the Court finds that these allegations are sufficient to plead materiality.

For the reasons set forth above, the Court will not dismiss Relator's claims under § 3729(a)(1)(A) and § 3729(a)(1)(B) (Counts One & Two) against Defendant HCHB.

### ii.  Conspiracy Under 31 U.S.C. § 3729(a)(1)(C)

To state a conspiracy claim under the FCA, a relator must allege (1) "a conspiracy to get a false or fraudulent claim allowed or paid" and (2) "an act in furtherance of the conspiracy." *United States v. Medco Health Sys., Inc.*, No. 12-CV-522, 2014 WL 4798637, at * (D.N.J. Sept. 26, 2014) (internal citation omitted); *see also United States ex rel. Atkinson v. PA. Shipbuilding Co.*, 473 F.3d 506, 513 (3d Cir. 2007). "Importantly, an agreement between two or more persons is the 'essence' of a conspiracy under the FCA." *United States v. Premier Educ. Grp., L.P.*, No. 11-CV-3523, 2016 WL 2747195, at *19 (D.N.J. May 11, 2016).

Relator's FAC alleges that "Defendants' entered into a conspiracy or conspiracies through their employees and offices to defraud the United States by upcoding home health therapy visits." FAC ¶ 90. This assertion is conclusory and too vague to state a plausible claim for relief. *See Premier Educ. Grp., L.P.*, 2016 WL 2747195, at *19 (dismissing conspiracy claim where complaint "does not specify which specific entities or persons were party to the alleged conspiracy"). Relator otherwise predicates his conspiracy claim on the fact that "Holy Redeemer licensed the software from HCHB for the improper purpose of increasing revenues from medically unnecessary home health visits." ECF No. 39 at 40. However, a licensing agreement, without more, is insufficient to plausibly allege an agreement amongst Defendants to defraud the government. *See, e.g.*, *Scibetta v. AcclaiMed Healthcare*, No. 16-CV-02385, 2021 WL 5450296, at *7 (D.N.J. Nov. 22, 2021) ("Merely alleging that two companies shared . . . billing information to effectuate the submission of false claims is insufficient to state a claim for conspiracy."). Therefore, Relator's conspiracy claim (Count Three) against Defendant HCHB is dismissed without prejudice.

### c. Relator's State Law Claims

In addition to his federal FCA claims, Relator also brings a number of state-law claims (Counts Five through Thirty-Two) against Defendants under the equivalent false claim statutes of 27 states and the District of Columbia, and the insurance fraud statutes of Illinois and California (Counts Thirty-Three and Thirty-Four).

### i. Relator's State FCA Claims

At the outset, the Court notes, and Defendants do not contest, that "each of the State FCAs require substantially identical proofs to the Federal FCA." ECF Nos. 24-1 at 35; *see also United States ex rel. Rahimi v. Zydus Pharma., Inc.*, No. 15-CV-6536, 2017 WL 1503986, at *12 (D.N.J. Apt. 26, 2017) (noting a "substantial similarity between the [federal] FCA and each of the state false claims statutes"); *Portilla*, 2014 WL 1293882, at *18 (adjudicating New Jersey FCA ("NJFCA") claim using federal FCA standards). However, upholding state-law FCA claims on grounds that a plaintiff's federal FCA claims survive is only appropriate where a defendant's challenges to the state and federal claims are congruent. *See, e.g.*, *Portilla*, 2014 WL 1293882, at *9 (noting parallel outcomes on federal and NJFCA claims are appropriate where "the parties raise no arguments specific to the state statutes"); *United States ex rel. Petratos v. Genetech, Inc.*, 141 F. Supp. 3d 311, 322 (D.N.J. 2015) (deciding NJFCA claim consistent with ruling on federal FCA claim where "[d]efendants argue[d] that state law claims must be dismissed [ ] for the same reasons as the federal claims").

Here, Relator's state-law FCA claims fail as a matter of law. While Relator successfully alleges certain federal FCA claims against Defendant HCHB, those claims are solely predicated on the company's SaaS application and the prompts that it utilizes. And as Defendant HCHB notes, Relator's "allegations regarding the software 'prompts' all relate to reimbursement under

Medicare and not New Jersey Medicaid, which has a different reimbursement methodology than Medicare." ECF No. 24-1 at 37; *see also* Hr'g Tr. at 36:9-18. Indeed, Relator admits that New Jersey Medicaid reimbursements are predicated on the length of home health visits. Hr'g Tr. at 39:3-18; FAC at ¶¶ 52, 72-75. Yet, his allegations regarding the software prompts all relate to inflating the *number* of home health visits (a metric for Medicare), not the *duration* of visits (a metric for New Jersey Medicaid). *See* FAC at ¶¶ 60-68.

Defendant HCHB further contends that "[t]he FAC fails to allege how or even if HCHB's software in any way prompted users regarding information relevant to . . . Medicaid [in] any of the other 26 states and the District of Columbia." ECF No. 24-1 at 37. The Court agrees that this is detrimental to Relator's state-law claims. *See, e.g.*, *United States v. Exec. Health Res., Inc.*, 196 F. Supp. 3d 477, 506 (E.D. Pa. 2016) (upholding federal FCA claim but dismissing state FCA claims where relator failed to "sufficiently allege falsity . . . under the requirements of dozens of particular state Medicaid programs"); *Carson v. Select Rehab., Inc.*, No. 15-cv-5708, 2023 WL 5339605, at *21 (E.D. Pa. Aug. 18, 2023) (dismissing state FCA claims where relator "fail[ed] to plead how Medicaid reimbursement works under each state's laws"). And while the FAC otherwise broadly alleges that the "software was intentionally designed to inflate reimbursements from . . . Medicaid," FAC at ¶ 55, that allegation without more is insufficient to plausibly allege that Defendant HCHB caused the submission of false Medicaid claims. Accordingly, Relator's state-law claims will be dismissed without prejudice against Defendant HCHB.

### ii. Relator's State Insurance Claims

Defendant HCHB further argues that Relator's state-law insurance claims should be dismissed because he has "failed to allege [Defendant HCHB's] . . . specific intent to defraud th[e] insurers," ECF No. 24-1 at 35, which is required under California and Illinois law, *see, e.g.*, *People*

*ex rel. Gov. Employees Ins. Co. v. Cruz*, 244 Cal. App. 4th 1184, 1193 (2016) (finding it a requirement under the Insurance Fraud Prevention Act to show "the intent to defraud"); 740 Ill. Comp. Stat. Ann. 92\5; 740 Ill. Comp. Stat. Ann. 5/17-10.5; 740 Ill. Comp. Stat. Ann.5/17-8.5. However, as Defendant HCHB also points out, claims under these statutes typically rise or fall with the underlying federal FCA claims. ECF No. 24-3 at 12-13; *United States ex rel. Zverev v. USA Vein Clinics of Chicago, LLC*, 244 F. Supp. 3d 737, 743 (N.D. Ill. 2017) (noting that "various state laws [such as the Illinois Insurance Claims Fraud Prevention Act] . . . require the same elements as the [federal] FCA"); *United States v. Orthopedic Alliance, LLC*, No. 16-CV-3966, 2020 WL 8173025, at * (C.D. Cal. Nov. 19, 2020) (noting that claims under the California Insurance Fraud Prevention Act are "guided by the same principles as the Court's analysis of the [federal] FCA claims"). Because Relator's underlying federal FCA claims survive, so too do his California and Illinois insurance law claims.

## CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss (ECF No. 24) is **DENIED** in part and **GRANTED** in part. First, except as otherwise provided below, all claims in the FAC are hereby dismissed without prejudice against Defendant Hearst. Second, Relator's conspiracy claim (Count Three) under 31 U.S.C. § 3729(a)(1)(C) is hereby dismissed without prejudice. Third, Relator's claim under 31 U.S.C. § 3729(a)(1)(G) (Count Four) is hereby dismissed with prejudice. Fourth, Relator's state-law FCA claims (Counts Five through Thirty-Two) are dismissed without prejudice. Consistent with this Opinion, Relator's remaining claims survive. An appropriate order follows this Opinion.

Date: April 30, 2024

s/ Claire C. Cecchi
_____
**CLAIRE C. CECCHI, U.S.D.J.**
